**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
steven.serajeddini@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Rachael M. Bentley (*pro hac vice* pending)
Peter A. Candel (*pro hac vice* pending)
Ashley L. Surinak (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
rachael.bentley@kirkland.com
peter.candel@kirkland.com
ashley.surinak@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MULTI-COLOR CORPORATION, *et al.*, | Case No. 26-10910 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

---

[1]    The last four digits of Debtor Multi-Color Corporation's tax identification number are 5853.  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.veritaglobal.net/MCC.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  3284 Northside Parkway NW, Suite 400, Atlanta, Georgia 30327.

**DEBTORS' MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) USE CASH COLLATERAL,
AND (C) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

the following in support of this motion (the "Motion")[2] for the relief set forth herein.  In support

of this Motion, the Debtors submit the First Day Declaration, the *Declaration of Brent Banks in*

*Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors*

*to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and*

*Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain*

*Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,*

*and (V) Granting Related Relief* (the "Banks Declaration"), and the *Declaration of Eric Koza in*

*Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to*

*(A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and*

*Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain*

*Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,*

*and (V) Granting Related Relief* (the "Koza Declaration," and together with the Banks Declaration,

the "DIP Declarations"), filed contemporaneously herewith.  In further support of this Motion, the

Debtors respectfully state the following:

---

[2]  A detailed description of the Debtors, their business, and the facts and circumstances giving rise to the Debtors' chapter 11 cases is set forth in the *Declaration of Garrett Gabel, Chief Restructuring Officer of Multi-Color Corporation and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

2

**Introduction**

1.      As set forth in the First Day Declaration, after months of robust and competitive negotiations with various stakeholders around potential strategic alternatives, the Debtors commenced these chapter 11 cases to preserve the value of the Debtors' estates, implement the value-maximizing transactions set forth in the Restructuring Support Agreement, a copy of which is attached to the First Day Declaration as Exhibit A, and maximize recoveries for all stakeholders. As set forth in the Initial DIP Budget (as defined below), in light of the Debtors' significant ordinary course operating expenses and the Debtors' cash on hand as of the Petition Date (which totaled approximately $67 million), the Debtors have an immediate and critical need for an infusion of new money to fund the administration of these chapter 11 cases and ordinary course expenses in the immediate next weeks.  Accordingly, the Debtors seek authorization to enter into the DIP Facility (as defined below) in an aggregate principal amount of up to $657.5 million, with $150 million of such amount available upon interim approval of this Motion.  Immediate access to the DIP Facility will send a critical signal to the Debtors' stakeholders, including their customers and extensive foreign vendor base, that the Debtors are adequately capitalized during these chapter 11 cases and, given the support pursuant to the Restructuring Support Agreement, have a clear path to emergence.

2.      Absent the liquidity infusion and corresponding signal to the marketplace provided by the DIP Facility, the Debtors will not have enough cash on hand to continue operating in the ordinary course and risk material customer attrition and potential business disruption.  In the face of intensifying market noise surrounding the Company's financial health, the DIP Facility furthermore sends a strong, unequivocal message that the Company is backed by a committed group of lenders and a new money plan sponsor who intends to equitize and deleverage the business upon emergence from these chapter 11 cases.  The Restructuring Support Agreement and

the Secured Ad Hoc Group's support for these chapter 11 cases provide the Debtors with the opportunity for a prompt and efficient process towards confirmation of a chapter 11 plan and emergence. Conversely, without immediate access to the DIP Facility, the Debtors' ability to preserve its going-concern value is prejudiced. Furthermore, the Debtors would be unable to implement these chapter 11 cases and emerge as a going concern without such new money funding because there would be insufficient capital to fund ongoing operations and the administrative costs during these chapter 11 cases and make all necessary and timely payments to the Debtors' essential vendor and supplier partners, all in accordance with the initial 13-week cash flow projection, a copy of which is attached to the Interim Order (as defined below) as Schedule 1 (the "Initial DIP Budget").

3. The Restructuring Transactions embodied in the Restructuring Support Agreement for these chapter 11 cases provide the Debtors with the opportunity for a prompt and efficient process to exit. Importantly, the Restructuring Support Agreement enjoys the support of the (a) Consenting First Lien Lenders, which hold, in the aggregate, approximately 72.3% percent in principal of the obligations under the Cash Flow Revolving Facility, the U.S. Term Loan Facility, the European Term Loan Facility, and the Secured Notes, (b) the Sponsor, and (c) the Plan Sponsor. As a critical aspect of the Restructuring Transactions embodied in the Restructuring Support Agreement, the Debtors secured a commitment from the Plan Sponsor and the Consenting First Lien Lenders to provide the DIP Facility to fund the Debtors' operations and administrative costs during these chapter 11 cases and following emergence. As further described below and in the DIP Declarations, the DIP Facility is comprised of (a) $250 million of "new money" super priority debtor-in-possession loans and notes, (b) a "roll-up" of $250 million in the collective aggregate principal amount of the Cash Flow Term Loan Facility Claims, Cash Flow Revolving

Facility Claims, and Secured Notes Claims, (c) $7.5 million in the form of the Backstop Premium, and (d) up to $150 million in incremental "new money" super priority loans, which may be borrowed subsequent to the issuance of the Final New Money DIP Loans subject to the terms set forth in the DIP Documents to, among other things, fund certain emergence costs.  Importantly, the Restructuring Transactions contemplated by the Restructuring Support Agreement provide the Debtors with a clear path to exit chapter 11 while adequately capitalizing the Company during the pendency of these chapter 11 cases.

4.       The reasons necessitating the Company's access to additional liquidity through the DIP Facility are further laid out in detail in the First Day Declaration and the DIP Declarations. The Debtors' extremely limited cash on hand is insufficient to support both (a) the administrative costs of these chapter 11 cases and (b) the Company's ordinary course operations over the coming days while having no cushion for downside performance, which are essential to preserving the Debtors' going-concern value.  As set forth in the First Day Declaration and the DIP Declarations, the Debtors worked alongside their advisors—Kirkland & Ellis LLP ("K&E") as restructuring counsel, AlixPartners, LLP ("AlixPartners"), as financial advisor, and Evercore Group L.L.C. ("Evercore") as investment banker—to understand the Debtors' near-term liquidity and potential resolutions there.

5.       With the assistance of these advisors, the Company engaged in the aforementioned discussions with its stakeholders regarding additional solutions to address its substantial debt service obligations and significant liquidity constraints.  Ultimately, the Debtors, with their advisors, concluded that the value-maximizing path forward for the Debtors was a consensual restructuring with the Secured Ad Hoc Group designed to, among other things:  (a) allow the Debtors to successfully emerge from chapter 11 with a rightsized balance sheet and poised to

capitalize on their operational initiatives; (b) resolve Company liabilities in a manner that maintains the Debtors' ability to deliver their valuable products to their customer base, including paying trade claims through the duration of the Chapter11 Cases; and (c) provide DIP financing and exit capital to support the Company during the chapter 11 proceedings as a going concern.

6. As described more fully below and in the DIP Declarations, prior to the Petition Date, the Debtors worked diligently, in good faith, on transaction proposals with, among others, the Secured Ad Hoc Group and the Crossover Ad Hoc Group. The Debtors carefully considered the terms of each proposal and consulted with their advisors and the Special Committee to evaluate the same and determine the respective effects of each proposal on the Debtors, their estates, and their stakeholders. Ultimately, it became clear, considering the Debtors' circumstances, that the value-maximizing transactions contemplated by the Restructuring Support Agreement, which includes the provision of the DIP Facility, were most favorable to the Debtors, value maximizing, and in the best interests of their stakeholders.

7. Additionally, to further determine whether the DIP Facility represented the best available financing arrangement, in January 2026, the Debtors, with the assistance of Evercore, undertook a marketing process to solicit alternative proposals from third-party institutions, all of whom had done significant diligence on the Company during an out-of-court financing process as described in the Banks Declaration. Evercore re-engaged with eight potential financing sources (including the Crossover Ad Hoc Group) and all parties signed nondisclosure agreements. However, the Debtors were unable to generate any serious proposals from these third parties, all of whom were sophisticated parties with familiarity of the Company and its capital structure, for any postpetition financing prior to commencing these chapter 11 cases, primarily because the third parties did not want to provide any postpetition financing on a junior or unsecured basis.

8.    In addition, on January 25, 2026, the Debtors received a debtor-in-possession financing proposal from the Crossover Ad Hoc Group (the "Crossover Group DIP Proposal"). The Debtors, alongside their advisors, engaged with the Crossover Ad Hoc Group and its advisors to understand the Crossover Group DIP Proposal and assess its viability.  Ultimately, the proposal proved inactionable because it did not have the support of the Secured Ad Hoc Group, and, most importantly, was not coupled with a viable chapter 11 plan.  In light of the foregoing, Debtors' pursuant of the Crossover Group DIP Proposal would have resulted in significant delays to the chapter 11 process, increased costs, and a message of instability to their stakeholders, resulting in destruction of the Debtors' going-concern value.  The Debtors presented the Crossover Group DIP Proposal to the Secured Ad Hoc Group and their advisors, who indicated that it would not support the transactions contemplated in the Crossover Group DIP Proposal.  Therefore, given the challenges associated with the Crossover Group DIP Proposal, pursuit of such proposal proved to be an untenable option because it did not provide any viable path to emergence.

9.    The Debtors, with the assistance of Evercore, ultimately determined, after careful consideration and in an exercise of their business judgment, that entering into the DIP Facility was both necessary and in the best interests of their estates and their key stakeholders.  The Special Committee also determined, after a thorough review of the terms of the DIP Facility, that entering into the DIP Facility was in the best interests of the Debtors' estates.  Therefore, after careful consideration of all proposals, the Debtors concluded the DIP Facility was the best available source of financing.  As a result, in the weeks immediately prior to the Petition Date, the Debtors and the DIP Lenders (through their respective advisors) finalized the terms of the DIP Facility.

10.    The Debtors also seek the Court's authorization to continue using Cash Collateral (as defined below).  The Debtors have or expect to obtain the requisite consent to use the Debtors'

7

existing Cash Collateral prior to the interim hearing on this Motion, subject to the terms and limitations set forth in the Interim Order. Given the nature of the Debtors' business and the circumstances of these chapter 11 cases, the Debtors require immediate access to Cash Collateral. Absent the ability to use Cash Collateral, the Debtors will be unable to meet their near-term working-capital needs, such as funding payroll and operational expenses, and the Debtors' ability to maintain favorable relationships with their suppliers, customers, and employees will be impaired as a result.

11. As a whole, the DIP Facility represents the culmination of extensive prepetition negotiations between the Debtors and the DIP Secured Parties and is the best financing option currently available for the Debtors in these chapter 11 cases that comes with a path to confirmation of a chapter 11 plan and emergence from these chapter 11 cases. Access to the DIP Facility will provide the Debtors with crucial liquidity necessary to effectively and efficiently administer these chapter 11 cases, allowing the Debtors to focus on consummating the Restructuring Transactions contemplated in Restructuring Support Agreement.

12. Thus, for the reasons set forth in this Motion, in the First Day Declaration, and in the DIP Declarations, the Debtors believe that approval of the DIP Facility and access to Cash Collateral will maximize the value of the Debtors' estates for the benefit of all stakeholders and is a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the Court approve the relief requested herein and enter an interim order substantially in the form to be filed (the "Interim Order")[3] and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders").

---

[3]   The Debtors will file the form of Interim Order promptly after the filing of this Motion.

**Jurisdiction and Venue**

13.    The United States Bankruptcy Court for the District of New Jersey (the "Court")
has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of
Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on
June 6, 2025 (Bumb, C.J.).  The Debtors confirm their consent to the Court entering a final order
in connection with this Motion to the extent that it is later determined that the Court, absent consent
of the parties, cannot enter final orders or judgments in connection herewith consistent with
Article III of the United States Constitution.

14.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.    The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503,
506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy
Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure
(the "Bankruptcy Rules"), and rules 4001-1, 4001-3, 9013-1, 9013-2, 9013-3, and 9013-4 of the
Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local
Rules").

**Background**

16.    The Debtors, together with their non-Debtor affiliates (collectively, "MCC" or
the "Company") are a leading global provider of prime label solutions, supporting prominent
brands across end categories, including food and beverage, wine and spirits, home and personal
care, and healthcare, among others.  Since its inception in 1916 as the Franklin Development
Company, MCC has remained a consistent pioneer of label printing.  Over the years, the Company
has continuously added new print technologies—including pressure sensitive, cut and stack,
roll-fed, in-mold, shrink sleeve, and radio frequency identification (RFID)—and innovations to its

9

arsenal to provide customers with the right label solution coupled with value-additive service. Headquartered in Atlanta, Georgia, MCC currently employs approximately 12,800 employees and has exponentially grown its global footprint for over a century, with current operations in over 90 facilities across the globe.

17.     On January 29, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

## Relief Requested

18.     By this Motion, the Debtors seek entry of the Interim Order and the Final Order:

    a.     authorizing the Debtors to enter into a senior secured super priority debtor-in-possession financing facility (the "DIP Facility") in an aggregate principal amount of up to $657.5 million (the "DIP Commitments"), consisting of:

        (i).     "new money" super priority DIP loans in an aggregate principal amount of $250 million (the "New Money DIP Commitments"), of which:  (a) $150 million shall be made available upon entry of the Interim Order, consisting of DIP Term Loans and DIP Notes (together, the "Interim New Money DIP Loans"), and (b) $100 million shall be made available upon entry of the Final DIP Order, consisting of DIP Term Loans and DIP Notes (together, the "Final New Money DIP Loans," and together with the Interim New Money DIP Loans, collectively, the "New Money DIP Loans");

        (ii).     a "roll-up" of $250 million in the collective aggregate principal amount of Prepetition Cash Flow Obligations (the "Cash Flow Roll-Up DIP Loans") and Prepetition Secured Notes Obligations (the "Notes Roll-Up DIP Loans," and together with the Cash Flow Roll-Up DIP Loans, the "Roll-Up DIP Loans,"), on a proportionate

basis to the amount of Interim New Money DIP Loans and Final New Money DIP Loans actually funded by each Holder on account of each such Holder's Cash Flow Term Loan Facility Claims, Cash Flow Revolving Facility Claims, and/or Secured Notes Claims, with (i) $150 million of the Roll-Up DIP Loans issued as described herein upon entry of the Interim Order, consisting of DIP Term Loans and DIP Notes, and (ii) $100 million of the Roll-Up DIP Loans issued as described herein upon entry of the Final Order, consisting of DIP Term Loans and in DIP Notes, in each case subject to the satisfaction or waiver of the conditions precedent contemplated herein (it being understood that each dollar of New Money DIP Commitment shall be accompanied with a corresponding dollar of Roll-Up DIP Loan);

(iii).      $7.5 million in the form of the Backstop Premium; and

(iv).      up to $150 million in incremental "new money" super priority DIP Loans under the DIP Term Loan Facility (the "Incremental New Money DIP Loans"), which may be borrowed subsequent to the issuance of the Final New Money DIP Loans in accordance with the terms and conditions of the DIP Documents.

b.      approving the terms of, and authorizing the Debtors party thereto to execute and deliver, the DIP Credit Agreement, the DIP Note Purchase Agreement, and any other agreements, instruments, and documents related thereto (collectively, the "DIP Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

c.      authorizing the Debtors to execute and deliver the DIP Documents, to incur all obligations owing thereunder to the DIP Lenders (collectively, the "DIP Obligations"), grant the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of these chapter 11 cases and any successor cases, subject to the Carve Out and Permitted Prior Liens (each as defined in the Interim Order) and otherwise perform all of their respective obligations under the DIP Documents, including payment of the DIP Fees (as defined below);

d.      subject to the Carve Out, granting to the DIP Representatives (for itself and for the benefit of the other DIP Secured Parties) automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code, (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) other than payroll, trust, tax withholding and employee benefit accounts, or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of

11

the Prepetition Collateral (together, "Cash Collateral"), which liens shall be subject to the priorities set forth herein;

e.  authorizing and directing the Debtors to use proceeds of the DIP Facility and Cash Collateral for: (a) working capital and general corporate purposes of the Debtors, (b) bankruptcy-related costs and expenses in respect of the chapter 11 cases (including the Carve-Out (as defined in the Interim Order)), (c) costs and expenses related to the DIP Facility, and (d) any other purposes set forth in the Budget;

f.  subject to the DIP Documents, the Approved Budget, and the Interim Order, authorizing the Debtors to use the Prepetition Collateral (as defined in the Interim Order), providing, among other things, adequate protection to the Prepetition Secured Parties for any diminution in value ("Diminution in Value") including arising from (i) the sale, lease, or use by the Debtors or property subject to prepetition liens and security interest, (ii) the incurrence of the DIP Facility and the priming of such prepetition security interests and liens, and (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

g.  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent set forth herein solely to the extent necessary to permit the Debtors, their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

h.  authorizing payment of the certain fees and expenses;

i.  waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order;

j.  scheduling a final hearing (the "Final Hearing") to consider the relief requested herein on a final basis and approving the form of notice with respect to the Final Hearing; and

k.  granting related relief.

12

**Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-3**

**I.      Concise Statement regarding the DIP Facility.**

19.      The below chart contains a summary of the material terms of the DIP Facility,

together with references to the applicable sections of the relevant source documents, as required

by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-3.[4]

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | Labels Buyer, LLC, a Delaware limited liability company, Multi-Color Corporation, an Ohio corporation, and MCC Manufacturing, Inc., a Delaware corporation. *See* DIP Credit Agreement, Preamble. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | The collective reference to Holdings, Intermediate Holdings and each Subsidiary Guarantor; each individually, a "Guarantor". *See* DIP Credit Agreement, § 1.1. |
| **Agent** Bankruptcy Rule 4001(c)(1)(B) | DIP Credit Agreement: Acquiom Agency Services LLC ("Acquiom") and Seaport Loan Products LLC ("Seaport"), as co-administrative agents and Acquiom as collateral agent (Acquiom and Seaport, together with their successors and permitted assigns, together in such capacities, the "DIP Term Loan Agent," and together with the DIP Term Loan Lenders, the "DIP Term Loan Secured Parties"). *See* DIP Credit Agreement, Preamble. DIP Notes Purchase Agreement: Acquiom Agency Services LLC, as Collateral Agent and Acquiom Agency Services LLC, as Paying Agent. *See* DIP Notes Purchase Agreement, Preamble. |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | The lenders under the DIP Facility (the "DIP Lenders") shall be, collectively, (i) the DIP Guarantors, the financial institutions or other entities from time to time party thereto as "Purchasers" (as defined in the DIP Note Purchase Agreement) (the "DIP Noteholders") and (ii) the DIP Term Loan Lenders. *See* Interim Order, Preamble. |
| **Reporting Information** Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes standard and customary conditions that require the Borrowers to provide periodic reports to the Administrative Agent and their respective professionals regarding the Initial Budget, consolidated financial statements of the Borrowers, and certain other matters. |

---

[4]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.

[5]    The DIP Credit Agreement and the DIP Notes Purchase Agreement are substantially similar in all material respects outside of the form of indebtedness.

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| | *See* DIP Credit Agreement, § 7.1. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The DIP Facility shall terminate and all DIP Loans shall be due and payable in full in accordance with the Restructuring Support Agreement, or otherwise in cash, on the date that is the earliest of (the "Maturity Date"):  (a) November 30, 2026; *provided* that this clause (a) may be extended with the consent of the Required Lenders, (b) the effective date of a plan of reorganization filed in the chapter 11 cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (c) the acceleration of the DIP Facility Obligations in accordance with the terms hereof, (d) dismissal of the chapter 11 cases or conversion of any of the chapter 11 cases to one or more cases under chapter 7 of the Bankruptcy Code (solely with respect to dismissal, without the consent of the Required Lenders), and (e) the sale of all or substantially all of the Debtors' assets, taken as a whole, under section 363 of the Bankruptcy Code; provided, however, that, notwithstanding anything to the contrary herein, (i) in no event shall a Qualifying Consenting Stakeholder Termination Event (as defined in the RSA) constitute an Event of Default hereunder or a termination event with respect to the DIP Facility Obligations for the duration of the Cooperation Period (as defined in the RSA), (ii) upon any default under the DIP Facility (regardless of whether or not such default is also a Qualifying Consenting Stakeholder Termination Event and/or the Cooperation Period has been triggered), the Lenders shall in no circumstances be required to fund DIP Facility Obligations, (iii) regardless of whether the Cooperation Period has been triggered, the Lenders may exercise remedies with respect to any Event of Default that is not also a Qualifying Stakeholder Termination Event, other than with respect to breaches of (a) the Milestones and (b) the variance testing as set forth in Subsection 8.12 of the DIP Credit Agreement;<br><br>*See* DIP Credit Agreement, § 1.1. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | New Money DIP Loans:  "new money" super priority DIP loans in an aggregate principal amount of $250 million with:  (a) $150 million available upon entry of the Interim Order and (b) $100 million available upon entry of the Final Order.<br><br>Roll-Up DIP Loans:  $250 million in the collective aggregate principal amount of Prepetition Cash Flow Obligations and Prepetition Secured Notes Obligations with: (x) $150 of the Roll-Up DIP Loans issued in accordance with the DIP Facility Subscription upon entry of the Interim Order; and (y) $100 of the Roll-Up DIP Loans issued in accordance with the DIP Facility Subscription upon entry of the Final Order.<br><br>*See* Interim Order, Preamble. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP Credit Agreement, § 6.1. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Interest on the DIP Loans shall be paid in cash at a rate per annum equal to SOFR + 6.75% for DIP Loans denominated in Dollars and EURIBOR + 6.75% for DIP Loans denominated in Euros.<br><br>*See* DIP Credit Agreement, § 4.1. |

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| **Use of DIP Financing Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) Local Rule 4001-3 | Subject to the Orders, the proceeds of the Term Loans will be used in accordance with, and as provided in, the Approved Budget (subject to permitted variances) (a) to pay costs, fees and expenses related to the chapter 11 cases, including the Carve Out and costs and expenses related to the DIP Facility and (b) to fund general corporate purposes and the working capital needs and expenditures of the Debtors during the chapter 11 cases in accordance with the Approved Budget (subject to permitted variances), including, for the avoidance of doubt, the claims of prepetition creditors, which may include, without limitation, employees, customers, lienholders, insurers, vendors, and taxing authorities, in each case, to the extent authorized by the Interim DIP Order or the Final DIP Order (as applicable) and consistent with the Approved Budget (subject to permitted variances) and (c) any other purpose set forth in the Approved Budget (subject to permitted variances). *See* DIP Credit Agreement § 5.16. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral), to the extent of any Diminution in Value and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and the use of their Cash Collateral, as set forth herein, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"): (i) *Prepetition ABL Adequate Protection Liens.* The Prepetition ABL Agent is hereby granted, for the benefit of itself and the other Prepetition ABL Secured Parties, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements, or by possession or control, to the extent of any of the Prepetition ABL Secured Parties' Diminution in Value, a valid, binding, non-avoidable, enforceable, and fully perfected replacement security interest and lien upon all of the DIP Collateral (collectively, the "ABL Adequate Protection Liens"), in each case in the order of priority set forth in Exhibit 3 of the Interim Order and not subject to any other liens; (ii) *Prepetition ABL Secured Parties' Section 507(b) Claim.* The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, is hereby granted an allowed superpriority administrative expense claim against the DIP Obligors on a joint and several basis (without the need to file any proof of claim) to the extent of any of the Prepetition ABL Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "ABL 507(b) Claim"), which ABL 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions and Recovery Actions, but including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance/Recovery Proceeds). The ABL 507(b) Claim shall be senior to all other claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject and subordinate only to: (i) the Carve Out; (ii) the DIP Superpriority Claims except solely with respect to ABL Priority Collateral; and (iii) the Cash Flow 507(b) Claim and the Secured Notes 507(b) Claim, solely with respect to the Term/Notes Priority Collateral. The ABL 507(b) Claim shall be *pari passu* with the Cash Flow 507(b) Claim and the Secured Notes 507(b) Claim with respect to any DIP Collateral that does not constitute Term/Notes Priority Collateral or ABL Priority Collateral; |

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| | (iii) *Prepetition ABL Secured Parties Fees and Expenses.* Subject and subordinate to the Carve Out, as further adequate protection, the DIP Obligors shall pay on a current basis to the Prepetition ABL Agent, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition ABL Agent as well as the Prepetition ABL Agent's reasonable and documented prepetition and postpetition professional fees (postpetition fees shall be limited to one counsel (and, if necessary, one local counsel) and one financial advisor) to the extent permitted under the Prepetition ABL Loan Documents and/or any existing engagement letter (the "ABL Adequate Protection Fees and Expenses"), subject to the review procedures set forth in paragraph 20 of the Interim Order; |
| | (iv) *Prepetition Cash Flow Adequate Protection Liens.* The Prepetition Cash Flow Agent is hereby granted, for the benefit of itself and the other Prepetition Cash Flow Secured Parties, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements, or by possession or control, to the extent of any of the Prepetition Cash Flow Secured Parties' Diminution in Value, a valid, binding, non-avoidable, enforceable, and fully perfected replacement security interest and lien upon all of the DIP Collateral (the "Cash Flow Adequate Protection Liens"), in each case in the order of priority as set forth in Exhibit 3 of the Interim Order and not subject to any other liens or encumbrances; |
| | (v) *Prepetition Cash Flow Secured Parties' 507(b) Claim.* The Prepetition Cash Flow Agent, for the benefit of itself and the other Prepetition Cash Flow Secured Parties, is hereby granted an allowed superpriority administrative expense claim against the DIP Obligors on a joint and several basis (without the need to file any proof of claim) pursuant to section 507(b) of the Bankruptcy Code (the "Cash Flow 507(b) Claim") subject to the Prepetition Debt Documents and any turnover provisions contained therein, to the extent of any of the Prepetition Cash Flow Secured Parties' Diminution in Value, which Cash Flow 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions and Recovery Actions, but including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance/Recovery Proceeds). The Cash Flow 507(b) Claim shall be *pari passu* with the Secured Notes 507(b) Claim (as defined below) but senior to all other claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in or ordered pursuant to sections 105, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 546(c), 1113, and 1114 of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, subject and subordinate only to: (i) the Carve Out; (ii) the DIP Superpriority Claims; and (iii) the ABL 507(b) Claim with respect to ABL Priority Collateral.; |
| | (vi) *Prepetition Cash Flow Secured Parties Fees and Expenses.* Subject and subordinate to the Carve Out, as further adequate protection, the DIP Obligors shall pay on a current basis to the Secured Ad Hoc Group Advisors and the Prepetition Cash Flow Agent, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Secured Ad Hoc Group Advisors and the Prepetition Cash Flow Agent and the reasonable and |

16

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| | documented prepetition and postpetition professional fees of the professionals to the Prepetition Cash Flow Agent (postpetition fees shall be limited to one counsel (and, if necessary, one local counsel) and one financial advisor)) to the extent permitted under the Prepetition Cash Flow Documents and/or any existing engagement letter (the "Cash Flow Adequate Protection Fees and Expenses"), subject to the review procedures set forth in paragraph 20 of the Interim Order;<br><br>(vii) *Prepetition Secured Notes Adequate Protection Liens*. The Prepetition Secured Notes Trustee is hereby granted, for the benefit of itself and the other Prepetition Secured Notes Secured Parties, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements, or by possession or control, to the extent of any of the Prepetition Secured Notes Secured Parties' Diminution in Value, a valid, perfected replacement security interest and lien upon all of the DIP Collateral (the "Secured Notes Adequate Protection Liens," and together with the ABL Adequate Protection Liens and the Cash Flow Adequate Protection Liens, the "Adequate Protection Liens"), in each case in the order of priority as set forth in Exhibit 3 of the Interim Order and not subject to any other liens or encumbrances;<br><br>(viii) *Prepetition Secured Notes Secured Parties' 507(b) Claim.* The Prepetition Secured Notes Trustee, for the benefit of itself and the other Prepetition Secured Notes Secured Parties, is hereby granted an allowed superpriority administrative expense claim against the DIP Obligors on a joint and several basis (without the need to file any proof of claim) pursuant to section 507(b) of the Bankruptcy Code (the "Secured Notes 507(b) Claim," and together with the ABL 507(b) Claim and the Cash Flow 507(b) Claim, the "Adequate Protection 507(b) Claims"), subject to the Prepetition Debt Documents and any turnover provisions contained therein, to the extent of any of the Prepetition Secured Notes Secured Parties' Diminution in Value, which Secured Notes 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions and Recovery Actions, but including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance/Recovery Proceeds). The Secured Notes 507(b) Claim shall be *pari passu* with the Cash Flow 507(b) Claim but senior to all other claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in or ordered pursuant to sections 105, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 546(c), 1113, and 1114 of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, subject and subordinate only to: (i) the Carve Out; (ii) the DIP Superpriority Claims; and (iii) the ABL 507(b) Claim with respect to ABL Priority Collateral. For the avoidance of doubt and notwithstanding anything to the contrary in the Interim Order, until the payment in full in cash of all Prepetition ABL Obligations and the Adequate Protection Obligations owing to the Prepetition ABL Secured Parties, no Adequate Protection 507(b) Claim (other than the ABL 507(b) Claim) shall be payable from, or have recourse to, the ABL Priority Collateral;<br><br>(ix) *Prepetition Secured Notes Secured Parties Fees and Expenses*. Subject and subordinate to the Carve Out, as further adequate protection, the DIP Obligors shall currently pay to the Secured Ad Hoc Group Advisors and the Prepetition Secured Notes Trustee, in cash, all reasonable and documented prepetition and |

17

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| | postpetition fees and out-of-pocket expenses of the Secured Ad Hoc Group Advisors and the Prepetition Secured Notes Trustee and legal advisors counsel to the Prepetition Secured Notes Trustee (which shall be limited to one counsel (and, if necessary, one local counsel)) to the extent permitted under the Prepetition Secured Notes Documents (the "Secured Notes Adequate Protection Fees and Expenses"), subject to the review procedures set forth in paragraph 20 of the Interim Order; and<br><br>(x) *Postpetition Interest Payments.* Subject and subordinate to the Carve Out, as further adequate protection, from and after the Petition Date, (i) for the benefit of the Prepetition Cash Flow Agent and the Prepetition Secured Notes Trustee, on behalf of the applicable Prepetition Secured Parties, interest shall accrue, on a non-cash basis, on the Prepetition Cash Flow Obligations and the Prepetition Secured Notes Obligations, respectively, under the Prepetition Cash Flow Documents and the Prepetition Secured Notes Documents, respectively, in each case at the applicable non-default rate of interest provided for thereunder, and (ii) the Debtors shall pay in cash on a current basis the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, all interest accruing before or after the Petition Date at the default interest rate provided for under the Prepetition ABL Facility Credit Agreement, subject to the rights preserved in the Interim Order.<br><br>*See* Interim Order ¶ 15. |
| **Roll-Up**<br>Local Rule 4001-2(a)(i)(E) | Subject to the DIP Facility Subscription and upon entry of the Interim Order, $150 million of the Roll-Up DIP Loans shall be issued.<br><br>Subject to the DIP Facility Subscription and upon entry of the Final Order, $100 million of the Roll-Up DIP Loans shall be issued for a total of $250 million in Roll-Up DIP Loans.<br><br>*See* DIP Credit Agreement § 2.1; Interim Order ¶ 2. |
| **Budget and Variance Reporting**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-3 | On each Budget Variance Test Date, the Debtors will not permit actual total expenditures and disbursements of the Debtors on an aggregate basis (excluding (i) Professional Fee Disbursements, (ii) payments in respect of fees of the U.S. Trustee (as defined in the Interim DIP Order or the Final DIP Order, as applicable) and (iii) non-operating disbursements (which shall be capped at $20,000,000 for foreign non-Debtor funding) for such Budget Variance Test Period to be greater than 115.0% of the forecasted total expenditures and disbursements of the Debtors on an aggregate basis for such Budget Variance Test Period as set forth in the applicable Approved Budget. For the avoidance of doubt, it is understood and agreed that the second week of any Budget Variance Test Period shall be based off of the Approved Budget as updated during such week, with the first week based off of the immediately preceding Approved Budget.<br><br>*See* DIP Credit Agreement §8.12. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | The DIP Credit Agreement contains events of default (each, an "Event of Default") consistent with the Documentation Principles and based on those contained in the Cash Flow Credit Agreement (but subject to customary modifications required to reflect the proposed DIP Facility and the chapter 11 cases), including the DIP Milestones and those customary for debtor-in-possession financings of this type (which will be applicable to the Borrowers, the Guarantors, and their respective Debtor subsidiaries), in each case, acceptable to the Required DIP Lenders; *provided* that, for the avoidance of doubt, the DIP Credit Agreement and the DIP Orders shall contain a customary remedies notice |

18

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| | period for DIP financing orders approved by the Bankruptcy Court.  The Events of Default shall include those referenced in the Restructuring Support Agreement.<br><br>*See* DIP Credit Agreement § 9.1. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Documents and Interim Order contain indemnification provisions ordinary and customary for DIP financings of this type by the Borrowers in favor of the DIP Agent, the DIP Lenders, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them subject to customary carve outs.<br><br>*See* DIP Credit Agreement § 4.12. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | As of the Petition Date, the Prepetition Secured Parties, as defined in the Interim Order, have an interest in Cash Collateral subject to the terms of the DIP Credit Agreement and Interim Order.<br><br>*See* Interim Order ¶ H. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The DIP Orders provide a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors and the Creditors' Committee (if appointed) pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 4. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Backstop Premium:  The Borrowers shall pay to the Fronting Lender, for the ratable account of each DIP Backstop Party, a premium in an amount equal to 3.0% of the New Money DIP Loans (including, for the avoidance of doubt, the DIP Holdback), which premium shall be earned, due, and payable in-kind at such time as such New Money DIP Loans are funded and drawn.<br><br>OID:  2.0%; to be paid in cash solely with respect to the New Money DIP Loans and at such time as such New Money DIP Loans are funded and drawn.<br><br>*Consent Fee*.  As consideration for the Prepetition ABL Secured Parties' agreement to permit the Debtors to use the ABL Cash Collateral in accordance with the terms of the Interim Order, the Debtors shall pay to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties, upon entry of this Interim Order, a fee payable in kind on the ABL Commitments.<br><br>*See* Interim Order ¶¶ 2, 10; DIP Credit Agreement § 4.5. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br><br>Local Rule 4001-3<br><br>**Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | *Section 506(c) Claims*.  Subject to the entry of the Final Order granting such relief, except to the extent of the Carve Out, no costs or expenses of administration of these chapter 11 cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from any DIP Secured Party, any Prepetition Secured Party, any DIP Collateral, or any Prepetition Collateral (including Cash Collateral) pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Representatives, and/or each Prepetition Representative, as applicable, and no consent shall be implied from any action, inaction, or acquiescence by any of the DIP Secured Parties, or Prepetition Secured Parties, and nothing contained in the Interim Order shall be deemed to be a consent by any of the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. |

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
|  | *Section 552(b)*. Subject to the entry of the Final Order granting such relief, in each case, the Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and subject to the rights and protections of the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral set forth in the Interim Order, in no event shall (a) the DIP Secured Parties or the Prepetition Secured Parties, as applicable, be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Adequate Protection Obligations, the Prepetition Secured Obligations, or the Prepetition Collateral, as applicable, or (b) the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties, the Prepetition Secured Obligations, or the Prepetition Collateral.<br><br>*See* Interim Order ¶¶ 11, 12. |
| **Liens on Avoidance Actions**<br>Local Rule 4001-3 | Proceeds from Avoidance Actions, but not the Avoidance Actions themselves, shall be subject to liens upon entry of the Final Order.<br><br>*See* Interim Order ¶ 5. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-3 | After consultation with their attorneys and financial advisors, the Debtors admit, stipulate, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition Secured Parties' claims and liens.<br><br>*See* Interim Order ¶ G. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-3 | As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation, or filing of any perfection document or instrument, or the possession or control by the DIP Representatives of, or over, any Collateral, without any further action by the DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable, and non-avoidable security interests and liens (collectively, the "DIP Liens") are hereby granted to the DIP Representatives for the benefit of the DIP Secured Parties (all property identified in clauses (a) through (e) below, together with all other real and personal property of the Debtors of any kind, nature, or description whatsoever, wherever located, and whenever acquired or arising, and together with all additions and accessions to, substitutions for, and replacements, proceeds, rents, issues, profits, and products of the foregoing, but excluding "Excluded Assets" (as defined in the DIP Documents), being collectively referred to as the "DIP Collateral"), subject and subordinate only to the Carve Out and in accordance with the priorities set forth on Exhibit 3 in the Interim Order and not subject to any other liens other than as permitted by the DIP Documents:<br><br>(a)   *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve Out and in accordance with the priorities set forth on Exhibit 3 in the Interim Order and not subject to any other liens other than as permitted by the DIP Documents) all tangible and intangible prepetition and postpetition property of the DIP Obligors of any kind or nature whatsoever, whether existing on the Petition Date or thereafter acquired or arising and wherever located, and the proceeds, products, rents, and profits thereof, whether arising from section 552(b) of the Bankruptcy Code (subject to paragraph 21 of the Interim Order) from time to time, that, on or as of the Petition Date, is not subject to (i) a valid, perfected, and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the Avoidance Actions, the Recovery Actions, the Carve Out Reserves, and any professional fee escrow |

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| | account (and any amounts held therein), but including, upon and subject to entry of the Final Order, the Avoidance/Recovery Proceeds (collectively, the "Unencumbered Property"), and for the avoidance of doubt, the ABL Priority Collateral shall not be considered to be included among the Unencumbered Property; <br><br> (b) *Liens Priming Certain Prepetition Secured Parties' Liens.* Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior priming security interest (subject to the Carve Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Obligors constituting Term/Notes Priority Collateral, regardless of where located. Notwithstanding anything herein to the contrary, the DIP Liens shall not be subordinate to any lien, security interest, or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, and shall have such priority as set forth in Exhibit 3 of the Interim Order and shall not be subject to any other liens or encumbrances other than as permitted by the DIP Documents but shall be subject to the Carve Out; <br><br> (c) *Junior Liens Priming Certain Prepetition Secured Parties' Liens.* Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected junior priority priming security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Obligors constituting ABL Priority Collateral, regardless of where located, which security interest and lien shall only prime the Prepetition Cash Flow Liens and the Prepetition Secured Notes Liens on the ABL Priority Collateral and for the avoidance of doubt, shall not and shall at all times be junior to the Prepetition ABL Liens and the ABL Adequate Protection Liens on the ABL Priority Collateral. Notwithstanding anything herein to the contrary, the DIP Liens shall not be subordinate to any lien, security interest, or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, and shall have such priority as set forth in Exhibit 3 and shall not be subject to any other liens or encumbrances other than as permitted by the DIP Documents but shall be subject to the Carve Out; <br><br> (d) *Liens Junior to Certain Other Liens.* Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest and lien upon all tangible and intangible prepetition and postpetition property of the DIP Obligors that, on or as of the Petition Date, is subject to Prepetition Permitted Senior Liens, which shall have such priority as set forth in Exhibit 3 of the Interim Order and shall not be subject to any other liens or encumbrances other than as permitted by the DIP Documents but shall be subject to the Carve Out; and <br><br> (e) *No Senior Liens.* Other than the Carve Out, the DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents, the Intercreditor Agreements, or in the Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the DIP Obligors, or (C) any intercompany liens, or (ii) unless otherwise provided for in the Interim Order, subordinated to or made *pari passu* |

| Bankruptcy Code | Summary of Material Terms[5] |
|---|---|
| | with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 7. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Debtors are required to comply with the milestones set forth in the Restructuring Term Sheet.<br><br>*See* Restructuring Support Agreement, Ex. B. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | No later than:  (i) the earlier of (A)(x) as to the Creditors' Committee, if any, and all other parties in interest (excluding the following sub clause (y)) 75 calendar days after the entry of the Interim Order, and, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (1) 75 calendar days after entry of the Interim Order or (2) the date that is 30 calendar days after their appointment and (B) the date of an order confirming the Debtors' chapter 11 plan; and (ii) any such later date as (A) has been agreed to in writing by the Prepetition ABL Agent with respect to the Prepetition ABL Obligations or the Prepetition ABL Liens, (B) has been agreed to in writing by the Prepetition Cash Flow Agent with respect to the Prepetition Cash Flow Obligations or the Prepetition Cash Flow Liens, (C) has been agreed to in writing by the Prepetition Secured Notes Trustee with respect to the Prepetition Secured Notes Obligations or the Prepetition Secured Notes Liens, or (D) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(ii), the "Challenge Period").<br><br>*See* Interim Order ¶ 21. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br>*See* Interim Order ¶ 30. |

## II.     The Debtors' Prepetition Capital Structure.

20.     As of the Petition Date, the Debtors have approximately $5.9 billion in aggregate outstanding principal amount of prepetition debt obligations.  The following table depicts the Debtors' prepetition capital structure:

| Secured Debt | Approximate Principal Outstanding |
|---|---|
| ABL Facility | $445 million |
| Cash Flow Revolving Facility | $200 million |
| U.S. Term Loan Facility | $1,598 million |
| European Term Loan Facility | $569 million |
| 2028 5.875% Secured Notes | $500 million |
| 2028 9.500% Secured Notes | $300 million |
| 2031 Secured Notes | $950 million |
| Finance Leases / Other | $226 million |
| **Secured Debt Total** | **$4,788 million** |
| **Unsecured Debt** | **Approximate Principal Outstanding** |
| 2027 Unsecured Notes | $690 million |
| 2029 Unsecured Notes | $460 million |
| **Unsecured Debt Total** | **$1,150 million** |
| | |
| **Total Debt** | **$5,938 million** |

### A.   The ABL Facility.

21.   Pursuant to that certain ABL Credit Agreement, dated October 29, 2021 (as amended, restated, modified, or supplemented in accordance with the terms thereof, the "ABL Credit Agreement"), by and between LABL, Inc. (the "Parent"), certain subsidiaries of the Parent organized in the United States (which include certain of the Debtors) (the Parent and such U.S. subsidiaries, including certain of the Debtors, the "U.S. Borrowers"), certain French subsidiaries of the Parent (which include certain of the Debtors) (the "French Borrowers") and certain Belgian, Canadian, English, German, Irish, New Zealand and Scottish subsidiaries of the Parent (which include certain of the Debtors) (the "Non-U.S. Borrowers"), the lenders from time to time party thereto (the "ABL Lenders"), and Barclays Bank PLC ("Barclays") as issuing lender, swingline lender, administrative agent, Australian security trustee and collateral agent, the ABL Lenders provide the Company with an asset-based revolving credit facility in an aggregate principal amount of up to $590 million (the "ABL Facility"), consisting of a $400 million U.S. sub-facility, a $15 million French sub-facility and a $175 million global sub-facility.  Loans under the ABL

23

Facility bear interest at a *per annum* rate of (a) in the case of U.S. dollar denominated loans, SOFR plus an applicable margin ranging from 1.25% to 1.75%, (b) in the case of Canadian dollar denominated loans, the Term CORRA Rate, (c) in the case of Australian dollar denominated loans, the Adjusted AUD Rate plus an applicable margin ranging from 1.25% to 1.75%, (d) in the case of Euro denominated loans, Adjusted EURIBOR plus an applicable margin ranging from 1.25% to 1.75%, (e) in the case of Pound Sterling denominated loans, SONIA, plus an applicable margin ranging from 1.25% to 1.75%, and (f) in the case of New Zealand dollar denominated loans, the Adjusted NZD Rate plus an applicable margin ranging from 1.25% to 1.75%, with the margin in each applicable case adjusted quarterly based on the average daily excess availability of revolving loan commitments under the ABL Facility. The ABL Facility matures on the earlier of October 8, 2029, or 91 days prior to the maturity date with respect to each of the U.S. Term Loan Facility, the Euro Term Loan Facility, the Secured Notes or Unsecured Notes, if the aggregate principal amount of such indebtedness outstanding on such date exceeds certain thresholds. The Debtors' obligations under the ABL Facility are guaranteed by (i) LABL Acquisition Corporation ("Holdings"), (ii) each direct and indirect wholly owned U.S. restricted subsidiary of the Parent that is not a U.S. Borrower (which include certain of the Debtors), (iii) each U.S. Borrower (other than with respect to its own primary obligations), (iv) with respect to the French sub-facility and subject to local law limitations, each direct and indirect wholly owned French restricted subsidiary of the Parent that is not a French Borrower, (v) with respect to the French and global sub-facilities (other than borrowings by a U.S. Borrower under the global sub-facility) and subject to local law limitations, each direct and indirect wholly owned Australian, Belgian, Canadian, English, German, Irish, Mexican, New Zealand, Polish and Scottish restricted subsidiary of the Company that is not a Non-U.S. Borrower (which include certain of the Debtors), and (vi) each Non-U.S.

24

Borrower other than the French Borrower (other than with respect to its own primary obligations), in each case subject to customary exceptions.  The ABL Facility is secured by liens on substantially all the assets and property of the borrowers and guarantors with respect to the ABL Facility, including first priority liens on the ABL Priority Collateral (as defined in the ABL Credit Agreement) (the "ABL Priority Collateral"), which includes certain of the accounts receivable and inventory of the Company and the other borrowers and guarantors thereunder, second priority liens on the Cash Flow Priority Collateral (as defined in the ABL Credit Agreement) (the "Cash Flow Priority Collateral"), and on other bases as described in the appropriate credit documents, in each case subject to customary exceptions.  As of Petition Date, the Debtors have drawn approximately $445 million under the ABL Facility.

### B.       Cash Flow Credit Agreement.

22.       Pursuant to that certain Cash Flow Credit Agreement, dated October 29, 2021 (as amended and restated from time to time, the "Cash Flow Credit Agreement"), by and among the Parent borrower, the other U.S. Borrowers from time to time party thereto (which include certain Debtors organized in the United States), the ABL Agent, as administrative agent and collateral agent, and the lenders party thereto, as may be amended, restated, supplemented or otherwise modified from time to time, the Company has access to a revolving credit facility in the principal aggregate amount of up to $200 million (the "Cash Flow Revolving Facility"), a term loan in the principal aggregate amount of approximately $1,864 million (the "U.S. Term Loan Facility"), and a term loan in the principal amount of €593 million (the "Euro Term Loan Facility" and, together with the Cash Flow Revolving Facility and the U.S. Term Loan Facility, the "Cash Flow Facilities").  Loans under the Cash Flow Revolving Facility bear interest at a *per annum* rate of (a) in the case of U.S. dollar denominated loans, SOFR plus an applicable margin ranging from 3.50% to 4.00%, (b) in the case of Canadian dollar denominated loans, the Term CORRA Rate,

25

(c) in the case of Australian dollar denominated loans, the Adjusted AUD Rate plus an applicable margin ranging from 3.50% to 4.00%, (d) in the case of Euro denominated loans, Adjusted EURIBOR plus an applicable margin ranging from 3.50% to 4.00%, and (e) in the case of Pound Sterling denominated loans, SONIA, plus an applicable margin ranging from 3.50% to 4.00%, with the margin in each applicable case adjusted quarterly based on the Parent's senior secured leverage ratio.  Loans under the U.S. Term Loan Facility bear interest at a *per annum* rate of SOFR plus a 0.10% credit spread adjustment plus 5.00%.  Loans under the Euro Term Loan Facility bear interest at a *per annum rate* of Adjusted EURIBOR plus 5.00%.  The Cash Flow Revolving Facility matures on the earlier of October 8, 2029, or 91 days prior to the maturity date with respect to each of the U.S. Term Loan Facility, the Euro Term Loan Facility, the Secured Notes or Unsecured Notes, if the aggregate principal amount of such indebtedness outstanding on such date exceeds certain thresholds.  Each of the U.S. Term Loan Facility and the Euro Term Loan Facility matures on October 29, 2028.  The Debtors' obligations under the Cash Flow Facilities are guaranteed by (i) Holdings, (ii) each direct and indirect wholly owned U.S. restricted subsidiary of the Parent that is not a U.S. Borrower (which include certain of the Debtors), and (iii) each U.S. Borrower (other than with respect to its own primary obligations), in each case subject to customary exceptions. The Cash Flow Facilities are secured by liens on substantially all the assets and property of the borrowers and guarantors with respect to the Cash Flow Facilities, including first priority liens on the Cash Flow Priority Collateral (on a *pari passu* basis with the liens securing the Secured Notes) and second priority liens on the ABL Priority Collateral, and on other bases as described in the appropriate credit documents, in each case subject to customary exceptions.  As of Petition Date, the Debtors have drawn approximately $200 million under the Cash Flow Revolving Facility.

### C.   Secured Notes.

23.   Pursuant to that certain indenture, dated October 29, 2021 (as amended or supplemented from time to time, the "Secured Notes Indenture"), by and among the Parent, the guarantors from time to time party hereto, and Wilmington Trust, National Association ("Wilmington Trust"), as trustee and notes collateral agent, (i) on October 21, 2021, Parent issued 5.875% Senior Secured Notes due 2028 (the "2028 5.875% Secured Notes") in an aggregate principal amount of $500 million, (ii) on April 3, 2023 the Parent issued 9.500% Senior Secured Notes due 2028 (the "2028 9.500% Secured Notes") in an aggregate principal amount of $300 million, and (iii) on October 8, 2024, Parent issued 8.625% Senior Secured Notes due 2031 (the "2031 Secured Notes," and together with the 2028 5.875% Secured Notes and the 2028 9.500% Secured Notes, the "Secured Notes") in an aggregate principal amount of $950 million. The Secured Notes are guaranteed by Holdings and each wholly owned U.S. restricted subsidiary of the Parent, subject to certain exceptions.   The Secured Notes are secured by liens on substantially all the assets and property of such guarantors, including first priority liens on the Cash Flow Priority Collateral (on a *pari passu* basis with the liens securing the Cash Flow Facilities) and second priority liens on the ABL Priority Collateral, each as described in the applicable notes documents, in each case subject to customary exceptions.  As of the Petition Date, the full principal amounts of the Secured Notes remain outstanding.

### D.   Unsecured Notes.

24.   Pursuant to that certain indenture, dated July 1, 2019 (as amended or modified from time to time), by and among LABL Escrow Issuer, LLC, as initial issuer, the Parent, the guarantors from time to time party thereto and Wilmington Trust, as trustee, LABL Escrow Issuer, LLC issued 10.50% Senior Notes due 2027 (the "2027 Unsecured Notes") in an aggregate principal amount of $690 million.  Pursuant to that certain indenture, dated October 29, 2021 (as amended or modified

27

from time to time) by and among the Parent, as issuer, the guarantors from time to time party thereto, and Wilmington Trust, as trustee, the Parent issued 8.250% Senior Notes due 2029 (the "2029 Unsecured Notes," and together with the 2027 Unsecured Notes, the "Unsecured Notes") with an aggregate principal amount of $460 million.  The Unsecured Notes are guaranteed by each wholly owned U.S. restricted subsidiary of the Parent, subject to certain exceptions.  As of the Petition Date, the full principal amounts of the Unsecured Notes remain outstanding.

### E.     Finance Leases and Other Funded Debt.

25.     *Equipment Finance Leases*.  The Company is party to certain equipment leases (the "Equipment Finance Leases") that it enters into, as lessee in relation to the equipment subject thereto, with certain banks and finance companies.  The key structural features of the Equipment Finance Leases are that the relevant lessor leases a specified piece of equipment to the exclusive possession of the Company for a definite term in exchange for rent.  The Company generally assumes no obligations of outright ownership but either have:  (a) an option to purchase the equipment at the end of the term for fair market value; (b) a nominal buyout amount at the end of such Equipment Finance Lease; or (c) an early buyout option based on a fixed percentage of the original financed amount.  However, certain of the Equipment Finance Leases specify that (i) the Company party to such lease becomes the title owner of the equipment at the end of the lease term and (ii) the lease counterparty retains title to the equipment.  As of the date hereof, the Company owes approximately $56 million on account of the Equipment Finance Leases.

26.     *Building Finance Leases*.  The Company, as lessee, is party to certain building leases (the "Building Finance Leases") with certain banks and real estate companies.  The key structural features of the Building Finance Leases are that the relevant lessor leases a specified property to the exclusive possession of the Company for a definite term in exchange for rent.  The Company generally assumes no obligations of outright ownership but may have an option to

purchase the property at fair market value.  Certain of the Building Finance Leases also have an early buyout provision to terminate the lease before its scheduled expiration date.  As of the date hereof, the Company owes approximately $66 million on account of the Building Finance Leases.

27.    *Other Funded Debt*.  In June 2025, the Company entered into a sale and master lease agreement (the "First Master Lease Agreement").  Pursuant to the First Master Lease Agreement, the Company sold certain equipment and then leased certain assets (the "Assets") back through a sale-leaseback transaction.  Based on certain criteria and in accordance with U.S. GAAP, the sale-leaseback transaction was accounted for as a failed sale-leaseback or financing transaction.  As a result, the Assets remained on the Company's condensed consolidated balance sheets (the "Condensed Consolidated Balance Sheets") at their historical net book value and will continue to be depreciated.  A financing obligation liability of $35 million was recognized and the Company incurred less than $1 million in debt issuance costs.  As of the date hereof, the Company owes approximately $32 million on account of the First Master Lease Agreement.

28.    In September 2025, the Company entered into a sale and master lease agreement (the "Second Master Lease Agreement").  Pursuant to the Second Master Lease Agreement, the Company sold certain equipment and then leased certain Assets back through a sale-leaseback transaction.  Based on certain criteria and in accordance with U.S. GAAP, the sale-leaseback transaction was accounted for as a failed sale-leaseback or financing transaction.  As a result, the Assets remained on the Condensed Consolidated Balance Sheets at their historical net book value and will continue to be depreciated.  A financing obligation liability of $75 million was recognized and the Company incurred less than $1 million in debt issuance costs.  As of the date hereof, the Company owes approximately $72 million on account of the Second Master Lease Agreement.

F.      **Common Equity Interests.**

29.     As of the Petition Date, Labels Buyer, LLC had two series of common stock, including approximately 14,100,000 Series A units issued and outstanding (the "Series A Units"), and approximately 172,000 Series B units issued and outstanding (together with the Series A Units the "Common Units").  The Common Units are not listed on a national securities exchange.  All the vested and unvested Series A Units are held by the Sponsor and certain of the Company's management and directors and all the vested and unvested Series B Units are held by LUX Global Label.

## The DIP Facility

**I.      The Debtors' Need for Access to Financing and the Use of Cash Collateral.**

30.     The Debtors require immediate access to the DIP Facility to preserve the value of the Debtors' estates and sustain operations.  *See* First Day Decl. ¶ 72.  As of the Petition Date, the Debtors only have $67 million in cash on hand, far from an amount sufficient to operate their business as a going concern in the near term, much less for the duration of these chapter 11 cases.  *See id*. at ¶ 53.  Without immediate access to the liquidity provided by the DIP Facility and Cash Collateral, the Debtors will not be able to consummate the restructuring transactions contemplated by the Restructuring Support Agreement while operating their business in the ordinary course during these chapter 11 cases.  *See* Koza Decl. ¶¶ 12-13.  This, in turn, would negatively impact the Debtors' relationship with their customers and vendors, which would adversely affect the Debtors' revenues and future operations and harm the value of the Debtors' business.  *See id.* at ¶ 15.  Accordingly, it is critical for the Debtors to be well capitalized to signal to the marketplace that the Debtors are worth doing business with.  Further, absent immediate access to the funds provided under the DIP Facility and the continued access to Cash Collateral, the Debtors project that they will be unable to pay essential costs required to continue operating as a going concern in

light of the anticipated costs over the course of these chapter 11 cases, and in particular, the first thirty days of these chapter 11 cases. *See id. at* ¶ 17. Specifically, the Debtors rely on the Cash Collateral generated from their operations to, among other things, honor employee wages and benefits, fund operational expenses, maintain favorable relationships with their customers, and make other payments integral to the continued management, operation, and preservation of the Debtors' business. *See id. at* ¶ 13. The ability to satisfy these expenses when they come due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases.

31.     Prior to the Petition Date, the Debtors, in consultation with their proposed financial advisor, AlixPartners, reviewed and analyzed their cash needs and prepared projections of postpetition liquidity needs for the Debtors' business in the initial thirteen weeks of these chapter 11 cases, including the Initial Budget. *See id. at* ¶ 9. In developing the Initial Budget, AlixPartners accounted for anticipated operating receipts and disbursements during the projected period and considered several cost factors, including, but not limited to, the potential effect of the chapter 11 filing on the operations of the business, fees and interest expense associated with the DIP Facility, restructuring costs (including professional fees), and employee, customer, and vendor obligations. *See id.* at ¶ 10. The Debtors and their advisors believe that the Initial Budget and the projections therein provide an accurate reflection of the Debtors' likely funding requirements over the next thirteen weeks and are reasonable and appropriate under the circumstances. *Id*. Furthermore, the Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases. *Id.* at ¶ 11.

32.     Based on these analyses, the Debtors determined that they would require approximately $250 million in incremental liquidity to fund these chapter 11 cases and meet their

cashflow needs in order to continue postpetition operations in the ordinary course. *See id.* Immediate access to the DIP Facility and the continued used of Cash Collateral is essential to not only meet the Debtors' working capital and business operating needs, but also to fund the administration of these chapter 11 cases, enabling the Debtors to implement the restructuring transactions contemplated by the Restructuring Support Agreement. *Id.* at ¶ 12.

33. The Debtors therefore believe the use of Cash Collateral and entry into the DIP Facility are essential to preserve and maximize the value of their estates and responsibly administer these chapter 11 cases.

### A.      Alternative Sources of Financing Are Not Available on Better Terms.

34. As described herein, in light of the Debtors' liquidity constraints, it would not be prudent, or even possible, to administer these chapter 11 estates on a cash collateral basis, rendering postpetition financing a necessity. Prior to executing the DIP Documents, the Debtors and the DIP Secured Parties engaged in good-faith, arm's-length negotiations regarding the terms of a comprehensive restructuring transaction, including the DIP Facility and the Debtors' use of Cash Collateral. *See* Banks Decl. ¶ 24. These negotiations, beginning in the third quarter of 2025, spanned the course of multiple months and involved several potential transaction options. *See id.* at ¶ 9. The Debtors, in consultation with their advisors, ultimately determined that pursuing DIP facility funded by the Plan Sponsor and the Secured Ad Hoc Group represented the most value-maximizing and only path to obtaining the critical funding required to implement the restructuring transactions contemplated in the Restructuring Support Agreement.

35. Furthermore, while the Debtors and their advisors diligently assessed the Crossover Group DIP Proposal, this proposal was not a viable source of postpetition financing. *Id.* at ¶ 16. Given the Secured Ad Hoc Group's lack of support for the Crossover Group DIP Proposal, the Crossover Group DIP Proposal, which, importantly, was not coupled with a viable chapter 11 plan,

would have resulted in significant delays to the chapter 11 process, increased costs, and a message of instability to their stakeholders, resulting in destruction of the Debtors' going-concern value. *See id.* at ¶¶ 14-15.

36.     As discussions with the DIP Secured Parties and the Crossover Ad Hoc Group progressed, and in order to ensure that the terms of the DIP Facility were fair and reasonable, the Debtors, led by Evercore, also undertook a marketing process to obtain additional proposals for DIP financing.  As part of this process, Evercore solicited interest from eight sources of financing outside of the Debtors' capital structure. *See id.* at ¶ 17.  The potential third-party lenders Evercore contacted included various institutions that routinely provide postpetition financing, including both well-known commercial banks and specialty lenders.  From that group of potential third-party lenders, all eight executed a confidentiality agreement and received access to non-public information.  Furthermore, all eight parties had previously completed significant due diligence on the Company during the out-of-court financing process.  Ultimately, the Debtors did not receive any interest in providing alternative DIP financing from the lenders contacted because of, among other reasons, such parties' lack of desire to (a) provide financing on a junior or unsecured basis, (b) seek to provide a priming facility on a nonconsensual basis, or (c) offer a postpetition facility absent a first priority lien on substantially all the Debtors' assets, excluding priority collateral of the ABL Facility. *Id.*

**B.     The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates.**

37.     Absent the liquidity infusion provided by the DIP Facility, the Debtors would experience severe business disruption and result in value-destructive interruption to the Debtors' current operations and the Debtors' Estates. *See* Koza Decl. ¶ 15.  Cash on hand and near-term revenues would not be sufficient to fund the Debtors' operations as a going concern in the near term or for the duration of these chapter 11 cases and absent incremental liquidity, the Debtors

33

would struggle to operate in the ordinary course of business.  *See* First Day Decl. at ¶¶ 53, 72. Without the ability to use Cash Collateral, the Debtors will be unable to meet near-term working capital needs, which, in turn, will leave no option but for the Debtors to implement additional cost-saving measures and risk further damaging the favorable relationships with the Debtors' suppliers, customers, and employees, which are the focal points of the Debtors' business and operations.

38.     Further, the DIP Facility, together with the Restructuring Transactions set forth in the Restructuring Support Agreement, will provide the Debtors with the necessary liquidity to fund their business operations and maintain favorable relationships with vendors, suppliers, and customers.  *Id*. at ¶ 13.  The DIP Facility will provide the Debtors with sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to proceed expeditiously toward confirmation of the Plan.  Accordingly, the DIP Facility pending approval before the Court is reasonable and is the best financing option currently available to the Debtors under the facts and circumstances of these chapter 11 cases, and should be approved.  *See* Banks Decl. at ¶ 32.

### Basis for Relief

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

**A.     Entry into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment.**

39.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and use Cash Collateral.

40.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, as discussed in more depth below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business

judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

41.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

42.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured*

35

*Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.***  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

43.     The Debtors' determination to move forward with the DIP Facility following multiple rounds of arm's-length negotiations, a marketing process for third-party financing proposals, and careful evaluation of potential alternatives is a sound exercise of their business judgment.  *See* Banks Decl. ¶ 8.  The Debtors and their advisors determined that the Debtors would require significant postpetition financing to stabilize their operations, which they propose to obtain through the DIP Facility and access to Cash Collateral.  Access to the DIP Facility and Cash Collateral will enable the Debtors to (a) continue operating their business in the ordinary course postpetition, (b) send a clear message to that the Debtors' customers, vendors, and employees that business will continue to operate in the ordinary course, (c) fund the administration of these chapter 11 cases, (d) finance payroll and other working-capital needs, and (e) preserve going-concern

value throughout these chapter 11 cases.  *See* Koza Decl. ¶¶ 11-13.  Without the DIP Facility, the

Debtors would experience significant business disruption and would face a number of other

value-destructive consequences, including the risk of losing customers and vendors key to the

Debtors' operations.  *See id*. at ¶ 18.

44.     The DIP Facility and proposed terms for continued use of postpetition Cash

Collateral are tailored to the Debtors' capital structure and go-forward funding needs.  *See id*. at

¶¶ 10-11.  The Debtors and their advisors also determined that the DIP Facility not only provides

certainty with respect to the capital required to fund the administration of these chapter 11 cases

and the Debtors' business operations, but also provides the Debtors with the liquidity needed to

proceed expeditiously towards a value-maximizing resolution and emergence from these

chapter 11 cases.  *See id.* at ¶¶ 17-18.  Additionally, the DIP Facility's economic terms are

customary, the product of a good faith and arm's-length negotiations, and in some cases highly

competitive and favorable to the Debtors:  for example, the DIP Facility's Backstop Fee shall be

paid entirely on a payment-in-kind basis.  *See* Banks Decl. ¶¶ 24, 29.  Finally, the Debtors and

their advisors market-checked the DIP Facility but received no actionable alternative proposals

from third parties, including on a junior or unsecured basis.  *See id.* at ¶ 30.

45.     For these reasons, the Debtors, in consultation with their advisors, determined that

the DIP Secured Parties' financing proposal represents the only actionable postpetition financing

option available to the Debtors.  *See id.* at ¶ 18.  Accordingly, the Court should authorize the

Debtors' entry into the DIP Documents, as it is a reasonable exercise of the Debtors'

business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims
to the DIP Lenders.**

46.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination immediately upon entry of the Interim Order.

47.      The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities and were a necessary feature to provide security for the proposed financings.  Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets such as leaseholds that are subject to leases that prohibit the impositions of liens thereon.  *See, e.g.*, *In re STG Logistics, Inc.*, No. 26-10258 (MEH) (Bankr. D.N.J. Jan. 14, 2026) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law on an interim basis); *In re United Site Services, Inc.*, No.25-23630 (MBK) (Bankr. D.N.J. Dec. 30, 2025) (same); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. April 4, 2024) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law on a final basis); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (same); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same).

48.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."    11 U.S.C. § 364(c).

*See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.      the credit transaction is necessary to preserve the assets of the estate; and

c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

49.      The Debtors satisfy each part of this test. First, as described above, the Debtors are unable to obtain unsecured credit that would afford the Debtors a path to confirmation of a chapter 11 plan of reorganization. *See* Banks Decl. ¶ 14. Second, absent the capital infusion under the DIP Facility, the Debtors would experience significant business disruption, would need to meaningfully curtail their operations, and would face a number of other value-destructive consequences to the detriment of all stakeholders, including attrition of vendors and customers imperative to the Debtors' business. *See* Koza Decl. ¶ 15. Finally, given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents, are fair, reasonable, and represent the best terms available to the Debtors to obtain postpetition financing that provides an expeditious path to emergence from these chapter 11 cases. *See* Banks Decl. ¶ 23. For all these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

50.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

51.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if either (a) the First Lien Lenders have consented or (b) the First Lien Lenders' interests in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

52.     As described above, the Debtors are not able to obtain adequate postpetition financing on an unsecured or junior basis that would provide the Debtors with a path to a confirmable chapter 11 plan. *See* Banks Decl. ¶ 14. However, the DIP Facility is supported by

the Debtors' existing secured lenders and noteholders,[6] the Plan Sponsor, the Holders of approximately 13.3 percent of the Cash Flow Revolving Facility Claims, the Holders of approximately 83.9 percent of the Cash Flow Term Loan Facility Claims, the Holders of approximately 64.7 percent of Secured Notes Claims, and the Holders of approximately 43.5 percent of Unsecured Notes Claims. *Id.* at ¶ 12. Nevertheless, the DIP Facility contemplates providing the Holders of First Lien Secured Claims, amongst other parties, an Adequate Protection package under the DIP Orders, discussed below. Accordingly, approving superpriority claims pursuant to section 364(d)(1) of the Bankruptcy Code in favor of the DIP Lenders is reasonable and appropriate.

### C.     The Proposed "Roll-Up" of Obligations under the DIP Facility is Appropriate and Should be Approved.

53.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (so holding). The business judgment rule shields such business from such business decisions from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

54.     The deemed exchange of prepetition funded indebtedness into postpetition financing obligations (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements. Courts in this jurisdiction and other jurisdictions have approved similar

---

[6]     Pursuant to a subscription process conducted by the Debtors, all Holders of First Lien Secured Claims were offered the opportunity to participate in the DIP Facility.

DIP financing features, including on the first day of the case.  *See, e.g., In re STG Logistics, Inc.*, No. 26-10258 (MEH) (Bankr. D.N.J. Jan. 14, 2026) (authorizing an approximately 1.2:1 interim roll-up); *In re Del Monte Foods Corp. II*, No. 25-16984 (MBK) (Bankr. D.N.J. Aug. 8, 2025) (authorizing a 1.5:1 roll-up); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 4, 2024) (authorizing a 1:1 interim roll-up)); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. June 15, 2023) (authorizing a 5:1 interim roll-up); *In re At Home Grp. Inc.*, No. 25-11120 (Bankr. D. Del. Jul. 18, 2025) (authorizing a 2:1 interim roll up).[7]

55.    The DIP Facility contemplates a roll-up in the aggregate principal amount of $250 million in indebtedness outstanding Cash Flow Term Loan Facility Claims, Cash Flow Revolving Facility Claims, and Secured Notes Claims, that will be assigned by the initial fronting lender to the applicable DIP Secured Lender in consideration for a like amount of DIP Loans, with $150 million available upon entry of the Interim Order and $100 million upon entry of the Final DIP Order.  The roll-up of funds is a material component of the consideration required by the DIP Lenders as part of their commitment to provide postpetition financing.  Banks Decl. ¶ 18-19.  The Debtors were unable to obtain DIP financing on similar terms that did not provide for the repayment of prepetition amounts.  The open participation of the DIP Facility on a pro rata basis is an incredible result of arm's-length negotiations that benefits the estates and helps ensure that the Debtors have a value-maximizing path toward a reorganization as it does not prejudice any one class of secured creditors over another.  Given these circumstances, the roll-up is a sound exercise of the Debtors' business judgment and should be approved.

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**D.      No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.**

56.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

57.      The Debtors do not believe that more favorable alternative postpetition financing is reasonably available.  As discussed above, the Debtors, with the assistance of their advisors, engaged with the DIP Secured Parties, the Plan Sponsor, and other key stakeholders on the terms of potential financing.  In the weeks preceding the Petition Date, the Debtors, with the assistance of Evercore, also undertook a marketing process to gauge potential interest among third-party lenders in providing DIP financing to the Debtors on an unsecured or junior priority basis.  *See* Banks Decl. ¶ 14.  The marketing process did not yield any actionable results, as the only other debtor-in-possession proposal—the Crossover Group DIP Proposal—was not actionable given it

43

did not provide a viable path to emergence. Thus, the Debtors believe that the DIP Facility represents the only actionable financing option available under the facts and circumstances of these chapter 11 cases. *See id.* ¶ 15. Simply put, the DIP Facility provides liquidity to ensure the Debtors have the runway to implement the Restructuring Transactions contemplated by the Restructuring Support Agreement. *See id.* at ¶ 24. Accordingly, the Debtors submit that they have satisfied the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors.

**II.     The Debtors Should Be Authorized to Use the Cash Collateral.**

58.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party. The Debtors have or expect to obtain the requisite consent to use the Debtors' existing Cash Collateral prior to the interim hearing on this Motion, subject to the terms and limitations set forth in the Interim Order.

59.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case-by-case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will

dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

60.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection obligations (the "Adequate Protection Obligations") to protect in part against the postpetition Diminution in Value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral and the imposition of the automatic stay.  The Debtors intend to provide the following parties the respective Adequate Protection Obligations:

(a)  the Prepetition ABL Agent is granted a perfected security interest in and Lien on the DIP Collateral the "ABL Adequate Protection Liens"), in the order of priority set forth in Exhibit 3 of the Interim Order;

(b)  the Prepetition ABL Agent is granted a superpriority administrative expense claim against the DIP Obligors on a joint and several basis (without the need to file any proof of claim) to the extent of any of the Prepetition ABL Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "ABL 507(b) Claim"), senior to all other claims against the DIP Obligors, subject and subordinate only to:  (i) the Carve Out; (ii) the DIP Superpriority Claims except solely with respect to ABL Priority Collateral; and (iii) the Cash Flow 507(b)

45

Claim and the Secured Notes 507(b) Claim, solely with respect to the Term/Notes

Priority Collateral;

(c) payment of the reasonable and documented prepetition and postpetition legal and

other professional fees and expenses of the Prepetition ABL Agent;

(d) the Prepetition Cash Flow Agent is granted a perfected security interest in lien

upon all of the DIP Collateral (the "Cash Flow Adequate Protection Liens"), in

the order of priority set forth in Exhibit 3 of the Interim Order;

(e) the Prepetition Cash Flow Agent is granted an allowed superpriority

administrative expense claim against the DIP Obligors on a joint and several basis

pursuant to section 507(b) of the Bankruptcy Code (the "Cash Flow 507(b)

Claim") subject to the Prepetition Debt Documents and any turnover provisions

contained therein, to the extent of any of the Prepetition Cash Flow Secured

Parties' Diminution in Value, shall be *pari passu* with the Secured Notes 507(b)

Claim (as defined below) but senior to all other claims against the DIP Obligors,

now existing or hereafter arising, of any kind whatsoever, including, without

limitation, all administrative expenses of the kind specified in or ordered pursuant

to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b),

546(c), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such claims

may become secured by a judgment lien or other non-consensual lien, levy, or

attachment, subject and subordinate only to:  (i) the Carve Out; (ii) the DIP

Superpriority Claims; and (iii) the ABL 507(b) Claim with respect to ABL

Priority Collateral;

(f)   payment of the reasonable and documented prepetition and postpetition legal and other professional fees and expenses of the Secured Ad Hoc Group Advisors and the Prepetition Cash Flow Agent;

(g)   the Prepetition Secured Notes Trustee is granted a perfected security interest in lien upon all of the DIP Collateral (the "Secured Notes Adequate Protection Liens," and together with the ABL Adequate Protection Liens and the Cash Flow Adequate Protection Liens, the "Adequate Protection Liens"), in each case in the order of priority as set forth in Exhibit 3 of the Interim Order;

(h)   the Prepetition Secured Notes Trustee is granted an allowed superpriority administrative expense claim against the DIP Obligors on a joint and several basis pursuant to section 507(b) of the Bankruptcy Code (the "Secured Notes 507(b) Claim") subject to the Prepetition Debt Documents and any turnover provisions contained therein, to the extent of any of the Prepetition Secured Notes Secured Parties' Diminution in Value, shall be *pari passu* with the Cash Flow 507(b) Claim but senior to all other claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, subject and subordinate only to:  (i) the Carve Out; (ii) the DIP Superpriority Claims; and (iii) the ABL 507(b) Claim with respect to ABL Priority Collateral;

47

(i)  payment of the reasonable and documented prepetition and postpetition legal and other professional fees and expenses of the Secured Ad Hoc Group Advisors and the Prepetition Secured Notes Trustee;

(j)  non-cash accrual of interest on the on the Prepetition Cash Flow Obligations and the Prepetition Secured Notes Obligations at the applicable non-default rate of interest provided under their respective debt document and cash accrual of interest on the Prepetition ABL Facility Credit Agreement at the applicable non-default rate of interest provided thereunder; and

(k)  reporting consistent with which the DIP Secured Parties are to receive under the DIP Facility.

61.    The proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate and is sufficient to protect the Prepetition Secured Parties from any Diminution in Value in the Cash Collateral.  The Debtors' provision of the Adequate Protection is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Secured Parties Under the DIP Documents.**

62.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay interest and certain fees to the DIP Agent, the DIP Lenders, and the Fronting Lender.  These fees are customary and reasonable under the circumstances and are comparable to fees agreed upon in similar DIP financings.  In particular, as noted above, the Debtors have agreed to pay:

(a) *Interest Rates*:  Interest on the DIP Loans shall be paid in cash at a rate per annum equal to SOFR + 6.75% for DIP Loans denominated in Dollars and EURIBOR + 6.75% for DIP Loans denominated in Euros;

48

(b) ***Backstop Premium***:  3.0% of the New Money DIP Loans to the Fronting Lender, for the ratable account of each DIP Backstop Party, which Backstop Premium shall be earned, due, and payable-in-kind; and

(c) ***OID***:  2.0% to be paid in cash solely with respect to the New Money DIP Loans.

63.     Courts in this district and others have approved similar fees in large chapter 11 cases.  *See, e.g., In re STG Logistics, Inc.*, No. 26-10258 (MEH) (Bankr. D.N.J. Jan. 14, 2026) (approving a backstop fee of 5.5%) *In re Marelli Automotive Lighting USA LLC*, No. 24-11034 (CTG) (Bankr. D. Del. July 30, 2025) (approving a backstop fee of 5%); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. Jun. 10, 2024) (approving a backstop fee of 5%); *In re Thrasio Holdings, LLC*, No. 24-11840 (CMG) (Bankr. D.N.J. April 4, 2024) (approving a 7.5% backstop premium, on a final basis); *In re Careismatic Brands, LLC*, No. 24-10561 VFP) (Bankr. D.N.J. Feb. 29, 2024) (approving an 11% backstop premium, payable in-kind, and a 3.5% exit premium on a final basis); *In re MD Helicopter Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. April 4, 2022) (approving an 8% backstop fee payable in cash or equity interests).[8]

64.     It is understood and agreed by all parties, that the fees and rates to be paid under the DIP Facility were the subject of extensive, arm's-length negotiations between the Debtors and the DIP Secured Parties, are an integral component of the overall terms of the DIP Facility, and were required by the DIP Secured Parties as consideration for the extension of postpetition financing.  *See* Banks Decl. ¶ 24.

65.     The Debtors considered the fees described above when determining in their business judgment that the DIP Facility is reasonable and constitutes the best terms on which the Debtors can obtain the postpetition financing necessary to maintain ordinary-course operations

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

and effectively administer these chapter 11 cases.  The DIP Facility is reasonable under the current circumstances.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with entering into those agreements.

**IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

66.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

67.    As explained herein and in the Banks Declaration, the DIP Documents are the result of: (a) the Debtors' determination that, under the current circumstances, the DIP Facility provides the best, actionable postpetition financing alternative available to the Debtors and (b) heavily negotiated, arm's-length, good-faith negotiations between the Debtors and the DIP Lenders. *See* Banks Decl. ¶ 21, 29.  The Debtors submit that the terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

50

## V.      The Automatic Stay Should Be Modified on a Limited Basis.

68.      The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Secured Parties to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Secured Parties and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and an appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents or applicable law.

69.      Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Thrasio Holdings, LLC*, No. 24-11840 (CMG) (Bankr. D.N.J. April 4, 2024) (modifying the automatic stay as necessary to effectuate the terms of the order); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (same); *In re Rite Aid Corp.*, No. 23-18992 (MBK) (Bankr. D.N.J. Dec. 22, 2023) (same); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same).[9]

---

[9]      Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

51

**VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

70.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

71.    For the reasons noted above and as set forth in the Koza Declaration, the Debtors have an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Facility. The Debtors will use cash to fund the operation of their business for a sufficient amount of time to effectuate the restructuring transactions completed by the Restructuring Support Agreement. Substantially all of the Debtors' cash represents the Cash Collateral and the Debtors will not be able to meet their near-term liquidity needs without immediate access to Cash Collateral. *See* Koza Decl. at ¶ 13. The Debtors rely on the Cash Collateral generated from their operations to, among other things, honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and maintain favorable relationships with their vendors, suppliers, employees, and customers. At the outset of these chapter 11 cases, the Debtors will need this operating revenue to satisfy payroll and contractual obligations, pay suppliers, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business. *Id.* The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases. The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral

52

and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. *See id.* at ¶ 15. In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

72. The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility. The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final DIP Order to continue operating, and to implement the relief requested in the Debtors' other "first day" motions. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

73. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after thirty (30) days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

74. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

### Reservation of Rights

75. Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an implication or admission as to the amount of, basis for, or validity

of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien (contractual, common law, statutory, or otherwise) on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim.

## No Prior Request

76.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Notice

77.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of New Jersey; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) co-counsel to the Sponsor and the Plan Sponsor; (d) each of the Agent/Trustees; (e) counsel to the ABL Agent;

(f) counsel to the Secured Ad Hoc Group; (g) the office of the attorney general for each of the states in which the Debtors operate; (h) the United States Attorney's Office for the District of New Jersey; (i) the Internal Revenue Service; (j) counsel to the DIP Lenders; (k) counsel to the DIP Agent; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors request that the Court enter DIP Orders, in substantially the

forms submitted herewith, granting the relief requested herein and such other relief as is just and

proper under the circumstances.

Dated:  January 29, 2026

/s/ *Michael D. Sirota*

| | |
|---|---|
| **COLE SCHOTZ P.C.** | **KIRKLAND & ELLIS LLP** |
| Michael D. Sirota, Esq. | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Warren A. Usatine, Esq. | Steven N. Serajeddini, P.C. (*pro hac vice* pending) |
| Felice R. Yudkin, Esq. | 601 Lexington Avenue |
| Court Plaza North, 25 Main Street | New York, New York 10022 |
| Hackensack, New Jersey 07601 | Telephone:     (212) 446-4800 |
| Telephone: (201) 489-3000 | Facsimile:     (212) 446-4900 |
| Email:  msirota@coleschotz.com | Email:            steven.serajeddini@kirkland.com |
|         wusatine@coleschotz.com | |
|         fyudkin@coleschotz.com | -and- |

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Rachael M. Bentley (*pro hac vice* pending)
Peter A. Candel (*pro hac vice* pending)
Ashley L. Surinak (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:            rachael.bentley@kirkland.com
                 peter.candel@kirkland.com
                 ashley.surinak@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Interim Order**

[TO COME]