**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
steven.serajeddini@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Rachael M. Bentley (admitted *pro hac vice*)
Peter A. Candel (admitted *pro hac vice*)
Ashley L. Surinak (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
rachael.bentley@kirkland.com
peter.candel@kirkland.com
ashley.surinak@kirkland.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| MULTI-COLOR CORPORATION, *et al.*, | Case No. 26-10910 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OBJECTION TO THE CROSS-HOLDER AD HOC
GROUP'S EMERGENCY MOTION FOR RELIEF FROM THE SALE
PROCESS AND FOR MODIFICATION OF CERTAIN RELATED MATERIALS**

---

[1] The last four digits of Debtor Multi-Color Corporation's tax identification number are 5853. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/MCC. The location of the Debtors' service address for purposes of these chapter 11 cases is: 3284 Northside Parkway NW, Suite 400, Atlanta, Georgia 30327.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") object to the *Cross-Holder Ad Hoc Group's Emergency Motion for Relief from the Sale Process and for Modification of Certain Related Materials* [Docket No. 263] (the "Motion")[2] filed by the ad hoc group of unsecured noteholders represented by Jones Day and Wollmuth Maher & Deutsch LLP (the "Minority Holdout Group").[3] In support of this objection, the Debtors respectfully state as follows:

**Preliminary Statement**

1. The Minority Holdout Group—a dwindling group representing only approximately 10% of the Debtors' funded debt—believes that it can supplant the Debtors' business judgment, exercised pursuant to their duties as estate fiduciaries, with its own self-interested judgment. Similar to the premises underlying the Motion—which are conclusory, theatrical, and false—that belief is incorrect. Pursuant to the RSA,[4] the Debtors have always maintained, and will always maintain, the ability to act in accordance with their fiduciary duties, and they will continue to act in such manner. The RSA permits the Debtors to "consider, respond to, facilitate, and negotiate" *any* alternatives and furthermore permits the Debtors to actively "solicit" alternatives for a sale.[5] That includes any proposals from the Minority Holdout Group.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

[3] *See Joint Verified Statement of Jones Day and Wollmuth Maher & Deutsch LLP Pursuant to Bankruptcy Rule 2019* [Docket No. 199].

[4] *See Declaration of Garrett Gabel, Chief Restructuring Officer of Multi-Color Corporation and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [Docket No. 23], Ex. A.

[5] *See* RSA, § 8.02.

2

2. Although the Minority Holdout Group indicated almost a month ago that it was preparing an alternative plan proposal and reiterated the same at the first day hearing,[6] the Debtors have not received any such proposal. The Debtors remain open and willing to engage with the Minority Holdout Group on any proposal that the Minority Holdout Group puts forth. And if the Minority Holdout Group requests the ability to discuss with other potential interested parties, the Debtors are willing to accommodate such request after the Debtors are provided the identity of such parties to allow the Debtors to confirm that, in their business judgment, such discussions will not impair the integrity of the ongoing marketing process. The Minority Holdout Group's requested relief is nothing more than a thinly veiled attempt to obtain authority from this Court to spearhead its own competing process premised on its self-interested motives.

3. Although the Motion is framed as an altruistic pursuit of a fair process, the reality is that the Minority Holdout Group has been singularly focused on hindering the Debtors' restructuring efforts, which are supported by a supermajority of holders of the Debtors' funded indebtedness and where all other creditors are unimpaired. In light of the foregoing, the Motion suggests that the Debtors should be conducting this marketing process for the sole benefit of the Minority Holdout Group. The arguments made by the Minority Holdout Group in the Motion are consistent with the fact that the Minority Holdout Group is not an estate fiduciary, nor a statutory committee, and is under no obligation to represent any other party's interests other than its own.

4. Consequently, the Debtors require, as is customary, that outreach to potential interested parties be conducted by the Debtors and their advisors. If the Debtors determine that any such party is unable or unwilling to bid on a stand-alone basis, the Debtors may, in their business judgment, permit parties to work together in submitting a potential bid. But unless and

---

[6] *See* Jan. 30, 2026, Hr'g. Tr. at 149:22–23.

3

until such determination is made, reducing the number of potential bidders, and therefore competition, is inappropriate. The NDA provides for the foregoing framework, which is typical and appropriate in these circumstances.

5. The Minority Holdout Group's motives are even more perplexing when considering its proposed comments to the Debtors' form NDA. The Minority Holdout Group seeks authority from this Court to be included in the definition of "*Permitted Financing Sources*" in the Debtors' form process NDA.[7] The Minority Holdout Group has confirmed to the Debtors and on the record before this Court that it will be submitting a competing plan proposal, yet it now asks this Court to direct the Debtors to allow *all* potential bidders and financing sources the ability to work with the Minority Holdout Group in connection with preparation of their own competing bids. The Minority Holdout Group should not be permitted to upend the Debtors' competitive process in contravention of the protections afforded by section 363(n) of the Bankruptcy Code and rule 6004-2 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").[8]

6. Finally, there is no requirement for bidding procedures in connection with initial outreach to potential interested parties, let alone any requirement for a marketing process in connection with a debtor's chapter 11 cases as a threshold matter. The Motion, which implies there is entitlement to such procedures or process, is therefore based on a fundamentally flawed

---

[7] *See* Mot. at Ex. 1, p. 2.

[8] *See* 11 U.S.C. § 363(n) ("The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection."); Local Rule 6004-2(c)(2) (requiring each potential bidder "to confirm that it has not engaged in any bad faith or collusion with respect to the bidding or the sale.").

4

premise. Nonetheless, the Debtors, in an exercise of their business judgment, commenced a marketing process approximately two weeks ago to evaluate whether an actionable, value-maximizing sale alternative to the restructuring transactions embodied in the chapter 11 plan [Docket No. 17] (the "Plan") exists. That marketing process remains ongoing, and nothing prevents the Debtors from seeking approval of bidding procedures, bid protections, and related matters at the appropriate time once the Debtors determine, in their business judgment after obtaining initial feedback from such process, that such mechanics are appropriate, necessary, and an efficient use of the Debtors' resources. However, consistent with the Debtors' goal of ensuring all potential value-maximizing alternatives can be evaluated, preserving the integrity of the marketing process is of paramount concern to the Debtors.

7. As set forth in the scheduling order [Docket No. 97], the date of the confirmation hearing (March 17, 2026) is appropriate, and any changes to the marketing process timeline appropriately remains within the Debtors' business judgment.[9] The Motion is nothing more than a premature confirmation objection and another example of the Minority Holdout Group's gamesmanship in these chapter 11 cases. For the reasons set forth herein, the Court should deny the Motion.

**Background**

8. On January 29, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On February 2, 2026, this Court entered an order directing the procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 98]. No request for the

---

[9] For example, the Debtors have extended the deadline for indications of interest to March 4, 2026, and will continue to make any modifications to the marketing process as they determine, in their business judgment and in their evaluation of potential value-maximizing alternatives.

5

appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### I. The Restructuring Support Agreement.

9. Prior to the commencement of these chapter 11 cases, the Debtors entered into the RSA, which represents the overwhelming consensus of key stakeholders across the Debtors' capital structure regarding the terms of a comprehensive restructuring. The restructuring transactions contemplated by the RSA will significantly deleverage the Debtors' balance sheet, reduce cash interest, and extend long-term debt maturities. The RSA contains provisions that enable the Debtors to seek alternative restructuring transactions to maximize the value of the Debtors' estates. As noted above, pursuant to section 8.02 of the RSA, the Debtors are permitted to "consider, respond to, facilitate, and negotiate an Alternative Restructuring Proposal." Additionally, section 7.02(g) and section 8.02 of the RSA permit the Debtors to actively seek and solicit Alternative Restructuring Proposals (as defined in the RSA) in the form of a sale or disposition of the Debtors' assets. Importantly, section 12.03 of the RSA provides the Debtors with a "fiduciary out" that allows them to terminate the RSA if proceeding with the restructuring transactions embodied in the Plan would be inconsistent with the exercise of their fiduciary duties to the estate. The Debtors therefore have been, and will continue to be, able to pursue the transaction that they believe will be value-maximizing for their estates in accordance with their fiduciary duties.

10. Further, section 1121 of the Bankruptcy Code provides the Debtors with a 120-day period in which the Debtors have the exclusive right to propose a plan and a 180-day exclusive period to obtain acceptances to a plan. 11 U.S.C. § 1121(b)–(d). As noted above, the Minority Holdout Group has yet to submit a bid to the Debtors and the Minority Holdout Group should not

be permitted to improperly insert itself into the Debtors' process in an attempt to overturn the Debtors' exclusive statutory right to pursue consummation of a value maximizing transaction.

## II. The Debtors Marketing Process.

11. As noted above, the Debtors determined, in their business judgment, to begin conducting a marketing process to evaluate potential sale alternatives. The Debtors began such process on February 3, 2026, by sending a standard, confidential process letter to potential bidders that the Debtors, alongside their advisors, determined in their business judgment could be suitable participants. As of the date hereof, the Debtors and their advisors have contacted approximately 20 financial and strategic parties, in addition to the advisors to the Minority Holdout Group. Given the public nature of the chapter 11 cases and the Plan on file, along with the related disclosure statement (including the valuation analysis and financial projections attached as exhibits thereto), the market has had access to significant amounts of critical information since the Petition Date.

### A. The Minority Holdout Group's Involvement in the Marketing Process.

12. After receiving the process letter, rather than submit an alternative proposal to the Debtors—which, again, the Minority Holdout Group has claimed has been in process since January 25, 2026—the Minority Holdout Group spent three days drafting an extensive list of alleged deficiencies in the Debtors' marketing process. In response, the Debtors confirmed that they would share a CIM and historical financial reports—which collectively, along with other information being provided in connection with a second round in the marketing process, incorporates all of the information identified by Guggenheim as beneficial to the process (and more)—with parties that agreed to execute an NDA. The Debtors shared their form NDA with advisors to the Minority Holdout Group and sought confirmation of a single, but critically important piece of information—the capacity (creditor or bidder) in which the Minority Holdout

7

Group intended to participate in the marketing process. Following several requests for a response to this question, the Minority Holdout Group committed to being a bidder.[10]

13. The Minority Holdout Group then proceeded to obfuscate again regarding the identities of potential co-bidders, with whom it appeared the Minority Holdout Group had already been in contact. The Debtors requested that the identity of the potential co-bidders be disclosed to allow Evercore to commence outreach to these parties to share the Debtors' process letter and form NDA. To date, the Minority Holdout Group has refused to share the identity of the co-bidders with the Debtors' advisors and, without providing a legitimate basis for withholding this information, the Minority Holdout Group filed the Motion. Attached as Exhibit 1 to the Motion is the Minority Holdout Group's markup of the NDA. Six hours after the Minority Holdout Group filed the redacted Motion, the Minority Holdout Group shared the unredacted Motion with the Debtors, which was the first time the Debtors saw the Minority Holdout Group's markup of the NDA. Additionally, despite their emails on January 27, 2026, and their comments at the first day hearing that the alternative proposal was in progress, to date the Debtors have not received any alternative proposal from the Minority Holdout Group, who instead has focused its efforts on extensive and costly litigation.

---

[10] Notably, as a bidder, the Minority Holdout Group is precluded from colluding or seeking to enter into any exclusive arrangements. While the Minority Holdout Group posits that *In re Energy Future Holdings Corp.*, 2011 WL 13503057 (Bankr. D. Del. Apr. 26, 2011) supports its position, that court order, in a case concerning completely different facts and circumstances, involved the ***debtors*** seeking approval of bidding procedures, which is within their business judgment as discussed herein, and included protections against collusion. *Id.* (order provided that "each Bidder must acknowledge in writing that it has not engaged in any collusion" and permitted provisions "preclud[ing] entering into exclusive arrangements").

8

**Objection**

I. **The Debtors are Not Required to Conduct a Marketing Process or Have Bidding or Auction Procedures to Conduct a Marketing Process.**

   A. **There is No Requirement that the Debtors Conduct a Marketing Process.**

14. Court approval is only required if the Debtors seek to enter into a transaction outside of the ordinary course of business. *See* 11 U.S.C. § 363(b)(1) (requiring noticing and hearing for a sale of property of the estate outside of the ordinary course of business); § 1129(a) (requiring court approval for a plan, including one that would sell all or part of property of the estate). Prior to that point, there is no requirement that the Debtors seek court approval of their marketing process, as the Minority Holdout Group's own citations show. *See In re Dura Auto. Sys., Inc.*, 2007 WL 7728109, at *86 (Bankr. D. Del. Aug. 15, 2007) (describing various parts of the debtors' marketing process, all done without court approval, prior to the motion seeking approval of bidding procedures).

15. Not only is court approval not required for a marketing process, but there is no statutory requirement for a marketing process in the first instance. The requirement for a ***sale*** pursuant to section 363(b)(1) is a "sound business reason," *see Comm. Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983), and that the bid is the "highest and best bid." *See In re GSC, Inc.*, 453 B.R. 132, 169-70 (Bankr. S.D.N.Y. 2011) (explaining that a trustee maximizes value for the estate by selecting the highest and best bid). There is no requirement for a marketing process in connection with a ***sale***, as such a process is merely ***one*** way to demonstrate the appropriateness of price. *See In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992). To be clear, the Debtors are not seeking authority to consummate a sale transaction at this time. The Debtors are instead simply conducting market outreach to gauge the level of initial interest in a potential sale. Given there is no entitlement to a

marketing process as a threshold matter, there is no basis for the Minority Holdout Group to seek it incorporate its own self-interested views into any such process.

### B. There is No Requirement for Court-Approved Bidding Procedures.

16. As there is no statutory requirement for a marketing process, there is likewise no requirement for bidding or auction procedures related to any marketing or sale process unless the Debtors seek court approval of such procedures in an exercise of their business judgment. *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001) (noting that a "sale transaction does not require an auction procedure"); *In re MTE Holdings LLC*, 2021 WL 3743201, at *6 (Bankr. D. Del. Aug. 17, 2021) (noting that, while the Bankruptcy Code requires court approval of a *sale*, "[the Bankruptcy Code] does not by its terms require an auction"); *In re Edwards*, 228 B.R. 552, 560 (Bankr. E.D. Pa. 1998) (raising no issue that the sale process began without court-approved bidding procedures). It is no surprise then that the cases cited to by the Minority Holdout Group are situations where the *debtor* sought court approval of procedures. At this time, such procedures are unnecessary and unwarranted and would not be beneficial to the process or constitute an efficient use of the Debtors' resources in seeking their approval. The Minority Holdout Group cannot point to any legal authority eliminating the Debtors' business judgment on this matter, as the Minority Holdout Group's own citation shows. *See In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. Nov. 3, 2014) [Docket No. 2699] Tr. at 16:7–16 (explaining that debtors "normally" seek court approval of a stalking horse *after* the selection of a stalking horse has already been made by the debtors, including prior to the approval of bidding procedures).

**II.    The Marketing Process is Appropriate and Designed to Promote Competition and Ensure Fair Bids.**

17.    Notwithstanding the foregoing, the Debtors commenced an appropriate marketing process to gauge interest in a potential sale.  The Debtors reached out to approximately 20 financial and strategic potential counterparties, all of whom had access to the material information filed in connection with these chapter 11 cases, including, among other things, the Plan, the related disclosure statement, financial projections, a valuation analysis, and a suite of first day motions describing the Debtors' ordinary course operations.  The Debtors, based on their business judgment and in consultation with their sophisticated advisors, believed those participants were the right audience.  Nonetheless, the Debtors requested from the Minority Holdout Group the names of any other potential bidders, whom the Debtors and Evercore will promptly reach out to once identified.  The Debtors have entered into NDAs with three potential bidders and are currently in negotiations with an additional party regarding the terms of the NDA.  The potential bidders under NDA have received the CIM and other financial information and the Debtors will continue to foster participation and maintain the integrity of the process.

**A.    The NDA is Appropriate.**

18.    The NDA does nothing more than preserve that integrity and ensure that the Debtors receive competitive bids that are not tainted by collusion.  Unsurprisingly, ***no other party*** has raised any issues with these NDA provisions and the parties under NDA executed NDAs containing these provisions.  The NDA permits any potential bidder to engage with other potential bidders or financing sources upon obtaining the consent of the Debtors, as is customary.  Accordingly, the Debtors may permit such engagement after the Debtors determine, in their business judgment, that doing so is appropriate and would not harm the process or their pursuit of

11

a potential value-maximizing sale (*i.e.*, that a party is unable or unwilling to bid on a stand-alone basis).

19. The inclusion of these provisions is consistent with the principles embodied in section 363(n) of the Bankruptcy Code and Local Rule 6004-2(c)(2) against collusion. Given the Minority Holdout Group's actions and correspondences to date, the Debtors are particularly concerned of potential collusion and, as fiduciaries of the estate, must continue to protect the integrity of the process. The Debtors reserve all rights with respect to the Minority Holdout Group's actions taken to date with respect to the ongoing marketing process, including seeking emergency relief.

### B. There is Nothing "Secretive" About the Marketing Process.

20. Contrary to the Minority Holdout Group's argument, the marketing process is not "clandestine." Mot. at ¶ 25. The RSA was filed on the public docket and makes clear that the Debtors are fully able to consider any and all alternative proposals that parties want to submit. *See* RSA § 8.02. There is no requirement to issue a press release with respect to a marketing process. The Debtors and their advisors have reasonably determined to focus their efforts efficiently on realistic counterparties to a transaction of this nature. As noted above, if the Minority Holdout Group provides a list of potential parties to the Debtors and their advisors, the Debtors will engage with these parties, and subject to execution of an NDA, be provided confidential information.

### III. The Marketing Process Timeline is Appropriate.

21. As noted above, the marketing process timeline is appropriate and subject to adjustment by the Debtors as they determine in their business judgment. For example, the deadline for initial indications of interest has been extended to March 4, 2026. The Debtors and their advisors will, after reviewing the feedback and information received, determine appropriate next steps in their pursuit of a value maximizing transaction. The Minority Holdout Group—again, a

12

dwindling group holding only approximately 10% of the Debtors' funded debt—cannot substitute its own self-interested views in place of the Debtors.

## **Conclusion**

22. For the foregoing reasons, the Motion should be denied.

*[Remainder of page intentionally left blank.]*

Dated: February 20, 2026

*/s/ Michael D. Sirota*

| | |
|---|---|
| **COLE SCHOTZ P.C.** | **KIRKLAND & ELLIS LLP** |
| Michael D. Sirota, Esq. | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Warren A. Usatine, Esq. | Steven N. Serajeddini, P.C. (admitted *pro hac vice*) |
| Felice R. Yudkin, Esq. | 601 Lexington Avenue |
| Court Plaza North, 25 Main Street | New York, New York 10022 |
| Hackensack, New Jersey 07601 | Telephone: (212) 446-4800 |
| Telephone: (201) 489-3000 | Facsimile: (212) 446-4900 |
| Email: msirota@coleschotz.com | Email: steven.serajeddini@kirkland.com |
| wusatine@coleschotz.com | |
| fyudkin@coleschotz.com | -and- |

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Rachael M. Bentley (admitted *pro hac vice*)
Peter A. Candel (admitted *pro hac vice*)
Ashley L. Surinak (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    rachael.bentley@kirkland.com
peter.candel@kirkland.com
ashley.surinak@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*