

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
**U.S. COURTHOUSE**
**402 E. STATE STREET**
**TRENTON, NEW JERSEY 08608**

**Hon. Michael B. Kaplan**                                        **609-858-9360**
**Judge, United States Bankruptcy Court**

March 16, 2026

*All Interested Parties*

**Re:     In re Multi-Color Corporation, et al.**
        <u>**Case No. 26-10910 (MBK)**</u>

Dear Counsel:

Presently before the Court are:

1. The Cross-Holder Ad Hoc Group's Motion to Dismiss or, in the Alternative, Transfer the Chapter 11 Cases (ECF No. 71); and

2. The United States Trustee's Motion to (i) Dismiss the case of MCC-Norwood, LLC pursuant to 11 U.S.C. § 1112(b) and (ii) Transfer venue or dismiss all cases pursuant to 28 U.S.C. §§ 1406, 1408, 1412 and Bankruptcy Rule 1014(a) (ECF No. 266).

The Cross-Holder Ad Hoc Group (the "Cross-Holders") and the United States Trustee ("UST") (collectively, the "Movants") argue that venue in the District of New Jersey is improper under 28 U.S.C. § 1408 and that the cases must therefore be dismissed or transferred. The UST additionally seeks dismissal of MCC-Norwood under § 1112(b) for lack of good faith.

The Court has reviewed carefully the parties' written motions, objections, joinders, replies and supplemental briefs, as well as the witness declarations, testimony of Garrett Gabel, Matthew Jacques and Eric Koza, together with the cross/redirect examination of the witnesses and

1

documentary exhibits offered during the evidentiary hearing. The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984—as amended September 18, 2012, and June 6, 2025— referring all bankruptcy cases to the bankruptcy court.  This matter is a statutory core proceeding, and this Court has constitutional authority to enter a final order. 28 U.S.C. § 157(b)(2)(A).  After full consideration of the evidence, as well as the statutory framework, and controlling precedent, the Court, in denying both motions in their entirety, states its findings of fact and conclusions of law, consistent with Fed R. Bankr. P 7052.[1]

## I.        Background and Procedural History

Each of the Debtors' petitions rely on Debtor MCC-Norwood's venue in this district being proper as the basis for venue in this district.  MCC-Norwood is an Ohio limited liability company, formed in 2014, and is a direct, wholly owned subsidiary of Debtor Multi-Color Corporation ("MCC").  MCC-Norwood did not—and does not—have its own employees or customers.  Rather, MCC-Norwood was formed solely as an acquisition vehicle for the Debtors' purchase of a manufacturing facility located in Norwood, Ohio (the "Norwood Facility"), which was subsequently closed and thereafter sold in 2023.  There have been no operations since.

On December 19, 2025, MCC-Norwood opened a bank account (as funded, the "Adequate Assurance Account") with ConnectOne Bank, located in Englewood Cliffs, New Jersey.  On January 13, 2026, Multi-Color Corporation funded the Adequate Assurance Account with approximately $1.05 million via a wire transfer.  On the same day, MCC-Norwood opened a second account with ConnectOne Bank (as funded, the "DIP Account," and, together with the Adequate Assurance Account, the "Norwood Accounts") and funded the DIP Account with $1,000 via a wire transfer from the Adequate Assurance Account.  As of the Petition Date, the balances in the Adequate Assurance Account and the DIP Account were $1,048,975 and $1,000, respectively.  Debtors maintain that the Norwood Accounts, located in New Jersey, represent the MCC-Norwood's principal assets for the requisite portion of the 180-day period prior to the filing of the chapter 11 case, January 29, 2026 (the "Petition Date") and, thus, venue in this district is proper.

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact they too are adopted as such.

Movants point out that the MCC-Norwood petition lists MCC-Norwood's principal place of business as being located in Atlanta, Georgia. *See MCC-Norwood Petition*, Box 4 (ECF No. 1 in Case No. 26-10909). And, although venue in this district is premised on the location of MCC-Norwood's principal assets, the portion of the petition that asks for the "[l]ocation of principal assets, if different from the principal place of business" is blank. *Id.* Less than an hour before the First Day Hearings in this matter, the Cross-Holders filed a Motion to Dismiss, arguing that dismissal or transfer is mandatory based on the sworn statements made by Debtors in the MCC-Norwood petition. The Court declined to rule on the Cross-Holders' motion—finding that venue was appropriate based on the record that existed at the time, including representations by counsel as to the existence of the Norwood Accounts and the sworn statements made in the petition supporting the basis for venue in New Jersey. The Court deferred consideration of the Motion to Dismiss in favor of addressing the emergent First Day matters requiring immediate attention. As of the time of the First Day matters, no party in interest opposing the Debtors' choice of venue had carried their burden of demonstrating that venue was improper. *See, e.g. In re Neufeld*, 2012 WL 5845590, at *1 n.3 (Bankr. M.D. Pa. Nov. 16, 2012) ("The party challenging venue bears the burden of establishing by a preponderance of the evidence that the case was filed in the wrong district."); *see also Def. Distributed v. Att'y Gen. of New Jersey*, 2026 WL 394269, at *5 (3d Cir. Feb. 12, 2026) (explaining, in context of § 1404, that movants bear the burden of demonstrating the need for transfer of venue). Accordingly, the Court set the matter for an evidentiary hearing, on a compressed timetable, and directed the parties to engage in discovery and additional briefing to further develop a more fulsome record. In the interim, the UST filed its own motion to dismiss based on improper venue and bad faith.

In subsequent submissions and in oral arguments on the record, Movants elaborate on the bases for their motions. Specifically, the Cross-Holders allege that venue is improper because during the relevant period, MCC-Norwood possessed assets, other than the Norwood Accounts, located outside of the District of New Jersey. *See Cross-Holders' Reply* ¶¶ 15-36, ECF No. 336. The UST does not explicitly adopt this argument, but agrees that, if assets other than the Norwood Accounts exist, venue is improper in New Jersey. *UST's Motion* ¶ 21, ECF No. 266-1. The UST also separately asserts that bank accounts—as an intangible asset—are insufficient to create venue under § 1408, *see UST's Reply* ¶¶ 7-11, ECF No. 339, and that the MCC-Norwood petition was

3

filed in bad faith and must be dismissed as it lacks a valid restructuring purpose, *id.* at ¶¶ 12-14; *see also UST's Motion* at ¶ 22-25.

Following the evidentiary hearing held on February 26, 2026, the Court requested additional submissions from the parties. Specifically, the Court requested briefing on a narrow issue: "whether assets that have no demonstrable economic or monetary value may still be considered 'principal assets' for purposes of applying the venue statute." *Judge Correspondence dated March 3, 2026*, ECF No. 391. The Court has reviewed fully the responses received, including those submitted by the UST (ECF No. 410), Clayton Dubilier & Rice LLC (ECF No. 411), counsel for the Secured Ad Hoc Group (ECF No. 412), the Excluded First Lien Lenders (ECF No. 413), the Cross-Holders (ECF No. 414), and Debtors (ECF No. 416).

## II.    Discussion

### A.    Congressional Design of Bankruptcy Venue

Venue of a bankruptcy case is governed by 28 U.S.C. § 1408. The statute permits a debtor to file in any district where, its domicile, residence, principal place of business, or principal assets were located during the 180 days preceding the petition date (or for a longer portion of that period than in any other district). The statute is written in the disjunctive. It is deliberately broad.

For decades, at the urging of many in the bankruptcy community, Congress has considered proposals to narrow bankruptcy venue. Most recently, in 2023, H.R. 1017 proposed to materially restrict corporate bankruptcy venue options by requiring filing in the district of principal place of business or principal assets (with further refinement on the scope of "principal assets") and placed limits on affiliate-based venue. Of particular interest was the proposed language which specifically excluded cash or cash equivalents from consideration as "principal assets", as well as assets that were transferred within a year prior to the filing or for the express purpose of establishing venue. The proposed legislation also shifted the burden of proof onto the petitioner.

Like similar efforts in the past, H.R. 1017 died in committee, and no new legislation has been introduced. In point of fact, during the last twenty years, Congress repeatedly has been invited by judges, academics and practitioners to cabin bankruptcy venue and yet has chosen not to do so. Where Congress is aware of an issue and repeatedly declines to amend the statute, courts are not free to displace Congress and narrow the statute judicially. Section 1408 remains broad by

congressional design. That breadth is not a defect; it is a policy choice. This Court applies the statute as written. *See, e.g. Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 239, 145 S. Ct. 1984, 1995, 222 L. Ed. 2d 472 (2025) (discussing statutory interpretation in analogous circumstances, and explaining that courts cannot question whether Congress *should* have authorized a suit but, instead, must examine whether it, in fact, did so) (citing *Lexmark Int'l, Inc. v. Static Control Component*s, *Inc.*, 572 U.S. 118, 128, 134 S. Ct. 1377, 1388, 188 L. Ed. 2d 392 (2014) (stating that courts cannot limit a cause of action that Congress has created)).

### B.  Effect of the initial MCC-Norwood Petition

The Court first addresses Movants' contention that the original petition concedes Georgia venue. Movants argue that MCC-Norwood's original petition constituted a binding judicial admission that its "principal assets" were located in Georgia because the petition listed Georgia as the principal place of business and left blank the line for "location of principal assets if different." The Court rejects this argument.

First, the Official Form petition is not drafted as a binary declaration that silence serves as the equivalent of affirmative representation. Rather, it requests the location of principal assets if different from the principal place of business. The absence of a separate entry does not constitute a sworn factual representation that principal assets were located in Georgia. It reflects, at most, a possible omission or error which can be (and was) subsequently rectified through amendment of the petition.

Second, venue is determined under 28 U.S.C. § 1408 by objective statutory criteria—not by the wording precision of a form. Courts determine venue based on facts, not on drafting imperfections. Third, even assuming that the original petition was incomplete or ambiguous, Bankruptcy Rule 1009(a) permits amendment "at any time before the case is closed." The filing of an amendment does not "manufacture" facts; it clarifies them.

In their Reply, the Cross-Holders assert that "Debtors cannot simply amend the original petition in an attempt . . . to cure the [venue] deficiency." *Cross-Holders' Reply* ¶ 8, ECF No. 336.[2]

---

[2] The Cross-Holders cite *In re EDP Med. Computer Sys., Inc.*, 178 B.R. 57, 63 (M.D. Pa. 1995) in support of this proposition. As an initial matter, the *EDP* case does not involve or address amendments to petitions*; EDP* therefore, does not support the Cross-Holders' argument. Rather, the court in *EDP* analyzed the underlying facts and determined that the debtor "is not a resident nor is its principal place of business located in Pennsylvania, and all of its assets are located in New York." *EDP*, 178 B.R. at 63.  In other words, the *EDP* court conducted precisely the type of analysis

Such a position is contrary to Bankruptcy Rule 1009 and existing case law and, indeed, would produce absurd and inequitable results.  Courts have explained that "allowing a debtor to amend [a voluntary petition, list, schedule, or statement] at any time prior to the closing of a bankruptcy case is intended to aid in maximizing the opportunity for the debtor to make a fresh start." *In re Akulova*, 407 B.R. 602, 605 (Bankr. D. Del. 2009) (citations omitted). Thus, foreclosing the possibility of amendment altogether—as the Cross-Holders suggest here—would undermine the purpose of the Bankruptcy Code.  Furthermore, it is not difficult to imagine scenarios wherein precluding amendment to clarify venue would result in illogical and unfair outcomes. Simply put, the question of venue cannot hinge on typos or omissions; nor can it rest on unsupported factual allegations.  Instead, once venue is challenged, a court must undertake an inquiry to determine whether venue is proper based on the existing record.  This Court undertakes such an inquiry here.

As to the assertion that amendments filed after a venue objection should be given diminished weight, *see, e.g. UST's Reply* ¶¶ 5-6, ECF No. 339, such an argument may possibly apply where an amendment contradicts substantive sworn testimony. That is not this case.  Here, the factual record—including testimony regarding MCC-Norwood's assets—was developed in open court and subject to cross-examination. Venue in this matter turns on where principal assets were located—not on whether or when a form was amended. The Court therefore finds no binding judicial admission that precludes the Debtors' venue position and declines to ascribe meaning to the timing of the amended MCC-Norwood petition.[3]

### C. Analysis

#### 1. Venue under 28 U.S.C. § 1408

As stated, venue in the filing of a bankruptcy case is controlled by the provisions of 28 U.S.C. § 1408, which provides (in relevant part) that a voluntary petition may be filed in the district

---

this Court now undertakes to determine whether venue is proper.  The Cross-Holders add a parenthetical to their *EDP* citation, explaining that "bankruptcy courts faced with improperly venued proceedings must either dismiss or transfer the case—they cannot retain it[.]" *Cross-Holders' Reply* at ¶ 8.  This Court agrees.  Nevertheless, *EDP* does not support the Cross-Holders' argument that a petition cannot be amended to clarify venue; rather, the decision merely confirms the obvious, that a court must consider all relevant factors analyzing whether venue is proper.

[3] Additionally, it is undisputed that the Norwood Accounts—which serve as the basis for venue and whose existence the petition was amended to reflect—were opened *before* the initial MCC-Norwood petition was filed. This further negates the UST's argument that the timing of amendment should impact the weight accorded to the facts asserted therein.

6

"in which the . . . [debtor's] *principal assets . . .* have been located for the one hundred and eighty days immediately preceding [the petition] *or for a longer portion of such one-hundred-and-eighty-day period than . . . in any other district.*" 28 U.S.C. § 1408(1) (emphasis added); *see also, e.g. In re Moreno*, 2025 WL 3522447, at *2 (Bankr. D.P.R. Dec. 8, 2025). The question, thus, is two-fold: (1) what are the debtor's principal assets? and (2) where were those principal assets located for the longer portion of the 180-day period immediately preceding the filing of the petition (the "Venue Period")?

Application of this statute is ordinarily straightforward. Typically, the principal assets—and their location—can be clearly identified. If, for example, the principal asset is a piece of machinery, then venue is appropriate in the district in which that machinery has been located throughout the Venue Period. If the machinery changed locations during the Venue Period, then a comparative analysis begins, and venue is appropriate in the district in which the machinery was located for the longer portion of the Venue Period. However, the statutory language is less instructive, and the inquiry becomes muddled, when—as here—questions exist as to what constitutes the principal assets, and the principal assets upon which venue is based have existed for only a small portion of the 180-day Venue Period.

The Norwood Accounts were opened on December 19, 2025, and funded on January 13, 2026—16 days prior to the filing of the petition on January 29, 2026. Thus, Norwood Accounts could only serve as the principal asset for, at most, 16 days during the Venue Period and did not exist during the remaining 164 days (by far, the longer portion of the 180-day window). Does this mean—as the Cross-Holders suggest—that a *different* asset served as MCC-Norwood's principal asset during those 164 days? If that is the case, and if MCC-Norwood possessed that other asset for *more than* 16 days during that 164-day period, then that asset, by default, would be the principal asset that MCC-Norwood possessed "for a longer portion" of the Venue Period under the statute. As a corollary, venue appropriately would be determined by the district in which that other principal asset is located. The Court will refer to this analysis as the "Time-Based Approach." Under this approach, the Debtor's principal assets are identified and tabulated for each day during the 180-day window. While this approach is straightforward and logical, it is not the only approach which fits comfortably within the statute.

The statute also can be interpreted to require that a court *first* identify the Debtor's principal assets, *as of the petition date*, and then discern the location of the principal assets during the 180-day Venue Period. As the Debtors suggest—where there are multiple assets, a Court must first undertake a qualitative and quantitative analysis to determine which, out of all of the debtor's assets, are the *principal* assets—irrespective as to the number of days that the debtor owned each asset.  The Court then looks to where the principal asset(s) were located for the longer portion of the Venue Period to determine the appropriate venue.  The Court will refer to this as the "Asset-Based Approach."  The Asset-Based Approach becomes more complicated because the statute does not provide guidance as to how to conduct this inquiry.  Debtors suggest that courts should "look to the assets owned by the debtor at the time of filing." *Debtors' Supp. Br.* ¶ 14, ECF No. 416. Movants implicitly argue (and, indeed, the Time-Based Approach necessarily requires) that courts look to "any assets . . . owned during" the Venue Period. *See, e.g.*, *UST's Supp. Br.* 1, ECF No. 410; *Cross-Holders' Reply* ¶ 3, ECF No. 336 (arguing that the Norwood Accounts "cannot establish venue because Norwood held substantial assets outside of New Jersey for far longer during" the Venue Period).

Admittedly, the issue before this Court is difficult and none of the parties' suggested interpretations is without flaws. *Compare In re Ross*, 312 B.R. 879, 889 (Bankr. W.D. Tenn. 2004), *aff'd sub nom. In re MacDonald*, 356 B.R. 416 (W.D. Tenn. 2006), *aff'd sub nom. Thompson v. Greenwood*, 507 F.3d 416 (6th Cir. 2007) (stating that "a debtor may have more than one appropriate venue based upon more than one principal asset"); *with In re Innovative Commc'n Co., LLC*, 358 B.R. 120, 126 (Bankr. D. Del. 2006) (citing *In re Handel,* 242 B.R. 789, 792 (Bankr. D. Mass. 1999) and explaining that preceding word "principal" limits venue under § 1408 to singular location); *and In re J & L Plumbing & Heating, Inc.*, 186 B.R. 388, 392 (Bankr. E.D. Pa. 1995) (identifying singular asset—accounts receivable—as principal asset); *with In re Neufeld,* 2012 WL 5845590, at *1 (identifying "where the greater dollar value of all property of the estate is located" to determine location of principal assets).

Neither the parties' briefing, nor the Court's own research, discloses any prior court decisions which examine and compare these competing approaches or make inquiry as to the mechanics involved in applying the venue statute.  As this Court sees it, both approaches have

flaws and can lead to absurd or unintended results. For example,[4] consider a debtor who, several years prior to filing, purchased two pieces of machinery: one located in Kansas, and one in Texas. The machinery in Kansas is indisputably the more valuable. However, 10 days before filing for bankruptcy, a tornado destroys the machinery in Kansas, reducing it to scrap metal. The incident is not covered by any insurance. As a result, the most valuable asset the debtor possesses at the time of its bankruptcy filing is undeniably the machinery in Texas. On these facts, the machinery in Kansas was the debtor's principal asset for 170 days of the 180-day Venue Period; and the machinery in Texas was the debtor's principal asset for only 10 days out of the 180-day Venue Period. Under the Time-Based Approach, the primary asset for venue purposes is the Kansas machinery because debtor owned it for the "longer portion" of the 180-day Venue Period. This is an illogical result the debtor owns only scrap metal in Kansas and does not have any other ties to that jurisdiction. Requiring venue in a Kansas court would not assist with administration of the estate and would be contrary to the underlying purpose of the Code. *See, e.g. In re Murrin*, 461 B.R. 763, 788 (Bankr. D. Minn.), *rev'd and remanded on other grounds*, 477 B.R. 99 (D. Minn. 2012) ("Logically, [§ 1408] should be construed in a way most resonant with the *functional* concerns of the administration of the bankruptcy estate.") (emphasis in original); *see also In re Blixseth*, 484 B.R. 360, 367 (B.A.P. 9th Cir. 2012). In these circumstances, an Asset-Based Approach that evaluates the principal asset as of the petition date produces the more reasonable result. The principal asset at the time of the bankruptcy filing was the Texas machinery—even though it only qualified as the "principal asset" for 10 days out of the 180-day Venue Period.

The Court acknowledges that the Asset-Based Approach, to some degree, makes venue subject to manipulation. Indeed, many assets can be relocated. However, the potential for manipulation is tempered by the time constraints built into the statute. For example, using the same scenario presented above, for years, a debtor has owned two pieces of machinery: one located in Kansas, and one in Texas. The machinery in Kansas is indisputably the most valuable, i.e. principal asset. Ten days before filing for bankruptcy the debtor moves the machinery from Kansas to Delaware and then files for bankruptcy in that district. Even under an Asset-Based Approach, venue is *not* appropriate in Delaware based on the machinery's location there. Rather, the statute demands that courts compare the length of time that the principal asset was located in Delaware

---

[4] For all examples and hypotheticals employed in this Opinion, the Court considers only the location of the principal assets as a basis for venue, not place of incorporation or principal place of business.

during the Venue Period, versus the length of time it was located elsewhere.  On these facts, the machinery that serves as the principal asset was located in Kansas for 170 days of the 180-day Venue Period, and in Delaware for only 10.  Because it was located in Kansas for "a longer portion" of the Venue Period, venue is proper there—not in Delaware. *See* 28 U.S.C. § 1408(1).

The Court can conceive how some parties might develop creative workarounds to the protections built into the statute.  For example, using the same scenario presented above, let's assume that the debtor, 10 days before filing for bankruptcy, sells the machinery in Kansas (the principal asset) and uses the proceeds to purchase new, expensive machinery in Delaware.  On these facts, the machinery in Kansas was the debtor's principal asset for 170 days of the 180-day Venue Period, and the new machinery in Delaware is the debtor's current principal asset (from an economic and monetary value perspective)—even though the debtor has owned it for only 10 days out of the 180-day Venue Period, and despite the fact that the debtor has owned the less-valuable machinery in Texas for the entirety of the Venue Period.  Under the Asset-Based Approach, the principal asset at the time of filing is the Delaware machinery and venue is appropriate there— even though the debtor effectively manufactured venue on the eve of the bankruptcy filing. Importantly, however, courts may still make use of § 1412 and transfer the case if the facts so require.  Indeed, the appropriateness of venue under § 1408 and the decision to transfer under § 1412 require fact-intensive inquiries. *See, e.g. In re Blixseth*, 484 B.R. at 367 (mandating a "context-specific analysis" when determining principal assets); *In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012) (stating that courts considering a transfer of venue of bankruptcy case must base its analysis on the facts underlying the particular case before the court). As discussed, there have been specific proposed venue reforms which would address efforts to manipulate venue. Unless and until there is legislative action, Courts will apply existing case law and the considerations for case transfer under § 1412—convenience of the parties and the interests of justice—to prevent abuse of the venue statute.  This is evident in many of the analogous cases cited by Movants.  For example, courts have transferred venue even where debtors achieved "literal and technical compliance with the venue statute" by incorporating affiliates in the weeks preceding the date of filing. *See In re Patriot Coal Corp.*, 482 B.R. 718; *see also In re AnthymTV Co.*, 650 B.R. 261, 279 (Bankr. D.S.C. 2023) (finding that debtor's intangible principal assets were located in Massachusetts during the Venue Period but nevertheless transferring to South Carolina under §

10

1412). For the reasons addressed below, however, transfer of these cases pursuant § 1412 is unwarranted.

Ultimately, the Court concludes that an Asset-Based Approach—one that evaluates the assets that a debtor possesses *at the time the petition is filed* and where *such assets* were located for the longer portion of the Venue Period—is the appropriate approach for determining venue based on principal assets. *See, e.g. In re Szanto*, 2022 WL 4391803, at *9 (Bankr. S.D. Cal. July 22, 2022), *aff'd sub nom. Szanto v. Chase Bank*, 2023 WL 4629564 (S.D. Cal. June 15, 2023) (evaluating assets owned at the time of the bankruptcy filing); *In re Petrie*, 142 B.R. 404, 404 (Bankr. D. Nev. 1992) (evaluating principal assets at the time of the commencement of the case); *Barnes v. Whelan*, 689 F.2d 193, 205 (D.C. Cir. 1982) (evaluating assets owned by the debtor at the time the petition was filed); *id.* at n.20 (citing *Watters v. Hamilton Gas Co.*, 10 F. Supp. 323, 326 (S.D.W. Va.), *aff'd*, 79 F.2d 438 (4th Cir. 1935)). This approach produces more logical results and construes the statute in a way that is more consistent with the functional concerns of the administration of the bankruptcy estate. *See In re Murrin*, 461 B.R. 763; *In re Blixseth*, 484 B.R. 360. This Court has not found any case law directly on point and the statutory language does clarify the issue. Congress has—seemingly intentionally—left the venue statute broad and has not provided explicit guidance for its application. Effectively, Congress has created a jump ball when it comes to venue, and all parties are holding tight to their justifiable positions. Given the considerations discussed above and in analogous cases, however, this Court finds that the possession arrow favors the Asset-Based Approach.

With this framework in mind, the Court turns to the facts of the case before it—comparing MCC-Norwood's assets to determine which asset constituted its "principal asset" at the time it filed for bankruptcy protection. *See, e.g.*, *In re Szanto*, 2022 WL 4391803, at *9 (citing Webster's Collegiate Dictionary (11th ed. 2012), which defines "principal" as "most important, consequential, or influential")); *In re Neufeld*, 2012 WL 5845590, at *1 (citing Am. Heritage Dictionary (4th ed. 2000) and explaining that "the term 'principal' refers to an item of the 'first, highest or foremost in importance, rank, worth, or degree'"). The Court evaluates Debtors assets from both a quantitative and qualitative perspective, focusing both on the value and the importance of the assets in question. *See In re Houghton Mifflin Harcourt Pub. Co.*, 474 B.R. 122, 136 (Bankr. S.D.N.Y. 2012). For the reasons that follow, the Court finds that the Norwood Accounts constitute

11

the Debtors' principal assets for purposes of § 1408.  Because those assets were located longer in this district than in any other during the Venue Period—venue is proper in this district.

### a)  The Norwood Accounts

At the outset, the Court finds that the Norwood Accounts can serve as a basis for venue in this district.  The UST argues that bank accounts are intangible and follow the domicile of the owner under the doctrine *mobilia sequuntur personam*. *UST's Motion* ¶¶ 16-20, ECF No. 266-1. The Court declines to adopt this rigid rule. Indeed, several bankruptcy courts have directly addressed the location of deposit accounts for venue purposes and have declined to apply a domicile-based fiction.  For example, courts have held that bank accounts are located where:

- The account was opened,
- The depository branch maintains the account, or
- The funds are subject to withdrawal and control.

*See, e.g. In re Bavelis*, 453 B.R. 832 (Bankr. S.D. Ohio 2011) (brokerage account located where opened); *In re Farmer*, 288 B.R. 31 (Bankr. N.D.N.Y. 2002) (bank accounts located in district where bank was physically located); *In re Iglesias,* 226 B.R. 721 (Bankr. S.D. Fla. 1998) (deposit account located in district where opened). These courts did not apply *mobilia sequuntur personam*. They instead focused on the practical relationship between the debtor and the depository institution.  This Court finds those authorities persuasive. Here, the record—and the practical relationship between MCC-Norwood and ConnectOne Bank—establish New Jersey as the location of the accounts because:

- Norwood Accounts were opened at a branch of ConnectOne Bank in Englewood Cliffs, New Jersey.[5]
- The governing deposit agreement is governed by New Jersey law.
- The specific NJ branch is the designated beneficiary bank for wires.
- The routing numbers correspond to that specific institution.

---

[5] Cross-Holders point out that Englewood Cliffs, NJ is not in the Trenton vicinage and suggest that filing in Trenton, rather than Newark, also violates local rules. Local Bankruptcy Rule 1002-1 concerns administrative case assignment. It does not implicate subject matter jurisdiction or statutory venue. There is a myriad of factors considered by the Clerk of Court and its Chief Judge (in their absolute discretion) with regard to case assignment and having no relevance to these motions. Indeed, even if reassignment within this district were warranted, and it is not, it would not justify dismissal or transfer to another federal district.

Additionally, while not directly controlling, this Court finds further support and helpful context in certain treatment under Article 9 of the Uniform Commercial Code.  Specifically, § 9-304 of the UCC states:

> The law governing perfection of a security interest in a deposit account is determined by reference to jurisdiction and controlling law designated in the applicable deposit agreement, or failing that, the bank's location, as fixed by the branch designated to service the account or the location of the chief executive office.

Such treatment under the UCC reflects that commercial law assigns situs to deposit accounts based on factors which do not consider the depositor's domicile. On this factual record, the Court finds that the Norwood Accounts are located in New Jersey. *See e.g. In re Blixseth*, 484 B.R. 360 (discussing the situs for intangible assets and applying a context-based approach to conclude that the location of an intangible asset for bankruptcy venue purposes is the jurisdiction where collection must be pursued).

The UST further suggests that because the accounts were opened shortly before filing, they should not count for venue. However, § 1408(1), as currently written, requires merely that principal assets be located in the district for "the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than in any other district."  Thus, the statute does not require assets to exist for the entire 180 days. It requires only that—during that 180-day period—the principal assets were located in the district for a longer portion than in any other district. *See, e.g. In re Indus. Pollution Control, Inc.*, 137 B.R. 176 (in principal place of business context finding that 67 days was the longer portion of the 180–day period under § 1408(1)); *In re Shorts Auto Parts of Warren, Inc.*, 136 B.R. 30, 34 (Bankr. N.D.N.Y. 1991) (finding venue appropriate because record established that principal place of business was in the district for 152 days of the 180 days preceding the petition date).

Movants also contend that permitting venue to rest on recently opened bank accounts would render §1408 meaningless and allow debtors to file "anywhere." The Court disagrees. Section 1408 contains its own limiting principle by requiring that principal assets be located in the district for the 180 days preceding filing, or for a longer portion of that period than in any other district. The statute does not require longevity of ownership, historical nexus, operational activity, or a qualitative business purpose. *See, e.g.*, *In re LTL Mgmt. LLC*, 2021 WL 5343945, at *2 (Bankr. W.D.N.C. Nov. 16, 2021) (finding that venue was proper even though debtor was only formed as

13

an entity two days prior to filing date). Rather, the statute merely requires location and comparative duration during the relevant 180-day period. The Court chooses not to judicially graft additional requirements onto the statute. *See, e.g. Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 606 U.S. 226; *Lexmark Int'l, Inc. v. Static Control Component*s, *Inc.*, 572 U.S. 118.  Likewise, the Court is unpersuaded by the "file anywhere" parade of horribles. If a debtor truly has operating facilities, collectable receivables, significant intellectual property, inventory, or other significant assets in another district for a longer portion of the 180-day period, then venue properly would lie there and/or could be transferred there under § 1412 as the situation may demand.  This Court applies the statute, as written, to the facts presented.  The Norwood Accounts existed for 16 of the 180 days preceding the filing of the bankruptcy case and, importantly, were not located in any other district.  As of the Petition Date, the balances in the Adequate Assurance Account and the DIP Account were $1,048,975 and $1,000, respectively.  Because, as set forth below, the Norwood Accounts were the Debtors' principal assets—quantitatively and qualitatively—venue is proper in this district under § 1408(1).[6]

### b)  The Patents

The Debtors concede that MCC-Norwood owned five U.S. patents and seven foreign[7] reciprocal patents (the "Patents") throughout the entire Venue Period.  MCC-Norwood owned the Norwood Accounts for, at most, 16 days during this same period.  Thus, comparatively, MCC-Norwood owned the Patents for the longer portion of the 180-day lookback period.  However, as discussed, this Court adopts an Asset-Based Approach; therefore, the fact that Debtor owned the Patents for a longer portion of the Venue Period is of no moment.  Rather, this Court compares the quantitative and qualitative value of the Patents to the quantitative and qualitative value of the Norwood Accounts and concludes that the Norwood Accounts are more accurately the "principal asset" for venue purposes.

---

[6] The Court summarily rejects the Cross-Holders' contention—raised during oral argument—that MCC-Norwood does not "own" the Norwood Accounts because they were funded by MCC and/or other entities. The record establishes that MCC-Norwood is the owner of the Norwood Accounts, regardless of the origin of the funds therein.  No further discussion is warranted.

[7] Section 1408(1) refers to principal assets located in the United States. Since no party has taken a position or introduced evidence, with respect to the location of the foreign patents, the Court bottoms its venue analysis on the location of the U.S. patents only.

The parties dispute the value of the Patents.  The Debtors assert that the Patents are valueless.  However, the Court determines that the alleged lack of economic or monetary value of the Patents is not necessarily dispositive for the venue inquiry.  The question for purposes of § 1408 is whether the Patents constitute assets that MCC-Norwood owned.  The Court determines that they do, regardless of whether they have economic value. *See, e.g. In re Canavos*, 108 B.R. 55, 58 n.4 (Bankr. E.D. Pa. 1989) (finding that stock valued at zero dollars did not preclude the asset from being a "principal asset" upon which venue could rest in the district); *In re Ryan*, 38 B.R. 917, 920 (Bankr. N.D. Ill. 1984) (finding that assets that were so encumbered with debt as to have, in debtor's view, no value nevertheless provided the basis for venue).[8]  Indeed, the Code does not define the term "asset".  Accordingly, this Court must look to context and the term's ordinary meaning. *See FCC v. AT & T Inc.*, 562 U.S. 397, 131 S. Ct. 1177, 1178, 179 L. Ed. 2d 132 (2011).  Black's Law Dictionary includes a definition for the term "asset" that does not reference value.  Black's Law Dictionary (12th ed. 2024) (defining "asset" as "[t]he entries on a balance sheet showing the items of property owned, including cash, inventory, equipment, real estate, accounts receivable, and goodwill").  The fact that courts evaluate assets from a qualitative perspective, in addition to a quantitative one, further supports this conclusion. *See In re Houghton Mifflin Harcourt Pub. Co.,* 474 B.R. at 136 (emphasizing "the *importance* of the assets in question") (emphasis in original). Certainly, economic or monetary value factors into the analysis.  But dollar signs, alone, do not carry the day.  Debtors' bald assertion that the Patents are "valueless historical

---

[8] The Court notes that the term "asset" is not defined in the Bankruptcy Code.  Nevertheless, the Court finds support for its position that the term is not tied to value in the term's use in other definitions under the Code, in other contexts, and in illustrative examples.  To begin, certain definitions in the Code mention "assets," generally, and without any reference to value. *See, e.g.* 11 U.S.C.A. § 101(23) (defining "foreign proceeding" and referring to "the assets and affairs of the debtor"); *id.* at § 101(41)(A), (C) (defining the term "person" to include a governmental unit that "acquires an asset from a person [,]" or "is the legal or beneficial owner of an asset"—again, without any reference to value). In contrast, other definitions in the Code explicitly refer to the value of assets. *See, e.g. id.* at § 101(18)(B)(i) (defining the term family farmer and requiring—among other things—that "more than 80 percent *of the value of its assets* consists of assets related to the farming operation other sections"); *id* at § 101(19A)(B)(ii)(I) (discussing the percent of the value of an entity's assets that must be related to the commercial fishing operation to meet definition of "family fisherman").  Finally, the Court can conceive of circumstances in which something a debtor owns is deemed "valueless" but nevertheless remains an asset.  For example, a debtor may be unable to sell environmentally contaminated real estate. Although the contaminated real property is, in essence, valueless, it remains, of course, an asset of the debtor. Additionally, a debtor may depreciate the value of an asset, such as machinery, to zero for tax purposes (or other administrative or accounting purposes).  The asset, although valued at zero on paper, still remains an asset and may still be utilized in operations to produce revenue or sold for scrap.

artifacts," does not suffice to eliminate the Patents from consideration as Debtors' "principal assets" under § 1408 and/or preclude them from serving as a basis for venue.

Nevertheless, the Court cannot—on this record—assign a specific dollar value to the Patents. Indeed, the Court agrees with the Debtors that "[v]aluation analyses regarding patents are highly technical and typically require significant expert testimony." *Debtors' Obj.* ¶ 32, ECF No. 302. However, no party has offered into evidence documentation or testimony that this Court would expect to accompany a "highly technical" valuation. Although the Court—based on the existing record—would be hard-pressed to find that the Patents have *no* economic or monetary value,[9] the record is insufficient to demonstrate that the Patents have a quantitative or qualitative value that exceeds that of the Norwood Accounts. Notably, the qualifying term "principal" signifies importance. *See, e.g., In re Szanto*, 2022 WL 4391803, citing Webster's Collegiate Dictionary (11th ed. 2012) which defines "principal" as "most important, consequential, or influential"); *see also Principal*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Chief; primary; most important"). Therefore, it is not enough that the record establishes that the Patents have some value. Rather, the record must demonstrate that the Patents have such primary or important value that they—rather than the Norwood Accounts—are the principal assets for the § 1408 venue analysis. Movants, as the parties challenging venue, carry the burden of so demonstrating by a preponderance of the evidence. *See In re Neufeld*, 2012 WL 5845590, at *1 n.3. (explaining that the burden for establishing that the case was filed in the wrong district rests with the party challenging venue). Movants have not satisfied that burden here; they have not demonstrated, by a preponderance of the evidence, that the Patents are more important, consequential, or influential than the more-than-$1 million in the Norwood Accounts that Debtors need to make adequate assurance payments, among other things. On this record, the Court cannot conclude that the

---

[9] Debtors contend that "MCC-Norwood derives no qualitative benefit from the primary purpose of the Legacy Patents, namely, to provide the holder with the exclusive right to the underlying technology." *Id.* at ¶ 33. But this allegation, without more, does not establish that MCC-Norwood derives *no benefit* from the Patents and, more importantly, *does not negate the fact that Debtors own and use the Patents.* The record demonstrates that Debtors paid fees to maintain the Patents—some as recently as October 2025. The fact that Debtors continue to voluntarily incur these fees suggests that the Patents are worth to Debtors at least the amount of said fees. The Debtors further concede that at least one Patent remains in use at one of Debtors' operating facilities to service the needs of a customer. The fact that at least one Patent remains in active use, suggests that it has some usefulness and value to Debtors. Finally, the Patents continue to serve as listed collateral securing the Debtors' various secured obligations.

Patents—although likely having some value—are the Debtors' "principal" assets during the Venue Period.

### c)  Intercompany Balances

Debtors' books and records contain certain entries that the Cross-Holders cite as alternative principal assets.  Debtors describe these entries as "internal tracking and reporting of book entries" and label them "Journal Entry Allocations." *Debtors' Opp'n* ¶ 39, ECF No. 302.  In contrast, the Cross-Holders characterize these recorded entries as gross and net "intercompany receivables," in excess of $158 and $102 million, respectively, and which they assert are assets of the MCC-Norwood estate located outside of New Jersey. *Cross-Holders' Reply* ¶ 22, ECF No. 336; *In re J & L Plumbing & Heating, Inc.*, 186 B.R. 388 (stating that location of debtor's principal accounts receivable could be proper venue for case under bankruptcy venue provision). Accordingly, Cross-Holders argue that these balances constitute MCC-Norwood's principal assets during the Venue Period.  At the outset, the Court notes that these intercompany obligations were reclassified and eliminated prior to the petition filing and thus were not assets to be considered as principal assets on the fling date. More significantly, the evidentiary record, including the expert report and testimony of Matthew S. Jacques, do not support the finding that such ledger entries constitute principal assets when analyzed quantitatively or qualitatively. Mr. Jacques was retained to review MCC-Norwood's historical financial records and assess the significance of certain intercompany receivable balances reflected in its financial records during the Venue Period. After reviewing MCC-Norwood's books and records, including its general ledger activity and trial balances, Mr. Jacques concluded:

> MCC-Norwood's legacy intercompany receivables balance, reflected as an asset in its financial records in the 180 days preceding its Chapter 11 bankruptcy filing, should have been eliminated contemporaneously to the closure and sale of the Norwood Facility that occurred in December 2023 and did not represent assets of economic value to MCC-Norwood in the 180 days preceding its Chapter 11 bankruptcy filing.

*Jacques Decl.* ¶ 15, ECF No. 350.

The Court finds this opinion credible, well-supported, and unrebutted.  Indeed, although Movants challenged Mr. Jacques' conclusions during cross-examination, they did not produce a

competing expert to discredit the accounting maneuvers undertaken by Debtors in eliminating journal entries attributable to closed facilities.

### i)   Nature of the Intercompany Balances

The record reflects that MCC-Norwood historically functioned as an operating legal entity whose accounting activity was administered through MCC's consolidated systems. During its operational period:

- MCC-Norwood did not maintain its own bank account.
- Cash transactions were processed through MCC.
- Intercompany receivables and payables were recorded to reflect internal allocations of revenue and expense.
- All such intercompany balances were eliminated in consolidation under GAAP.

When the Norwood facility ceased operations in July 2023 and was sold in December 2023, no additional operating activity occurred. The intercompany balances remaining on MCC-Norwood's trial balance were legacy accounting entries arising from historical operating allocations. These balances were not cash-settled, were not subject to arm's-length collection efforts, and were not treated internally as enforceable claims. *See Debtors' Reply* ¶ 39, ECF No. 302. Rather, they represented bookkeeping entries that, under ordinary accounting practice, should have been eliminated upon facility closure.

### ii)   2025 Reclassification Entries

During 2025, MCC undertook a review of dormant entities and closed facilities, including MCC-Norwood. In connection with that review, journal entries were recorded in November 2025 eliminating MCC-Norwood's intercompany receivable and payable balances to zero, with corresponding entries to retained earnings. The evidence establishes:

- Three journal entries were recorded between August 2, 2025 (180 days prepetition) and November 11, 2025.
- On November 12, 2025, an entry entitled "Norwood IC Balance Sheet Reclassification" eliminated the balances entirely.
- The majority of the intercompany balance—approximately $99.95 million—was with the Parent Company (via FCCS entities MC9000 and MC9001), with the remainder spread across various affiliates.

Critically, Mr. Jacques concluded that the November and December 2025 entries were "a matter of timing, not economic substance . . . [and] the product of historical inter-entity record keeping," reflecting no economic benefit to MCC-Norwood during the 180-day Venue Period. *Jacques Decl.* ¶ 25, ECF No. 350.

### iii) Lack of Economic Value

The evidence further demonstrates:

- The balances were internal accounting allocations, not third-party receivables.
- They were never cash-settled.
- They were eliminated in consolidation under GAAP.
- They were removed from MCC-Norwood's books without economic consequence.
- There were no expectations of collection and no evidence of realizable value.

As Mr. Jacques explained, the residual balance was "an aggregation of operating activities prior to the plant's closure and sale," historically not settled, and not expected to be settled. *Id.* at ¶ 25.  An accounting entry reflecting internal allocations does not, without more, constitute a realizable asset. Section 1408 concerns the location of a debtor's *principal assets*—that is, assets with economic substance or qualitative value—not bookkeeping artifacts arising from consolidated accounting processes. Wholly absent in the record is any evidence that the intercompany obligations are supported by promissory notes, contractual agreements, prior cash settlement history, or any other basis by which the MCC-Norwood could seek enforcement of such journal entries from the corporate parent or other affiliates. Indeed, given that any enforceable intercompany obligation owing to MCC-Norwood would also serve as collateral securing MCC-Norwood's liability on the approximate $5.5 billion of funded debt, the Court sees no scenario in which MCC-Norwood can recover or make use of these intercompany payables as part of its reorganization.

### iv) Potential Claims

Movants' suggestion that elimination entries could give rise to avoidance actions is also speculative. *See Cross-Holders' Reply* ¶¶ 27-29, ECF No. 336. Hypothetical, unfiled, contingent litigation rights do not transform internal ledger balances into principal assets for venue purposes. Were it otherwise, virtually every consolidated corporate debtor would have indeterminate venue based on theoretical intercompany adjustments.

**v)  Summary of Intercompany Balance Analysis**

In light of the foregoing, the Court finds that Movants have not demonstrated, by a preponderance of the evidence, that the book entries in question constitute MCC-Norwood's principal asset during the Venue Period.  The Court finds Mr. Jacques' Declaration and testimony credible and logical.  The Court acknowledges that, on cross-examination, counsel questioned and criticized Mr. Jacques' methods.  For example, counsel pointed out that there had been no similar reclassification of intercompany receivables for an affiliate entity ("W&S Mason") that likewise closed in 2023. *See Tr. of Feb. 26, 2026 Hrg.* 140:5-6, ECF No. 376.  However, Mr. Jacques explained that his review was limited to MCC-Norwood. *Id.* at 140:24-25.  When further pressed and asked why he failed to consider the accounting treatment of other facilities before rendering his opinion, Mr. Jacques responded that he "felt confident with the materials [he] had" in order to reach his own conclusions. *Id.* at 143:3-9.  Subsequently in his testimony, Mr. Jacques conceded that another accountant might disagree with his reclassification of asset accounts following closure of the business. *Tr. of Feb. 26, 2026 Hrg.* 154:21-24, ECF No. 376.  However, nothing in the record suggests that Mr. Jacques' treatment of the intercompany balances in this case was improper. The record conclusively establishes that "[t]here is no explicit rule around the treatment of intercompany balances [,]" i*d.* at 155:10-11, and Mr. Jacques adequately explained his reasoning and methodology, *see, generally, Jacques Decl.*, ECF No. 350; *see also Tr. of Feb. 26, 2026 Hrg.* 156:9-14, ECF No. 376; *id.* at 160:2-12.

The fact that other dormant entities continue to report transactions via ledger entries carries little weight, given the possible need to address potential offsets, credits, refunds or chargebacks. Movants did not produce their own expert to further discredit Mr. Jacques or to explain alternate treatment of the intercompany balances, and why such alternate treatment would be more appropriate. Accordingly, the Court is persuaded by the testimony given by Mr. Jacques, and Movants have not demonstrated by a preponderance of the evidence that the journal entries constitute enforceable intercompany receivables that exceed the quantitative and qualitative value of the Norwood Accounts so as to constitute the principal assets during the Venue Period.

### d)  D&O Insurance Policies

The Cross-Holders assert that MCC-Norwood "held insurance rights for the 180 days preceding the chapter 11 filings, including rights under the Debtors' directors' and officers' liability insurance coverage" (the "D&O Policy"). *Cross-Holders' Reply* ¶ 30, ECF No. 336.  Indeed, "[i]t has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (collecting cases); *see also, In re LTL Management, LLC*, 638 B.R. 291, 317 (Bankr. D.N.J. 2022). However, it is not enough that MCC-Norwood "held insurance rights" for the entire Venue Period. Rather, to succeed in their motion, Movants must demonstrate by a preponderance of the evidence that the D&O Policy (and/or other insurance policies) is so important and so valuable to MCC-Norwood to constitute MCC-Norwood's "principal asset" under § 1408.  They have not done so.

The Court notes that the D&O Policy is shared, subject to a substantial $250,000 retention, untriggered during the relevant period, and contingent. Additionally, there is no evidence of active coverage litigation, proceeds payable, or of realized value. Instead, the policy provides contingent, theoretical coverage only; it does not increase MCC-Norwood's worth or reduce liabilities and— given that MCC-Norwood has been dormant for nearly two years—it does not appear to have any qualitative importance to this debtor.  Simply put, Movants have failed to demonstrate that the insurance policies displace the Norwood Accounts as the principal asset for purposes of venue under § 1408.[10]

### 2.  UST's Motion to Dismiss

The UST seeks dismissal of MCC-Norwood's bankruptcy case for alleged bad faith, relying heavily on *In re LTL Management, LLC*, 64 F.4th 84 (3d Cir. 2023). The comparison fails. MCC-Norwood is not a newly created bankruptcy vehicle.  In *LTL Management*, the debtor was created immediately prior to filing through a divisional merger: a "Texas Two-Step." MCC-Norwood was formed in 2014, was not created on the eve of bankruptcy, was not formed through a divisional merger, and does not serve as a synthetic litigation entity. These are fundamental

---

[10] Cross-Holders also cite MCC-Norwood's "other contract rights" as assets existing outside of New Jersey. *Cross-Holders' Reply* ¶¶35-36, ECF No. 336.  As with the D&O Policy, the Cross-Holders have not demonstrated that these other assets surpass the Norwood Accounts in terms of value and significance so as to constitute MCC-Norwood's principal assets.

distinctions. Likewise, MCC-Norwood is in genuine financial distress. In *LTL Management*, the debtor had access to an extraordinary funding agreement—described by the Third Circuit as "an ATM disguised as a contract"—effectively eliminating financial distress. MCC-Norwood has no such backstop. Rather, MCC-Norwood is: (1) a guarantor of $5.5 billion in funded debt; (2) jointly and severally liable with all other related entities; (3) balance-sheet insolvent; (4) has no independent cash flow; and (5) faces matured and accelerated obligations. Simply put, this constitutes financial distress, and the mere absence of operations does not negate distress.

For a guarantor entity, the absence of revenue in the face of billions in liability underscores such financial distress. MCC-Norwood's chapter 11 filing serves a valid bankruptcy purpose. The restructuring seeks to modify funded indebtedness across the enterprise. Excluding MCC-Norwood would leave guaranty claims unresolved, permit piecemeal enforcement, undermine plan feasibility, and increase fragmentation risk. This is a traditional balance-sheet restructuring. Even under *LTL Management*, distress plus valid reorganizational purpose equals good faith. Both are present here. Accordingly, the § 1112(b) motion is denied.

### 3. Transfer Under 28 U.S.C. § 1412

For reasons discussed, the Court finds that venue is proper in this district pursuant to § 1408(1) because the Debtors' principal assets during the Venue Period—the Norwood Accounts—were located in this district longer than in any other during the 180-day look-back period. However, in certain situations, a case transfer may still be warranted despite "literal and technical compliance with the venue statute[.]" *In re Patriot Coal Corp.*, 482 B.R. at 741. The applicable statute and Rule provide that, even where venue is proper, a bankruptcy court may transfer to "a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412; *see also* FED. R. BANKR. P. 1014(a)(1). "The decision whether venue should be transferred lies within the sound discretion of the bankruptcy court." *In re Evola*, 2025 WL 3728102, at *14 (Bankr. D.N.J. Dec. 17, 2025) (collecting cases) (internal quotations and citations omitted). When assessing transfer under § 1412, "[a] flexible approach is necessary because 'venue does not easily submit to hard and fast rules.'" *In re Enron Corp.*, 284 B.R. 376, 390 (Bankr. S.D.N.Y. 2002) (quoting *In re Abacus Broad., Corp.,* 154 B.R. 682 (Bankr. W.D. Tex. 1993)); *see also In re Innovative Commc'n Co., LLC*, 358 B.R. 120; *In re LaGuardia Assocs., L.P.*,

316 B.R. 832, 837 (Bankr. E.D. Pa. 2004) (citing *In re Manville Forest Products Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990)).

In considering the appropriateness of transfer under § 1412, this Court is guided by case law, which employs a non-exhaustive list of factors. For example, in *In re RCS Cap. Corp*, a Delaware bankruptcy court observed that the Third Circuit acknowledged a host of factors, including:

> (1) plaintiff's choice of forum, (2) defendant's forum preference, (3) whether the claim arose elsewhere, (4) location of the books and records, (5) the convenience of the parties as indicated by their relative physical and financial condition, (6) the convenience of the witnesses—but only to the extent that the witness may actually be unavailable at trial, (7) the enforceability of the judgment, (8) practical considerations that would make the trial easy, expeditious, or inexpensive, (9) the relative administrative difficulty in the two fora resulting from congestion of the courts' dockets, (10) the public policies of the fora, (11) the familiarity of the judge with the applicable state law, and (12) the local interest in deciding local controversies at home.

*In re RCS Cap. Corp.*, 2018 WL 2410178, at *1 (Bankr. D. Del. May 17, 2018) (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)). Of course, the list of factors changes slightly when courts consider whether to transfer a *bankruptcy case*. For example, a bankruptcy court in the District of Delaware recently considered slightly different factors, including:

> (1) Whether transfer promotes the economic and efficient administration of the bankruptcy estate;
> (2) whether transfer facilitates judicial efficiency;
> (3) whether the parties will receive a fair trial in either venue.
> (4) whether either forum has an interest in deciding the controversy;
> (5) whether transfer would affect enforceability of any judgment rendered; and
> (6) whether the plaintiff's original choice of forum should be disturbed

*In re AmeriFirst Fin., Inc.,* 2023 WL 7029873, at *3 (Bankr. D. Del. Oct. 25, 2023). And, historically, other courts from within the Third Circuit have considered:

> (1) the proximity of creditors of every kind to the Court;
> (2) the proximity of the bankrupt (debtor) to the Court;
> (3) the proximity of the witnesses necessary to the administration of the estate;
> (4) the location of the assets;
> (5) the economic administration of the estate; and
> (6) the necessity for ancillary administration if bankruptcy should result.

*In re Oklahoma City Assocs.*, 98 B.R. 194, 199 (Bankr. E.D. Pa. 1989) (citing *Matter of Commonwealth Oil Ref. Co., Inc.*, 596 F.2d 1239, 1247 (5th Cir. 1979)); *see also, e.g. In re Kennedy*, 2013 WL 5230026, at *1 (Bankr. E.D. Pa. Sept. 9, 2013) (identifying an eight-factor test and observing that "[a]s with the application of any multi-factor judicial test, . . . '[n]ot all of the factors may be relevant in a particular case; the factors that are relevant may not be entitled to equal weight' ") (quoting *In re Alcorn Corp.,* 2012 WL 2974889, at *3 (Bankr. E.D. Pa. July 20, 2012)).

Here, unsurprisingly, none of the parties have expressed concerns touching on these factors. No party has taken issue with the fairness, costs or efficiency of this Court's continued administration of this case; nor has any party suggested that the Court's location poses difficulties for witnesses, stakeholders and their professionals.[11] There is no basis to conclude that transfer would serve the interest of justice or be more convenient for the parties. As explained, MCC-Norwood does not have any employees or customers. It is a subsidiary of an international corporation, a guarantor of $5.5 billion in funded debt owed to creditors around the world, and the present record indicates that *all* of its assets are intangible. Accordingly, nothing in the record establishes that a different district would provide greater proximity to its creditors, assets, or witnesses—or would otherwise be more convenient for those involved.

The Court appreciates that the manner in which the Debtors have employed the venue statute strikes many as being inconsistent with the "interest of justice". However, courts consistently hold that a primary consideration "under the interest-of-justice prong is whether transfer would promote the economic and efficient administration of the bankruptcy estate." *Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd.*, 616 B.R. 159, 173 (Bankr. N.D. Ala. 2020); *see also In re AmeriFirst Fin., Inc.*, 2023 WL 7029873, at *3 (Bankr. D. Del. Oct. 25, 2023) ("When weighing the interest of justice, bankruptcy courts lend the most significance to "the economic and efficient administration of the estate."); *In re Bavelis*, 453 B.R. 832, 870 (Bankr. S.D. Ohio 2011) (stating that the most important factor the economic and efficient administration of the debtor's estate); *In re Enron Corp.*, 284 B.R. at 387 (explaining that "[t]he factor given the most weight is the promotion of the economic and efficient administration of the estate"). Here, transfer to another district would not promote the economic and efficient administration of the

---

[11] Indeed, to date, with all hearing having been handled remotely, no one has had to leave the confines of their office.

bankruptcy estate—rather, it would increase costs and delay the ongoing administration of these chapter 11 estates.

As an initial matter, through several hearings and status conferences, this Court has:

- entered a scheduling order;
- set confirmation timelines;
- supervised first-day relief;
- addressed several emergent motions; and
- invested judicial resources.

If the case were transferred, the proceedings would necessarily be delayed so that a transferee court could familiarize itself with the case.  This delay would increase administrative costs and may disrupt certain restructuring milestones in the Restructuring Support Agreement and the DIP documents.   This Court has set hearing dates and deadlines, including a final hearing on DIP financing, which is scheduled for March 17, 2026.  The Debtors will need to draw upon the DIP facility to continue funding payroll, utilities, taxes, insurance and vendors, and generally maintain operations. The transfer of the case risks imperiling the Debtors' reorganization and could give rise to uncertainty among lenders, vendors, the market and thousands of employees.  The interest of justice favors continuity, not disruption. A transfer of a case such as this—in which the Debtors intend to reorganize rather than liquidate—would not serve the economic and efficient administration of the estate, facilitate judicial efficiency, or the interest of justice.  As a bankruptcy court in the Southern District of New York succinctly explained:

> This Court has gained such a familiarity with, and insight into, this case, that a transfer of venue would only thwart the efficient administration of the case and work an injustice in the case and to all parties involved . . . . A transfer of venue would have imposed on the new court the burdensome task of moving up along the 'learning curve' and would have delayed the entire reorganization process. Ultimately, a delay in the reorganization process would not have worked in favor of the convenience of the parties or the interest of justice.

*In re Vienna Park Props.,* 128 B.R. 373, 377–78 (Bankr. S.D.N.Y. 1991) (internal quotations and citations omitted).  Thus, while this Court is confident that any bankruptcy court in any another district could fairly and effectively administer these estates, the time and effort that court would have to expend in familiarizing itself with this case weigh against transfer. *See In re Patriot Coal Corp.,* 482 B.R. at 752–53 (explaining that "bankruptcy courts routinely apply and interpret other

25

states' laws and regulatory regimes," and that the cases and the interests involved "will be incapable and caring hands wherever they are heard").

This Court finds that no other forum has a significant interest in administering these estates. Indeed, no party persuasively argued or introduced facts indicating that a specific transferee district would better serve the interest of justice and/or be more convenient for the parties. The arguments were instead limited to "transfer" or "deny transfer."[12] In sum, the Court concludes that Movants have not demonstrated by a preponderance of the evidence that another forum has a greater interest in administering these estates. This factor likewise weighs against transfer.

The Court further respects the deference afforded to Debtors' choice of forum. *See In re PermaLife Prods., LLC*, 432 B.R. 503, 516 (Bankr. D.N.J. 2010) (quoting *In re Hechinger Inv. Co. of Del., Inc.,* 288 B.R. 398, 402 (Bankr. D. Del. 2003) and explaining that there is a "strong presumption in favor of maintaining venue where the bankruptcy case is pending"). Here, MCC-Norwood filed in New Jersey. That choice of forum should not be disturbed unless Movants demonstrate by a preponderance of the evidence that transfer is appropriate. *See, e.g. In re DBSI, Inc.*, 478 B.R. 192, 195 (Bankr. D. Del. 2012); *In re Onco Inv.. Co.*, 320 B.R. 577, 579 (Bankr. D. Del. 2005) (collecting cases and stating that "[a] plaintiff's choice of venue should only be disturbed when the balance weighs heavily in favor of the defendant's motion for transfer"). Movants have not satisfied that burden, thus, the Court determines that Debtors' decision to file in this district weighs against transfer.

Notwithstanding, the Court recognizes that a debtor's choice of venue is not entitled to absolute deference. Indeed, as discussed, cases may be transferred despite the fact that a debtor has technically complied with the venue statute. *See, e.g. In re Patriot Coal Corp.*, 482 B.R. 718. However, the safeguards to venue—implicit in the time constraints in the statute and the ability to transfer under § 1412 in the interest of justice—are only triggered when the circumstances so require. Such circumstances are not present here. No allegations were made or evidence presented suggesting that Debtors filed in this district to hinder another party in interest or to take advantage of any favorable caselaw.[13] Holders of more than 83% of Debtors' prepetition funded debt support

---

[12] Or, in the case of the UST: "dismiss."

[13] To the contrary, the record demonstrates that—if any party was seeking a competitive edge—it appears to be the Cross-Holders. As will be discussed, the Cross-Holder group was willing to consent to venue in this district so long

venue in this district.  And, while "venue is not determined by popular vote," *In re Caesars Ent. Operating Co., Inc.*, 2015 WL 495259, at *6, such high consensus weighs against the notion that Debtors are disingenuously seeking advantages by filing here. Additionally, transfers under § 1412 are fact-specific and courts that have transferred limit the scope of their rulings. *See, e.g.*, *In re LTL Mgmt. LLC*, 2021 WL 5343945, at *2 (explaining that decision to transfer venue is based on a "case-by-case analysis of the facts underlying each particular case") (collecting cases) (internal quotations and citations omitted); *In re Patriot Coal Corp.,* 482 B.R. at 748-9 (limiting scope of ruling and explaining fact-specific analysis).  Simply put, the facts of this case do not involve the complicated interests at play in cases like *Patriot Coal*—which implicated employees, local governments, retirees, and their dependents—nor does it present such an egregious affront to the integrity of the bankruptcy system so as to warrant transfer.  Several other courts considering venue transfer have examined the analogous facts and likewise determined that transfer was not warranted. *See In re AmeriFirst Fin., Inc.*, 2023 WL 7029873, at *5 (finding that "forming Delaware entities to hold its acquired stock does not represent the brazen manipulation of venue"); *see also*, *e.g. In re Amazing Energy MS, LLC*, 2020 WL 4730890, at *9 (Bankr. S.D. Miss. June 25, 2020) (movants failed to establish that debtor formed new subsidiary for the purpose of establishing venue; therefore, there was no need—as there was in *Patriot Coal*—to avoid rewarding the debtors' forum-shopping efforts).

The Court also finds there will be no prejudice to the interests of stakeholders in denying the Motions. The vast majority of creditors have signed on to the RSA and have supported the Debtors' initial choice of venue; even the Cross-Holders assented to these chapter 11 cases moving forward in New Jersey when they proposed their own alternative DIP financing. In their documentation for that proposal, they expressed that they were prepared to stipulate to proper venue in this forum, and to waive all venue-related objections. *See Ex. 1 to Rosenblum Decl.*, ECF No. 78-1.  In contrast, a transfer and the attendant delays—including a ruling on the final hearing

---

as this Court ruled in its favor. Moreover, its unsupported request for a transfer to the District of Delaware appears to be bottomed on the Cross-Holders' belief that it would receive more favorable treatment in that district. *See Tr. of Jan. 30, 2026 Hrg.* 154:19 – 155:1, ECF No. 85 (referring to a case presided over by "Judge Goldblatt down in Delaware where he said quite explicitly on analogous circumstances that he wasn't going to approve a DIP with a roll-up unless it had a carve-out for exactly the violation – the ability to pursue relief for the violation we're talking about here"); *see also In re Patriot Coal Corp.*, 482 B.R. 718, 750 (Bankr. S.D.N.Y. 2012) ("But it is not in the interest of justice merely to swap one party's perceived home field advantage for another.").

on the DIP Motion, which the Court already adjourned several weeks *sua sponte*—would risk noncompliance with existing milestones and deadlines and would likely necessitate additional financing in the interim; indeed, further delay could possibly place at risk the full amount of DIP financing available, as well as the exit financing and equity investments.  In short, the delays and complications that accompany a transfer would jeopardize the success of the reorganization and be "materially prejudicial to the interests of [the Debtors, its employees, and] the creditors whose money here is on the line." *In re Houghton Mifflin Harcourt Pub. Co.*, 474 B.R. at 138.  For these reasons, the Court declines to transfer the case.

Finally, the Court addresses what it will call the "gut check" factor.  Although this Court finds that the Debtors here did **not** take the same "eve-of-filing steps taken by the [d]ebtors" in *Patriot Coal*, 482 B.R. at 742, and did **not** so thwart the requirements of the venue statute as to warrant court action and transfer, no party can deny that the Norwood Accounts were opened so that MCC-Norwood could file in this district.  Given the number and variety of debtors in this case, it is likely that venue would have been appropriate in multiple districts.  Instead, Debtors created a situation that enabled MCC-Norwood to file in New Jersey.  To the extent this does not "sit right" with the parties in interest, the Court shares that sentiment.  However, this is the situation intentionally created by Congress when it elected to broadly draft—and decline to tailor—the venue statute.  It is not this Court's place to "close loopholes in legislation[.]" *In re Patriot Coal Corp.*, 482 B.R. at 745.  And this case does not present the type of circumstances wherein Debtors' exploitation of a loophole contravenes the purpose for which the statute was intended. *Id.*

### III.    Conclusion

For the foregoing reasons, the Court DENIES the Movants' Motions.  Debtors are directed to submit a form of order consistent with this Court's ruling.

.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Cc: Filed on CM/ECF