**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Bradford J. Sandler (NJ Bar No. 009521996)
Robert J. Feinstein (admitted *pro hac vice*)
Judith Elkin (admitted *pro hac vice*)
Shirley S. Cho (*pro hac vice* pending)
PACHULSKI STANG ZIEHL & JONES LLP
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
bsandler@pszjlaw.com
rfeinstein@pszjlaw.com
jelkin@pszjlaw.com
scho@pszjlaw.com

*Proposed Counsel for the Official Committee of*
*Unsecured Creditors*

| | |
|---|---|
| In re: | Chapter 11 |
| MULTI-COLOR CORPORATION, *et al.*,[1] | Case No. 26-10910 (MBK) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
FINAL APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF JOINT
PREPACKAGED PLAN OF REORGANIZATION OF MULTI-COLOR CORPORATION
AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE
BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee") of Multi-Color

Corporation, *et al.* (the "Debtors") submits this objection (the "Objection") to the (i) final approval

of the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Multi-*

*Color Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

---

[1] The last four digits of Debtor Multi-Color Corporation's tax identification number are 5853. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/MCC. The location of the Debtors' service address for purposes of these chapter 11 cases is: 3284 Northside Parkway NW, Suite 400, Atlanta, Georgia 30327.

4928-8926-7611.17 58985.00002

[Docket No. 18] (the "Disclosure Statement") and (ii) confirmation of the *Joint Prepackaged Plan of Reorganization of Multi-Color Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (the "Plan").[2]  In support of its Objection, the Committee respectfully represents as follows:

## I.      PRELIMINARY STATEMENT

1.      The Plan suffers from multiple defects, each of which independently warrants denial of confirmation.  The Plan is the product of the evident overarching control of the process by the Debtors' current equity owner, Clayton, Dubilier & Rice, LLC (together with certain of its affiliates, collectively, "CD&R"), which is currently out-of-the-money, in order to retain a controlling equity interest in the Reorganized Debtors without paying fair value, at the expense of certain unsecured creditors – specifically, the Holders of Unsecured Notes Claims (the "Unsecured Noteholders") who have been placed in Class 5 (Junior Funded Debt Claims) under the Plan.  The Committee represents the interests of all unsecured creditors – both the Unsecured Noteholders in Class 5 and the Holders of General Unsecured Claims (the "General Unsecured Creditors") who are in Class 6 and are predominantly trade creditors.

2.      Among other defects, the Plan contemplates a "sale" of ownership and control of the Reorganized Debtors to CD&R (the Plan Sponsor) without any market testing.  Thus, the Plan is based on an arbitrary allocation of value[3] which does not provide any meaningful recovery to Class 5 creditors and also improperly provides a recovery to a junior class of insiders on account of its claims and interests ahead of a senior class (the Unsecured Noteholders).  The

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement or the Plan, as applicable.

[3] Using an expert to opine on value does not cure the defect.  Beyond valuation, it is an issue of procedure and fairness as mandated by the Supreme Court in *Bank of Am. Nat'l Tr. & Sav. Ass'n v. North LaSalle St. P'ship*, 526 U.S. 434 (1999) ("*LaSalle*").

Plan also unfairly discriminates by including in Class 5 both Unsecured Note Claims (claims arising from two issuances of unsecured notes whose Holders include, but are not limited to, entities who are members of the Cross-Holder Ad Hoc Group[4]) and the alleged First Lien Deficiency Claims held by the Class 4 Holders of the First Lien Claims (the "First Lien Lenders"). The discrimination is the result of the Third-Party Releases and related package of Plan distributions provided to the Holders of the First Lien Deficiency Claims which are not available to all Holders of Unsecured Note Claims. By putting the First Lien Deficiency Claims (held by the Consenting First Lien Lenders who are signatories to and beneficiaries of the RSA) in the same Class as the Unsecured Noteholders, the Debtors and the Plan Sponsor have intentionally structured the Plan to neuter and disenfranchise the Unsecured Noteholders because the First Lien Deficiency Claims control the vote in Class 5.

3.        While under the Plan, the Junior Funded Debt Claims in Class 5 are estimated to receive only a 2.6% to 2.8% recovery, CD&R will come out of these bankruptcy cases owning 64% of the Reorganized Debtors' New Common Equity through an exclusive – and not market tested – opportunity to invest $400 million to purchase the New Common Equity at an understated valuation as alleged by the Cross-Holder Ad Hoc Group in its objection to confirmation of the Plan.[5] Importantly, this investment opportunity was not made available (and is still not available) to any other parties but was given to CD&R (together with an additional 1.6% commitment premium[6]) without any competitive bidding or market testing process.[7]

---

[4] The "Cross-Holder Ad Hoc Group" refers to the group of creditors represented by Jones Day and Wollmuth Maher & Deutsch LLP who hold both Unsecured Note Claims and First Lien Claims. *See* Docket No. 397. The members of the Cross-Holder Ad Hoc Group are not Consenting Lenders under the RSA.

[5] Docket No. 535 (the "Cross-Holder Group Plan Objection").

[6] Defined in the Plan as the "Plan Sponsor Equity Investment Commitment Premium" (Plan, Art. I.A.183).

[7] The benefits under the Plan to CD&R and the favored First Lien Lenders include (i) a New Debt Backstop Premium that pays CD&R and the Consenting Lenders a $125 million fee; (ii) a $48.9 million fee for backstopping a New

4.      The Plan's classification scheme is a blatant attempt to manufacture the acceptance of Class 5 by improperly classifying together the First Lien Deficiency Claims and the Unsecured Notes Claims.  The Cross-Holder Ad Hoc Group has a pending motion to designate the affirmative votes of the Holders of the First Lien Deficiency Claims placed in Class 5 pursuant to section 1126(e) of the Bankruptcy Code.[8]  The Committee supports the Motion to Designate because plainly the Holders of the First Lien Deficiency Claims did not vote in favor of the Plan in order to receive the less-than 3% estimated distribution for Class 5.  Logically, the First Lien Lenders voted for the Plan to get the myriad economic and other benefits being exclusively provided to them (and their fellow Sponsor, CD&R) under the RSA and the Plan. This inescapable reality weighs heavily in favor of designating the Class 5 votes of the First Lien Deficiency Claims. The Committee further supports designating the Class 5 vote held by CD&R[9] for these same reasons, as well as because, as a statutory insider, CD&R's votes should not be counted.[10]

5.      As set forth herein, the Plan is not confirmable because (i) the purchase of New Common Equity by the existing Interest Holder CD&R was never market tested, (ii) the Plan overpays the Holders of Class 4 Secured Note Claims, and (iii) the Plan discriminates unfairly between and among creditors in Class 5 by incentivizing their "yes" votes with the extra swag being distributed elsewhere to all Consenting Stakeholders including the Holders of the First Lien Deficiency Claims in Class 5.  Once the contrived acceptance of the Plan by Class 5 is undone via

---

[8] *Cross-Holder Ad Hoc Group's Emergency Motion for an Order Designating the Secured Group's and CD&R's Class 5 Votes Pursuant to 11 U.S.C. § 1126(e)* [Docket No. 536] (the "Motion to Designate").

[9]  CD&R holds both First Lien Debt (and presumably a First Lien Deficiency Claim) as well as Unsecured Notes Claims.

[10] *See* 11 U.S.C. § 101(31)(B) and 11 U.S.C. § 1129(a)(10).

Preferred Equity Investment; (iii) an exclusive opportunity to purchase 20% of the New Preferred Equity Investment; and (iv) a potential opportunity to swap their par value takeback debt for New Common Equity in the Reorganized Debtors. None of these opportunities were given or made available to other creditors, and none were market tested. These entities are also the beneficiaries of full Releases.

designation, the Debtors will be required to seek confirmation of the Plan under the "cramdown"

provisions of section 1129(b).  Section 1129(b)(1) of the Bankruptcy Code requires that a plan

provide a dissenting creditor class with treatment that is "fair and equitable".  To meet this test,

the Debtors must satisfy the absolute priority rule embodied in section 1129(b)(2)(B), which

mandates that Existing Equity Interest Holders in the Debtors cannot retain those Existing Equity

Interests, or receive or retain value on account thereof, unless the Plan provides for all Class 5

unsecured creditors to receive property of a value equal to the allowed amount of their claims.

6.      The Plan also distributes the value of unencumbered assets to the First Lien

Lenders that rightfully should be distributed to unsecured creditors.  Despite the short period of

time in which the Committee has been involved, two things are readily apparent to the Committee:

(i) the Plan has been put on a fast-track to confirmation to cover up its serious legal infirmities (as

will be discussed in more detail below) and (ii) the First Lien Lenders are not entitled to everything

they are receiving.  Based on its preliminary investigation, that the First Lien Lenders do not have

perfected or otherwise enforceable security interests in, the following assets of the applicable

Debtors or the proceeds thereof (collectively, the "Unencumbered Assets"):

- at least one-third of foreign subsidiary equity and all assets held by those subsidiaries (where substantial value resides);
- all foreign intellectual property;
- equipment or property subject to purchase money obligations, financing leases, or sale-leasebacks — a very material portion of the U.S. Debtors' equipment;
- all U.S. owned and leased real property, including manufacturing facilities;
- all U.S. fixtures located on owned real property and on leased property where the fixtures are owned by the landlord;
- all vehicles;
- joint venture interests; and
- commercial tort claims.[11]

---

[11] S*ee* Jan. 30, 2026 Hearing Transcript at 89:5 - 96:7 (Testimony of the Debtors' investment banker, Brent Banks (Evercore)). Among the Debtors' commercial tort claims are potential breach of fiduciary duty claims against the Debtors' officers and directors and the Holder of it Existing Equity Interests, CD&R.  Since the Special Committee's

7.     As set forth in the evidence presented by the Debtors at the hearing on approval of the DIP Facility, the value attributed to the Debtors' Unencumbered Assets ranges from $253 million to $328 million.[12]  Confidential expert reports prepared for the Cross-Holder Ad Hoc Group[13] estimate that the value of Unencumbered Assets is much higher.  If any of this value, even at the lowest valuation estimate, was made available to unsecured creditors, the recovery of Class 5, which is currently estimated to be 2.6 - 2.8%, would increase.

8.     Finally, the Plan contains improper Debtor and Third-Party Releases (as defined below) because there is nothing in the Plan or the Disclosure Statement from which any party in interest can assess the merits of the proposed Releases or the consideration allegedly being paid for such Releases.  Indeed, the entire basis for the Releases is the confidential Investigation Report[14] (as defined below) which has never seen the light of day. The Plan's legal infirmities, as discussed herein, further support the conclusion that the Plan fails the good faith requirement of section 1129(a)(3) of the Bankruptcy Code.

9.     The Committee has been a proponent of and continues to advocate for a consensual resolution of the ongoing contest over confirmation of the Plan by means of an upward

---

confidential Investigation Report (as defined below) has been kept secret, the Committee has no idea whether those claims were considered, investigated or otherwise evaluated.

[12] *See Expert Report of Jeffery W. Kopa, CFA, Going Concern Waterfall Analysis*, (the "Kopa Report") dated February 20, 2026, as admitted into evidence at the hearings on the final approval of the DIP Facility. *See*, March 17, 25 and 26, 2026 Hearing Transcripts; see also March 26, 2026 Hearing Transcript at 127:16-19, ruling of the Court ("The debtors' waterfall analysis estimates U.S. unencumbered asset value in the range of approximately $253 million to $328 million, based on Evercore's enterprise valuation range of approximately $2.9 billion to $3.4 billion").

[13] These reports have been filed with the Court under seal, but have been made available to the Debtors and the Committee.

[14] The so-called "Special Committee" of the Board of LABL, Inc. created to investigate CD&R transactions bases its conclusion to release CD&R under the Plan on a 120-page report of an investigation conducted by its counsel, Quinn Emanuel, and financial advisor, M3 Advisory Partners (the "Investigation Report"). *See Declaration of Roger Meltzer in Support of Joint Prepackaged Plan of Reorganization of Multi-Color Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 488] (the "Meltzer Declaration"), ¶¶ 15, 20.

revision to the distributions to Unsecured Noteholders disfavored by the Plan, but in the event

consensus is not reached, the Committee objects to final approval of the Disclosure Statement and

confirmation of the Plan unless the Plan is amended to address the infirmities discussed in this

Objection.

## II.     BACKGROUND FACTS

10.     On January 29, 2026 (the "Petition Date"), each of the Debtors commenced

a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and

managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

11.     On January 29, 2026, the Debtors filed the Plan [Docket No. 17] and the

Disclosure Statement [Docket No. 18].  The Debtors' "first-day" hearings took place on February

2, 2026, at which time, among other relief, the Court granted the Order approving the Disclosure

Statement on preliminary basis, approved the procedures for solicitation and voting on the Plan

and set the Confirmation Hearing.[15]

12.     On March 17, 2026, the United States Trustee (the "U.S. Trustee")

appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 493].  On

April 4, 2026, the U.S. Trustee filed its Notice of Appointment of Reconstituted Official

Committee of Unsecured Creditors [Docket No. 688].  The Committee retained its professionals

on or about March 19, 2026.

13.     The Committee, whose constituency had no voice at the first-day hearings,

was faced with a Confirmation Hearing originally set for March 31, 2026, or less than a week after

---

[15] *See* Docket No. 97.

it selected its professionals.  Upon the filing of the Committee's motion to continue the hearing on confirmation of the Plan, the Court set the Confirmation Hearing to commence on April 13, 2026.

14.     The Committee has made every effort to get up to speed as quickly as possible.  The Committee has done its best to investigate the extent, scope, and validity of the liens held by the First Lien Lenders and identify and analyze the causes of action being released pursuant to the Plan and the Released Parties who are the beneficiaries of the Releases.  Immediately upon retention, counsel for the Committee and its financial advisor made formal and informal requests for production of documents upon the Debtors and their financial advisors and on the Independent Directors.  The Debtors have produced and the Committee's professionals have reviewed in excess of 11,000 documents.  The Committee has also reviewed documents and discovery previously produced to and/or conducted by the Cross-Holder Ad Hoc Group.  However, given the speed at which the Debtors have sought to proceed to confirmation, the Committee's potential cause of action analysis has been hampered by being denied access to the Special Committee's Investigation Report upon which all the Plan Releases are based.

### III.   OVERVIEW OF CERTAIN KEY PROVISIONS OF THE PLAN

15.     The Debtors filed the Plan to implement a restructuring support agreement (the "RSA") supported by Holders of approximately 72.3% of First Lien Claims consisting of Cash Flow Revolving Facility Claims, Cash Flow Term Loan Facility Claims, and Secured Notes Claims, plus the Sponsor CD&R.  The Plan provides for $889 million in New Common Equity and New Preferred Equity Investment ($489 million available to First Lien Lenders and $400 million from CD&R), and on emergence, the Reorganized Debtors would have more than $500 million of liquidity.

16.     Under the Plan and on account of the First Lien Secured Claims, the Class 4 First Lien Lenders would share in the $489 million New Preferred Equity Investment, $1.57

billion in New Term Loans, $200 million in cash, New Warrants convertible into 9% of New Common Equity, 10.35% of New Preferred Equity (subject to dilution by a management incentive plan ("MIP") funded with an undetermined share of New Common Equity and the New Warrants) and 13.3% of New Common Equity (also subject to dilution by the MIP and the New Warrants).

17.     The Plan contains two classes of unsecured creditors: Class 5 (Junior Funded Debt Claims) and Class 6 (General Unsecured Claims).  Class 5 Junior Funded Debt Claims, which the Plan defines to include First Lien Deficiency Claims and Unsecured Notes Claims, would share $57.5 million in cash and 5% of New Common Equity (subject to dilution by the MIP and New Warrants). The Debtors estimate a 2.6% to 2.8% recovery for Class 5 (including the entirety of Unsecured Notes Claims which, with accrued interest, total $1.2 billion).

18.     Class 6 predominantly consists of trade claims which is a customary classification grouping.  Holders of General Unsecured Claims in Class 6 would purportedly ride through unimpaired by having their claims "reinstated".

19.     Intercompany Claims in Class 7 may be cancelled or reinstated at the option of the Debtors or the Reorganized Debtors.  If cancelled, Intercompany Claims will be cancelled "without any distribution on account of such Intercompany Claims".  Further, the Class 7 treatment provides that "This Plan shall be considered a settlement of the Intercompany Claims pursuant to Bankruptcy Rule 9019".

20.     Existing Intercompany Interests in Class 8 may be cancelled or reinstated at the option of the Debtors or the Reorganized Debtors.  Based on the Debtors' post-emergence loan documents on file in the Plan Supplement, the Debtors intend to reinstate Intercompany Interests to maintain the Debtors' existing corporate organizational chart.[16]

---

[16] *See* Docket No. 451, Ex. G (New Debt Documents).

21.     Class 10 Existing Equity Interests are purportedly cancelled and such Holders are stated to "receive no recovery or distribution on account thereof."  As will be discussed in detail below, this is untrue as CD&R is receiving a generous recovery on account of its Existing Equity Interests.

22.     The Plan contains two categories of broad general releases benefiting a litany of parties and their professionals: (i) the Releases by the Debtor (the "<u>Debtor Release</u>") and (ii) the Releases by the Releasing Parties (the "<u>Third-Party Release</u>" and with the Debtor Release, the "<u>Releases</u>").[17]  In each case, the Plan recites that the Releases constitute a compromise and settlement under Bankruptcy Rule 9019 and are "in exchange for good and valuable consideration" provided by the Released Party, "a good faith settlement and compromise of the Claims released", in the "best interests" of the Debtors and all parties in interest, "fair and equitable", and "given and made after due notice and opportunity for hearing."[18]

## IV.    ARGUMENT

23.     As the Court is aware, a proposed transaction with insiders such as the Plan Sponsor, as contemplated here, that purports to hand over the majority ownership and control of the Debtors back to its original owners, CD&R, is subject to heightened scrutiny.[19]  The Plan does

---

[17] *See*, Plan, Art. VIII.C and D.

[18] *Id*.

[19] *See, e.g., Citicorp Venture Cap. V. Committee (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein.") (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)), *aff'd*, 160 F.3d 982 (3d Cir. 1998); *In re Nugelt*, 142 B.R. 661, 667 (Bankr. D. Del. 1992) ("'[i]nsider transactions subject to greater scrutiny than arms length transactions'")(quoting In re *Zerodec Mega Corp.*, 39 B.R. 932, 935 (Bankr. E.D. Pa. 1984)); *Norris Sq. Civic Ass'n v. St. Mary Hosp.* (*In re St. Mary Hosp.)*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988) (denying proposed postpetition financing arrangement with debtor's parent because proposed financing gave parent superpriority lien on all unencumbered assets of the debtor, which the court found was not fair or reasonable in light of the parties' relationship and the circumstances of the transaction); *In re LATAM Airlines Grp.*, 620 B.R. 772, 669 (Bankr. S.D.N.Y. 2020) ("Thus, an insider's dealings with the debtor are subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the 'entire fairness' of the transaction at issue." ); *Liberty Mut. Ins. v. Leroy Holding Co.,* 226 B.R. 746, 755 (N.D.N.Y. 1998) ("The conduct of an insider is subject to more rigorous scrutiny.");

not pass muster for several reasons and confirmation must be denied. Additionally, and as a related matter, final approval of the Disclosure Statement must also be denied as failing to contain adequate information.

**D.    The Plan Contains a Classification Scheme that Manufactures an Assenting Class, Provides Disparate Treatment to Members of the Class, and Unfairly Discriminates Against Certain Unsecured Creditors in Favor of the First Lien Lenders.**

**1.    The Composition of Class 5 was Manufactured to Control the Votes.**

24.    Section 1122 of the Bankruptcy Code governs the classification of claims and interests under a chapter 11 plan.  Section 1122(a) provides, in relevant part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

25.    With the favored Consenting Lenders bound by the RSA, the First Lien Deficiency Claims dominated Class 5 voting in favor of the Plan, effectively disenfranchising the dissenting votes of the Unsecured Noteholders.[20]  The purpose of the Debtors' classification scheme is readily apparent from the circumstances: The Debtors and the Consenting Stakeholders (consisting of the Consenting Lenders and CD&R), reached a global deal (embodied in the Plan as mandated by the RSA), whereby the First Lien Lenders will receive oversized equity interests in the Reorganized Debtors notwithstanding their substantially undersecured position (*i.e.*, the First Lien Lenders will receive a bargain of too much stock at too low a price, as well as other

---

*In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997) ("[c]ourts subject the dealings of an insider to 'rigorous scrutiny'" (citing *Pepper v. Litton*, 308 U.S. at 306));  *In re AIG Fin. Prods.*, 651 B.R. 463, 476 (Bankr. D. Del. 2023) ("'[T]ransactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b).'") (quoting *Official Comm. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005)) ; *see also In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D.N.H. 2000) ("The closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to the matter.").

[20] *See Declaration of James Lee with Respect to the Tabulation of Votes on the Joint Prepackaged Plan of Reorganization of Multi-Color Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 482] (the "Lee Declaration"), Ex. A (Class 4 and 5 Vote Tabulation Summary).

economic benefits).[21]  The Debtors and CD&R classified the First Lien Deficiency Claims in Class 5 with the Unsecured Notes Claims so that the First Lien Deficiency Claims would swamp the voting and effectively neuter the holders of certain Unsecured Notes Claims who had been unwilling to kowtow to CD&R in the RSA negotiation process.

26.     In the Third Circuit, "the classification and treatment of classes of claims is always subject to the good faith requirements under § 1129(a)(3)." *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D.N.J. 2000).  *See In re Machne Menachem, Inc.*, 233 F. App'x 119, 121 (3d Cir. 2007) (affirming district court ruling vacating confirmation order because plan was filed in bad faith; debtor orchestrated insider's purchase of claims and such claims were improperly gerrymandered and reclassified to decrease the number of votes for plan confirmation).

27.     While as a technical matter, the First Lien Deficiency Claims and Unsecured Notes Claims are both unsecured[22] – under the facts of this case, the enhanced treatment of the First Lien Lenders in Class 4 cannot be divorced from the treatment of the First Lien Deficiency Claims in Class 5.  Even if claims are legally similar, classification cannot be used to manipulate voting to predetermine plan acceptance.[23]  Under the Plan, the First Lien Lenders will receive an exclusive, multi-faceted package of value and benefits (including oversized new equity allocations and blanket Debtor and Third-Party Releases) that not only effectively locks them into

---

[21] *See also In re Featherworks Corp.*, 25 B.R. 634 (Bankr. E.D.N.Y. 1982), *aff'd*, 36 B.R. 460 (Bankr. E.D.N.Y. 1984) ("The purpose of the vote is to secure an expression from the creditors of where they think their best interest lies.  An insider, like Hudson and Windsor, does not have the same interest as the creditors.  The creditors will benefit only to the extent of their distributive share in the $40,000 to be paid out by Featherworks; Hudson and Windsor will benefit by retaining effective ownership of a functioning company which has been freed of all outstanding debts in payment for that $40,000.  Hudson and Windsor are influenced by totally different considerations from those motivating the other creditors.").

[22] 11 U.S.C. § 1122(a) provides that claims may be classified together if they are "substantially similar".

[23] *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) ("Each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed.").

the Plan, but given them significant post-effective date upside value. Therefore, the First Lien Lenders—who are bound by the RSA to support the Plan and stand to receive significant Plan-related consideration unavailable to other unsecured creditors—possess fundamentally different economic incentives from the Unsecured Noteholders. In this context, it is fundamentally unfair to classify together two such conspicuously different kinds of creditors and permit the vote of the one getting all the benefits to trump the votes of those getting little or nothing. ***Simply put, the Class 5 treatment of the First Lien Deficiency Claims is a throw-away that is just one part of the significant Plan recovery these Holders are getting in Class 4 plus the Releases, whereas for the Unsecured Noteholders, it is all they are getting and it is a pittance.***

28. By improperly combining these groups, the Debtors ensured that the First Lien Lenders would dominate the Class 5 vote, thereby nullifying the voting rights of the Unsecured Noteholders and predetermining acceptance of the Plan under section 1129(a)(10). This is impermissible vote manipulation. The prohibition on classification manipulation applies equally to the "packing" of dissimilar claims into a single class to manufacture plan acceptance as it does to the artificial separation of similar claims.

29. The Debtors' and CD&R's attempt to distort section 1129(a)(10) and undermine the integrity of Plan voting should be rejected by the Court. *See, e.g., In re Bryson Properties XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) (classification structure "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims" (*quoting In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)).[24]

---

[24] *See also In re Adelphia Communs. Corp.*, 359 B.R. 54, 63 (Bankr. S.D. N.Y. 2006) ("the kinds of motives that have so far been held to warrant vote designation have been to assume control of the debtor" and other purposes); *In re Dune Deck Owners Corp.*, 175 B.R. 839 (Bankr. S.D. N.Y. 1995) (similar).

## 2. Disparate Treatment

30. In the event the Court approves of Class 5 as constituted, the Plan violates section 1123(a)(4) by providing disparate treatment to creditors on account of their claims. As more fully set forth in the Cross-Holder Group Plan Objection, the exclusive economic opportunities provided under the Plan to the First Lien Lenders were ***not*** offered to the Unsecured Noteholders or any other creditors. As well reasoned by the district court in *In re ConvergeOne Holdings, Inc.*,[25] such a scheme, certainly where it has not been subject to a market test, violates section 1123(a)(4). *Id.* at 16 ("Debtors and Majority Lenders argue that there is no cause for concern because 'Minority Lenders had time and opportunity to propose an alternative backstop after the bankruptcy filings.' . . . [S]uch opportunity was illusory at best.").

31. Here too, any opportunity of the Unsecured Noteholders to propose an alternative was illusory. As set out in the various pleadings filed by the Cross-Holder Ad Hoc Group and in testimony at various hearings, very little effort was made to include the Unsecured Noteholders in plan-related discussions and even potentially superior proposals submitted by the Cross-Holder Ad Hoc Group were ignored or rejected out of hand. In truth, neither the Debtors nor CD&R made any effort to market test any Plan provisions.

## B. The First Lien Lenders Stand to Recover More Than They Are Entitled Because Unencumbered Assets are Being Incorrectly Allocated to Satisfy Class 4 Claims.

32. As discussed herein, the Plan may impermissibly provide for more recovery than the First Lien Lenders are entitled to receive on account of their purported secured claims in violation of section 506(a) and the bankruptcy axiom that a creditor is not allowed to be paid more than the value of its secured claim.

---

[25] Case No. 4:24-cv-02001, Docket No. 54 (S.D. Tex. Sept. 25, 2025)

33.     Notwithstanding that the First Lien Secured Claims classified in Class 4 are not secured by all of the Debtors' assets, this value is being allocated to them. Unencumbered Assets of the Debtors include: (i) 35% of the equity interests in foreign subsidiaries and affiliates, (ii) preference claims, (iii) litigation claims, and (iv) real property. The proposed Plan allocates the value of Unencumbered Assets for the benefit of Class 4 First Lien Lenders and therefore, Class 4 is being overpaid. As noted above, the Unencumbered Assets are extremely valuable. Here, the Debtors are impermissibly giving the value of Unencumbered Assets to the First Lien Lenders, rather than to the unsecured creditors who are entitled to share in such value.

34.     Additionally, based on its preliminary analysis, the Committee believes that the value of the Reorganized Debtors being given to the First Lien Lenders and CD&R under the Plan is substantially more than what the Debtors posit. In such case, the First Lien Lenders will be overpaid on account of their secured claims – in violation of the principle that the bankruptcy process was designed to pay creditors what they are owed, not give one class of creditors a windfall while other classes receive little or nothing. Courts have recognized "that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs.,* 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc*., 266 B.R. 591, 612 (Bankr. D. Del. 2001)).

35.     In addition to various Unencumbered Assets, which assets and their value properly belong to unsecured creditors, the Committee believes there are various potentially valuable claims and causes of action against insiders and other third parties. The proposed Plan inappropriately releases such potential Estate claims for no consideration whatsoever while the retained causes of action and other Unencumbered Assets are utilized for the benefit of the First Lien Lenders rather than unsecured creditors.

C.      **The Plan Provides Distributions to CD&R on Account of Its Existing Equity Interests in Violation of the Absolute Priority Rule.**

36.     The Supreme Court has consistently held that interest holders may not retain their equity unless and until all general unsecured creditors are paid in full. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 209 (1988) (holding that the "interest respondents would retain under any reorganization must be considered 'property' under § 1129(b)(2)(B)(ii), and therefore can only be retained pursuant to a plan accepted by their creditors or formulated in compliance with the absolute priority rule."); *see also LaSalle*, 526 U.S. at 444 (acknowledging "the pre-Code judicial response known as the absolute priority rule, that fairness and equity required that "the creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever.'") (quoting *Northern P. R. Co. v. Boyd*, 228 U.S. 482, 508 (1913).

37.     The Plan violates the absolute priority rule of section 1129(b)(2)(B)(ii) by allowing CD&R, on an exclusive basis without competitive bidding or market valuation, to retain a controlling equity interest in the Reorganized Debtors (64% or more of the New Common Equity) despite senior creditors not being paid in full. CD&R's purported cash contribution is neither substantial enough, market-tested, nor reasonably equivalent to the value CD&R is receiving under the Plan to justify this recovery. The Plan's structure is similar to the prohibited arrangement in *LaSalle*, where old equity holders obtained exclusive rights to equity participation without market testing.

38.     The absence of any auction process, competitive bidding, or opportunity for third parties to propose competing plans renders CD&R's equity retention a clear violation of the absolute priority rule, regardless of the purported adequacy of its monetary contribution. *LaSalle*, 526 U.S. at 444 (plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation violate the absolute priority rule; exclusive

4928-8926-7611.17 58985.00002                    16

opportunities constitute property received "on account of" prior interests; market valuation through competitive processes is essential to ensure old equity pays "top dollar" for retained interests).

39.    In short, the Debtors' Plan runs afoul of the Supreme Court's *LaSalle* case. Notwithstanding the strict requirements enunciated in *LaSalle*, the Debtors have not conducted any meaningful prepetition or postpetition marketing process to vet the accuracy of the valuations upon which the entire Plan is based.  Critically, the Debtors are not testing the value of the Reorganized Debtors notwithstanding that such value is being given to the First Lien Lenders and CD&R.  The Supreme Court has stated that where the debtor's exclusivity period has not expired (as in the case here), market testing is imperative.  *LaSalle*, 526 U.S. at 457 ("Under a plan granting an exclusive right, making no provision for competing bids or competing plans, any determination that the price was top dollar [i.e., full value] would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value is exposure to a market. … This is a point of some significance, since it was, after all, one of the Code's innovations to narrow the occasions for courts to make valuation judgments, as shown by its preference for the supramajoritarian class creditor voting scheme in § 1126(c) ….").[26]

---

[26] *See also Ameriflex Engineering LLC*, 2018 Bankr. LEXIS 2267, at *10-*11 (Bankr. D. Ore. July 31, 2018) (debtor's chapter 11 plan, which gave substantial equity holder and largest secured creditor the exclusive opportunity to purchase its assets (through an LLC) and did not allow for competing bids, violated absolute priority rule; "No 'market' exists inside a vacuum in which only Ameriflex's Plan can be considered. Mr. Cam, as owner and operator of PDPM, Ameriflex, and Ameri-Fab, controls all parties to the proposed sale and has set the price that one will pay to the other. This is precisely the type of situation that *LaSalle* and its progeny direct us to avoid. 'Competition is essential whenever a plan of reorganization leaves an objecting creditor unpaid yet distributes an equity interest to an insider.' *In re Castleton Plaza, LP*, 707 F.3d 821, 821-22 (7th Cir. 2013) (ruling that a plan giving debtor's principal's wife 100% of the equity in reorganized debtor was subject to competitive bidding; "Competition is essential whenever a plan of reorganization leaves an objecting creditor unpaid yet distributes an equity interest to an insider."); *H.G. Roebuck & Son, Inc. v. Alter Communs., Inc*., 2011 U.S. Dist. LEXIS 59781, at *22-*23 (D. Md. June 3, 2011) ("this Court can find no evidence that the market for the reorganized Alter Communications has in any meaningful way been tested. An expert's valuation of a company, of the type conducted in this case, simply cannot suffice as it does not expose the stock in the reorganized debtor to the actual market, as *LaSalle* requires.  *See South Highland Ave. LLC v. Transcom Terminals, Ltd*. No. JFM-03-3498, (D. Md. March 8, 2004) (in overturning the Bankruptcy Court's confirmation of a reorganization plan similar to the one in this case, this Court held that LaSalle clearly requires market testing of the value of the reorganized debtor, and that an expert's opinion will not suffice—actual exposure to a market is necessary).  Because no other creditor was permitted to file a competing reorganization plan, any analysis of whether the expert's valuation is sufficient to constitute a market test would necessarily be conducted in a vacuum by the

40. The new value corollary is not satisfied here. The Debtors bear the burden of demonstrating that they meet the new value exception to the absolute priority rule. *In re NNN Parkway 400 26, LLC*, 505 B.R. 277, 283 (Bankr. C.D. Cal. 2014) ("[The] debtors bear the burden of showing that the new money offered is the most and best reasonably obtainable after some 'market testing' in order to cram down over the objections of a nonconsenting class of unsecured creditors.").

41. Nothing about the postpetition marketing process in these cases was designed to maximize value or foster robust competition.[27] Unlike court-supervised sales under section 363 or competitive plan processes, the Debtors have conducted their "marketing" entirely outside judicial oversight. Neither the Court, the Committee, or creditors generally have had any opportunity to evaluate whether this marketing process has been fair or adequate.

1. **To Satisfy the Fair and Equitable Test, the Debtors Must Prove that No Value is Being Retained by the Holders of the Debtors' Existing Equity Interests on Account of those Interests.**

42. Even though the Debtors are cancelling the Existing Equity Interests in the Debtors under the Plan to create the façade of compliance with the absolute priority rule, the Plan cannot be confirmed unless the Debtors meet their burden to prove that no value is being given to

---

court—precisely what *LaSalle* cautions against. Indeed, if the Bankruptcy Court simply allowed Roebuck to file a competing plan, and the creditors found that plan to be inferior, they could still vote for Alter's original plan, and *LaSalle* would have been satisfied. In sum, this Court cannot find that an expert's opinion regarding the value of the reorganized Alter Communications can substitute for true exposure to a market."); *In re Eletson Holdings Inc.*, 664 B.R. 569 (Bankr. S.D. N.Y. 2024) (where after termination of debtor's exclusivity period, competing plan with higher value to be paid for equity in reorganized company was confirmed; "*203 N. LaSalle* mandate[s] that a debtor market-test a proposed transaction in order to demonstrate that the purported new value was necessary and reasonably equivalent; and was not merely an exclusive opportunity for old equity to gain advantages at the expense of creditors."); *Off. Comm. of Unsecured Creditors of Champion Enters. Inc. v. Credit Suisse (In re Champion Enters., Inc.)*, 2012 Bankr. LEXIS 4009 (Bankr. D. Del. Aug. 30, 2012) ("[a] market test is the best evidence of a company's value at a given point in time"; citing *In re SubMicron Systems Corp.*, 432 F.3d 448, 461 (3d Cir. 2006) (holding that a free market auction "best reflects the economic realities" of a debtor's worth)).

[27] *See, e.g., In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Nov. 4, 2014) (Transcript at 21:15-18 [EFH Docket No. 2699] ("Creditor and Court oversight of the debtors' action outside the ordinary course of business, including asset marketing and sales, is not only appropriate, but is required by the law.")).

or retained by Holders of Existing Equity Interests. *In re Dave's Detailing, Inc.*, No. 13-08077, 2015 Bankr. LEXIS 2528, *52-53 (Bankr. S.D. Ind. July 30, 2015) ("to obtain confirmation of a reorganization plan that completely extinguishes equity interests, the plan's proponent must prove that there is no value left once the creditors have had their turn"), *citing In re Oneida Ltd.*, 351 B.R. 79, 87 (Bankr. S.D.N.Y. 2006); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 441 (1968)) ("Since participation by junior interests depends upon the claims of senior interests being fully satisfied, whether a plan of reorganization excluding junior interests is fair and equitable depends upon the value of the reorganized company.").

43.     The Debtors cannot meet this burden, because the entire remaining value of the Debtors is not being devoted to the satisfaction of Class 5 Junior Funded Debt Claims.  In order for a plan to be fair and equitable, the "residual value of the corporation, which is more than the liquidation value of the debtor" must be provided to general unsecured creditors until they are paid in full, before junior interests may receive or retain property under the plan. *In re W. E. Parks Lumber Co.*, 19 B.R. 285, 290 (Bankr. W.D. La. 1982) (emphasis added) ("Because this class of creditors is receiving the residual value of the corporation, which is more than the liquidation value of the debtor, and since no junior claim or interest is receiving and retaining any property under the plan, this class is receiving fair and equitable treatment under Section 1129(b)(2)(B).").

44.     As the Debtors are reorganizing rather than liquidating, the fair and equitable test requires an examination of the "going-concern" value of the Debtors to determine whether equity is impermissibly retaining value. *In re Dave's Detailing, Inc.*, 2015 Bankr. LEXIS 2528, at *52-53, *citing TMT Trailer Ferry*, 390 U.S. at 442-43; *see also Assocs. Commercial Corp. v. Rash (In re Rash)*, 90 F.3d 1036, 1053 n.23 (5th Cir. 1996) (*en banc*) ("In Chapter 11 cases, a

going-concern valuation of the reorganized debtors is a necessary step in applying the 'fair and equitable' standard to . . . a class of interests in a cram down.") (emphasis in original), *rev'd* on other grounds, 520 U.S. 953 (1997). The total enterprise value of the Debtors pursuant to their Valuation Analysis is estimated to be between $2.9 billion to $3.4 billion.[28] Instead of providing Class 5 Junior Funded Debt Claims with the remaining value of the Debtors— as the Debtors must do— the Debtors offer only a fractional and *de minimis* recovery to Class 5 while all remaining value of the Debtors goes to CD&R (the Holder of Existing Equity Interest) and the other RSA Consenting Stakeholders.

45. In exchange for a $400 million new money Plan Sponsor Equity Investment, CD&R is given a "to be determined" estimated number of common units, which is to be equal to 64.0% of the New Common Equity at Plan Equity Value on a Fully Diluted Basis, plus the Plan Sponsor Equity Investment Commitment Premium (i.e., 1.6% of the New Common Equity at Plan Equity Value, on a Fully Diluted Basis.).[29]

46. The Debtors' investment banker Evercore estimates the total enterprise value ("TEV") of the Reorganized Debtors at between $2.9 billion and $3.4 billion on emergence, assuming an Effective Date of May 31, 2026.[30] Given that net debt and preferred equity total $2.6 billion on emergence, the Debtors' implied reorganized equity value is estimated to be between approximately $300 million and $800 million per the Valuation Analysis. *Id.* The Plan indicates the Plan Equity Value is $625 million.[31] As the Court is aware, there has already been extensive litigation and dispute over the TEV. The Cross-Holder Ad Hoc Group pegs the high end of the

---

[28] *See* Disclosure Statement, Ex. D (Valuation Analysis"), at consol. p. 311.

[29] *See* Notice of Filing of Plan Supplement, Ex. C (Plan Sponsor Equity Purchase Agreement, at § 2.1, Ex. A) [Docket No. 432 at 107].

[30] *See* Disclosure Statement, Valuation Analysis, at consol. p. 311.

[31] *See* Plan, Art. I.A.180.

total enterprise value at $4.0 billion for purposes of the waterfall recovery, per the testimony of their investment banker, Guggenheim Partners at the hearings on the DIP Facility.[32]

47.    If the Debtors are correct that the upper range of TEV is $3.4 billion, then CD&R's 64% equity is actually worth $496 million, and CD&R will have underpaid by $96 million.  If the Cross-Holder Ad Hoc Group's TEV analysis is correct, then CD&R's emergence equity stake is worth between $624 million to $880 million and CD&R will have underpaid for their equity by between $224 million and $480 million – providing CD&R with a significant windfall.  The chart below summarizes these prospective outcomes.

| ($ in millions) | Plan | Range of Total Enterprise Values | | | |
|---|---|---|---|---|---|
| TEV | $ 3,250.0 | $ 3,400.0 | $ 3,600.0 | $ 3,800.0 | $ 4,000.0 |
| Estimated Equity Value[1] | $ 625.0 | $ 775.0 | $ 975.0 | $ 1,175.0 | $ 1,375.0 |
| CDR Investment | $ 400.0 | $ 400.0 | $ 400.0 | $ 400.0 | $ 400.0 |
| Ownership | 64% | 64% | 64% | 64% | 64% |
| CDR Investment Value | $ 400.0 | $ 496.0 | $ 624.0 | $ 752.0 | $ 880.0 |
| Increase in CDR Investment Value | | $ 96.0 | $ 224.0 | $ 352.0 | $ 480.0 |
| Percent Increase | | 24% | 56% | 88% | 120% |

Note: (1) Before dilution, if any, for warrants and Management Incentive Plan (MIP)

48.    A market test would have brought into the light this severe underpayment by CD&R for its Plan recovery, but that was not done here for what are now apparent and obvious reasons.  The Plan cannot satisfy the fair and equitable test or absolute priority rule, without, at a minimum, Class 5 receiving the going concern value of the Debtors (up to the allowed amount of their claims) to ensure that CD&R, the Holder of the Debtors' Existing Equity Interests, does not retain some portion of that value.  Class 5 does not receive this value under the proposed Plan treatment for Class 5 and, therefore, the Plan cannot be confirmed.

---

[32] Mar. 25, 2026 Hearing Transcript, at 67:3-6, Ex. 181 (Decl. of B. Hayes, Ex. A at 7 (Rebuttal Report of Brendan Hayes)).

**2.    CD&R's Post-Emergence Retention of Control Over the Reorganized Debtors Also Violates the Absolute Priority Rule.**

49.    Even if Class 5 received the going-concern value of the Reorganized Debtors (which it does not), the Plan would still violate the absolute priority rule to the extent that CD&R, the Holder of the Debtors' Existing Equity Interests, retains control over the Debtors:

> The absolute priority rule is clear.  If the dissenting unsecured creditor class is not being paid in full with interest, when the payments are to be paid over time, then a junior class may retain or receive nothing.  In this case, the debtor proposes to continue the existence of the limited partnership with the limited partners retaining their certificates of ownership.  Regardless of whether these certificates have no value at the present time, this constitutes a retention of property, which may, in fact, have value in the future.  This proposal violates the absolute priority rule. . . .

*In re Waterways Barge P'ship*, 104 B.R. 776, 786 (Bankr. N.D. Miss. 1989); *see also In re CRB Partners, LLC*, 2013 Bankr. LEXIS 800, at *39-40 (Bankr. W.D. Tex. March 4, 2013) ("It is well settled that that control over a company will be considered a property interest for purposes of determining if there is a violation of the absolute priority rule."); *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 700 (Bankr. W.D. Tex. 2012) (same).

50.    As courts have noted:

> On its face, the Code does not appear to allow the equity owners of a bankrupt enterprise, or any junior creditors for that matter, to retain or obtain **ownership and control** of the debtor without the appropriate consent of senior creditors. This "absolute priority rule" is codified a 11 U.S.C. § 1129(b)(2)(B) as a definition of the "fair and equitable" standard for plan confirmation. Thus, the holder of any claim or interest that is junior to the claims of an unsecured class may not receive *any property* on account of its claim or interest until the senior claims are repaid in full. *Id.* **It is undisputed that the right to run the reorganized business is property**. *Norwest Bankr. Worthington v. Ahlers*, 485 U.S. 197, 108 S. Ct. 963, 969, 99 L. Ed. 2d 169 (1988). The purpose of this section is to stratify creditors and equity interests so that a cramdown, or nonconsensual, plan will not redistribute a dissenting creditor's property rights to those with a junior right or interest in the debtor. Such a result would be neither fair nor equitable.

*In re Greystone III Joint Venture*, 995 F.2d 1274, 1282 (5th Cir. 1991) (emphasis added).

51.     Notably, in the quoted passage, courts explicitly hold that retention of the right to run the reorganized business violates the fair and equitable standard where an impaired creditor class rejects a plan.  *See also In re Cypresswood Land Partners, I*, 409 B.R. 396, 438 (Bankr. S.D. Tex. 2009) ("Simply stated, a plan violates the absolute priority rule if a class of unsecured creditors receives less than the full amount of its claims while a junior class receives ***something*** 'on account of' its interest.") (emphasis added).

52.     The Holders of the Existing Equity Interests of the Debtors (CD&R) are plainly retaining "ownership and control" of the Debtors on account of their Existing Equity Interests.  The treatment of the Intercompany Claims (a significant driver of the Debtors' reorganization value) under the Plan underscores the violation of the absolute priority rule that is underway here.   Under the Plan, those Intercompany Claims will either be reinstated or extinguished, at the option of the Debtors.  If the over $1.2 billion of Intercompany Claims[33] are reinstated, then the amount by which the reinstated Intercompany Claims exceeds the distribution to unsecured creditors will be value retained by the Existing Equity Interests of the Debtors.  The Debtors pretend under the Liquidation Analysis[34] that these asset values are eroded by Intercompany Claims, but that does not reflect the reality of the Debtors who are proposed to reorganize and whose intercompany interests (Class 8) will stay intact upon emergence.

53.     Not only do the Debtors retain the right to direct the cancellation of valuable Intercompany Claims for $0.00 value under Class 7 (Intercompany Claims) in violation of the absolute priority rule, but they also retain the right to direct the disposition of valuable, unencumbered non-Debtor affiliate assets. As evidenced by the New Term Loan Facility Credit

---

[33] *See* Kopa Report, Going Concern Waterfall Analysis.

[34] *See* Disclosure Statement at Ex. E ("Liquidation Analysis").

Agreement, all the Debtors foreign subsidiaries are obligated to pledge their assets or equity as Collateral (except for Mexican real estate).[35]

54. As further set forth in the proposed post-confirmation LLC operating agreement, the Reorganized Debtors will have a nine (9) member Board of Directors. CD&R, purportedly on account of its new money investment and not on account of its Existing Equity Interests, is entitled to designate seven (7) directors, one (1) director will be the CEO, and the remaining one (1) director may be appointed by the holders of majority of all Common Units held by the Non-Sponsor Common Equity holders holding at least 50% of the Common Units on the Effective Date.[36] Either way, under the Plan, the Existing Equity Interests of the Debtors will retain the right to use its management and control of the Debtors to continue to control the Reorganized Debtors in the exercise of all rights associated with control and/or ownership of the Debtors. CD&R will retain this control, notwithstanding the receipt by Class 5 Junior Funded Debt Claims of a Plan distribution whose value is but a small fraction of their claims. As a result, the Debtors fail to satisfy the cram down requirements of section 1129(b). These control rights, which the Supreme Court states has value, is clearly being given to CD&R on account of its ostensibly cancelled Existing Equity Interests.

D. **The Plan Releases Should Not Be Approved.**

55. The Plan contains extremely broad releases of CD&R and other third party Released Parties that should not be approved by the Court. The Debtor Release and Third-Party

---

[35] *See Notice of Filing of Amended Plan Supplement*, at Ex. G(i) (definitions of "Collateral", "Guarantors" and "Loan Parties") [Docket No. 451] (the "Plan Supplement").

[36] *See Plan Supplement*, at Ex. H (Third Amended and Restated Limited Liability Company Agreement of Labels Buyer, LLC at § 3.1(a)).

Releases must comply with Third Circuit law which requires that releases be supported by consideration and be consensual.

56.     The primary release at issue – that of CD&R, the Holder of the Debtors' Existing Equity Interests – is not supported by the record as the Investigation Report has not been disclosed to the Court, let alone to any party who is being asked to consent to the Releases.  The burden is on the Debtors to prove CD&R should be released, and here, given the failure to produce or even summarize the Investigation Report, the Debtors cannot met this burden.  On that basis, alone, the CD&R Release should be denied.

57.     The only "evidence" that has been put forward by the Debtors – the Meltzer Declaration – is strictly limited to a short recitation of operative transaction facts and a short list of potential areas of investigation, i.e. did CD&R take out management fees.  Mr. Meltzer is very careful in his choice of words when he makes the conclusory statement that there are no claims worth pursuing against CD&R and that litigation would not be a better alternative to the RSA.[37] Mr. Meltzer acknowledges up front that there is no backup or support for his conclusions, because those are all contained in the secret Investigation Report. *Id.* at ¶ 20.  By keeping the legal analysis confidential, the Meltzer Report only tells half the story as to the investigation into potential causes of action and is wholly lacking in any discussion of the consideration the Plan itself says is being paid for the Releases by the Released Parties.

58.     It must also be noted that the Meltzer Declaration, while filed in support of the Plan, is not part of the Solicitation Materials submitted to creditors.  In fact, both the Meltzer Declaration and the Lee Declaration summarizing the Plan voting results were filed on the same day.  Therefore, creditors voted on the Plan, including the Releases, without any basis for doing

---

[37] Meltzer Declaration, ¶ 57.

so. The Debtors put the Releases at issue and should have produced the Investigation Report, but chose not to do so (and to resist producing it), and thus, they cannot prove by a preponderance of the evidence that the Releases are appropriate.

59.    The reluctance of the Debtors and the Independent Directors to share the Investigation Report comes as no surprise. As mentioned on numerous occasions by the Cross-Holder Ad Hoc Group, the two Independent Directors were chosen by the Board from a slate of two – as put forth by Kirkland. These directors frequently work with Kirkland and were being tasked with investigating a large Kirkland client. Notwithstanding these facts, the Committee and the creditors are supposed to take at face value that there is nothing to disclose about the breadth and scope of any investigation, no consideration is necessary (even though the Plan says it is being contributed), and the Releases are fully justified.

60.    The Debtors will undoubtedly portray the Third-Party Releases – by unimpaired creditors and creditors who do not expressly opt-out – as consensual and thus permissible. A close reading of the definition of Releasing Parties,[38] however, shows this to be a fallacy because, in most instances, consent of the Releasing Parties is implied – not express. With respect to Class 6 (General Unsecured Claims), for example, as they are deemed to accept, any

---

[38] "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each Holder of an ABL Facility Claim; (e) each Company Party; (f) the Plan Sponsor; (g) the Sponsor; (h) each Holder of a DIP Claim; (i) each Agent/Trustee; (j) each DIP Backstop Party; (k) each New Preferred Equity Investment Backstop Party (l) each New Term Loan Facility Lender (m) each New Noteholder; (n) each New ABL Facility Lender (o) all Holders of Claims or Interests that vote to accept this Plan and do not affirmatively opt out of the releases provided for in this Plan; (p) all Holders of Claims or Interests who are *deemed to accept this Plan and do not affirmatively opt out of the releases* provided for in this Plan; (q) all Holders **of** *Claims who abstain* from voting on this Plan *and who do not affirmatively opt out of the releases* provided for in this Plan; (r) all Holders of Claims or Interests who vote to reject this Plan and who do not affirmatively opt out of the releases provided for in this Plan; (s) all Holders of Claims or Interests who are deemed to reject this Plan and who do not affirmatively opt out of the releases provided for in this Plan; (t) each current and former Affiliate of each Entity in clause (a) through the following clause (u); and (u) each Related Party of each Entity in clause (a) through this clause (u); provided that each Holder of Claims or Interests that is party to the Restructuring Party if it timely objects to the releases contained in Article VIII.D hereof and such objection is not resolved before Confirmation. Plan at Art. I.A.200 (footnote omitted) (emphasis added).

unsecured creditor is deemed to have consented to the Releases.  The only way for an unsecured creditor to not be bound by the Releases is to opt-out of the Releases.

61.    In the context of the Plan, this structure effectuates a coerced nonconsensual release, requiring Class 6 General Unsecured Creditors, who otherwise would not need to participate in the Chapter 11 Cases because, in theory, they are unimpaired, to now have to take immediate, affirmative action to opt out of the Release, otherwise, they may be unwittingly releasing a whole litany of claims held against non-debtor Released Parties.

62.    Such Releases are not appropriately considered to be truly consensual.  Indeed, the practice of inferring consent to plan provisions from unresponsive creditors has been ruled impermissible by the Supreme Court and the subject of criticism in several recent decisions.[39]  In refusing to confirm the terms of a plan containing so-called consensual third-party releases subject to a negative notice opt-out process, the court in *Emerge Energy Services* dealt with the exact fact scenario that exists here – ***a requirement that creditors affirmatively opt-out of a release***.  The court discussed the issues in the context of basic contract principles, holding as follows:

> The Court must respectfully disagree with its colleagues who have held differently as it has concluded that a waiver cannot be discerned through a party's silence or inaction unless specific circumstances are present.  A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify.

2019 Bankr. LEXIS 3717, at *53-55 (emphasis added).  Similarly, here, the illusory "opt-out" provision renders the Plan Third-Party Releases non-consensual.  The Debtors must, therefore,

---

[39] As this Court is aware, non-consensual non-debtor releases are not authorized by the Bankruptcy Code.  *Harrington v. Purdue Pharma L.P.*, 219 L. Ed. 2d 721, 739-740 (2024).  *See also In re Emerge Energy Services LP.*, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. December 5, 2019); *see also In re SunEdison, Inc.*, 576 B.R. 453, 458-61 (Bankr. S.D.N.Y. 2017); *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del 1999).

provide a fulsome discussion of the factual basis supporting the proposed Release of each Released Party. In short, any consent given by a creditor to a Third-Party Release must be ***informed*** consent. Withholding the Investigation Report from creditors asked to opt-out of the Third-Party Releases deprives them of any factual or legal basis upon which to make that important decision.

63.      It is not the intent of the Committee to rehash arguments that have been argued enumerable time before this Court on releases. But basing the validity of broad releases on a top secret Investigation Report that no one – not even the Court – is allowed to see has a Star Chamber aura. The Bankruptcy Code mandates disclosure of what creditors are getting and what they are giving up. If the Debtors are so convinced of the righteousness of their Releases, they should be required to disclose the substance of the Investigation Report and prove up their case. But gratuitous releases of undisclosed causes of action based on a secret investigation for zero consideration cannot be permitted.

E.      **The Plan Was Not Proposed in Good Faith.**

64.      Section 1129(a)(3) requires that a plan be proposed in good faith in order to be confirmed. An overarching confirmation inquiry for the Court is whether the Plan represents a fair, reasonable and viable alternative to maximize recoveries for all creditors under all pertinent circumstances of these Chapter 11 cases, including (a) the valuations of the Debtors, (b) the extent of unencumbered and potentially unencumbered property and assets of the Debtors (including potential D&O and other litigation claims), the value of which should be shared by general unsecured creditors, and (c) the validity and extent of all applicable First Lien Lenders' and insiders' claims, liens and security interests, and whether such parties are subject to any potential Estate claims and causes of action.

65.     In evaluating whether a plan satisfies section 1129(a)(3)'s good faith requirement, "courts have considered a wide variety of factors, such as . . . whether the plan served only as a vehicle for the personal profit of the debtor's investors." *In re Weber*, 209 B.R. 793, 797 (Bankr. D. Mass. 1997). Indeed, courts have explained that "[a]n unwarranted and discriminatory treatment of insiders' claims that favors those claims over those of creditors may preclude a finding of good faith." *In re Chi. Invs., LLC*, 470 B.R. 32, 104 (Bankr. D. Mass. 2012); *see also In re Rusty Jones, Inc.*, 110 B.R. 362, 375 (Bankr. N.D. Ill. 1990) (plan lacked good faith when it served as "a vehicle for the personal profit" of the debtor's insiders); *In re Smithfield Estates, Inc.*, 52 B.R. 220, 223 (Bankr. D.R.I. 1985) (plan lacked good faith when plan gave "patently unfair" favorable treatment to insider).

66.     This Plan has not been proposed in good faith for the following reasons:

- The Debtors and CD&R pre-negotiated a plan that contemplates equity's retention of ownership and control without a market test in plain violation of *LaSalle*.

- The Debtors have intentionally put both the First Lien Deficiency Claims and Unsecured Note Claims in Class 5 so as to disenfranchise the Unsecured Noteholders.  Similarly, the Debtors are permitting insider CD&R to vote its Unsecured Notes Claims so as to further dilute the votes of the Unsecured Noteholders who are not Consenting Stakeholders under the RSA.

- The Plan violates *ConvergeOne* in the way the Debtors have ensured that all benefits of the Plan are only being allocated to the Consenting Stakeholders – CD&R and the First Lien Lenders.

- The Debtors have created the illusion of an independent investigation of CD&R and other insiders using "independent directors" routinely used by Debtors' counsel, who is currently representing CD&R in a multi-billion acquisition and several other significant matters.

- The Investigation Report is top secret, such that it cannot even be summarized for the Committee who is a fiduciary statutorily charged with conducting such investigations, and none of the information in the report – other than generic conclusions that "there's nothing to see here" is disclosed to creditors so that their alleged consent can be informed.

- Not one penny of consideration is being paid by any Released Party for the Releases.

- The Debtors moved to disband a statutory committee that might get in their way, thereby wasting valuable estate resources.

- The First Lien Lenders will receive more value under the Plan than they are entitled to under the Bankruptcy Code and applicable state law (including the Uniform Commercial Code), at the expense of unsecured creditors.

- Finally, the insider party gaining the most from the proposed Plan in the form of majority equity ownership is underpaying for the company and retaining all indicia of ownership, including majority control of the Board and the cancellation of Intercompany Claims for no consideration while maintaining Intercompany Interests.

67. In sum, the totality of the circumstances demonstrates the lack of good faith in the filing of the Plan. The chapter 11 process is not intended to unfairly benefit the debtor's secured lenders, equity holders and insiders, and it cannot deprive creditors of their due value, reallocate such value entitlements to the lenders or other favored stakeholders, and otherwise overpay favored parties.[40] The bottom line is that CD&R has manipulated the process, kept a majority of the value of the Reorganized Debtors to themselves and allocated just enough value to the First Lien Lenders to induce them to signed on to the RSA for a limited time to get the deal done. While the First Lien Lenders are entitled to whatever value is attributed to their collateral – in this case, it is not the First Lien Lenders who are ending up with ownership of the Reorganized Debtors – but rather, that is CD&R and it is CD&R who is pulling the strings for this impermissible and unconfirmable Plan.

---

[40] *See, e.g., In re Quigley Co., Inc.,* 437 B.R. 102 (Bankr. S.D.N.Y. 2010) (plan process benefitting certain preferred creditors to the detriment of others not proposed in good faith); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D. N.J. 2000) ("Of course, the classification and treatment of classes of claims is always subject to the good faith requirements under § 1129(a)(3)."); *In re Bashas' Inc.*, 437 B.R. 874, 909 (Bankr. D. Ariz. 2010) ("Good faith is an inherent requirement which runs throughout the entire Bankruptcy Code. Because the bankruptcy court is a court of equity, as well as a court of law, and because of the fluidity of bankruptcy proceedings, equity demands a constant balancing of the competing needs of the various constituencies. It is essential that bankruptcy proceedings be transparent, candid and always operate in that spirit.").

## F.       The Disclosure Statement Should Not Be Approved on a Final Basis.

68.       The Disclosure Statement in this case is woefully inadequate.[41] Notwithstanding the broad Releases being granted to a myriad of insiders and creditor constituencies, the Disclosure Statement contains nothing but generic conclusory language about consideration, consent, fairness and due process.  Yet absolutely none of this mandated factual information is actually contained in the Disclosure Statement.

69.       Nothing in the Disclosure Statement identifies the exact parties being released and any of their Related Parties.  Nothing in the Disclosure Statement identifies the alleged consideration being paid by the Released Parties – even though the Plan contains the conclusory statement that such consideration exists.  Nothing in the Disclosure Statement identifies the subject matter of any investigation being conducted by the allegedly independent Special Committee, the potential causes of action it looked into, the results of the investigation or any other information upon which any creditor could make an informed decision about the Releases or consent to them.[42]  And nothing in the Disclosure Statement explains how – without any of this information – any creditor had notice and the opportunity for a hearing.

---

[41] "Disclosure is the 'pivotal' concept in Chapter 11 reorganization." *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (*citing* 5 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1125.03 (15th ed. 1992)).  A disclosure statement is the primary source of information creditors and other parties in interest rely on in making informed decisions about a debtor's plan of reorganization. *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion)*, 844 F.2d 1142, 1157 (5th Cir. 1988).  Full disclosure is fundamental to the proper functioning of the bankruptcy process:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement
> by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation
> to provide sufficient data to satisfy the Code standard of "adequate information."

*Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir. 2013); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

[42] The Meltzer Declaration, submitted by one of the independent directors and a member of the Special Committee in support of the Plan, is ostensibly supposed to fill this gap – but it does not.  First of all, it was never sent to creditors as part of the Solicitation Materials and was filed after the votes were already submitted.  Second, as discussed above, the Meltzer Declaration contains a lot of background information, but is lacking in substantive analysis.  That information is what is contained in the top secret Investigation Report which creditors have paid for but cannot see.

70.     The only information in the Disclosure Statement is generic and conclusory.[43]  As discussed above, the entire basis for the Special Committee's conclusion to release CD&R under the Plan is the Investigation Report.[44]  Despite requests from the only official Committee in these cases, the Special Committee has refused to turn over the Investigation Report on the basis of attorney-client privilege.[45]  The Committee notes that voting creditors, who have actually paid for the Investigation Report given that the Special Committee's advisors are paid by the estate (no doubt having received well over seven figures), are being asked to trust the Special Committee comprised of friends of the Debtors' counsel, without the independent review of the official Committee.  The Committee has made every effort to accommodate the Special Committee and protect any privilege.  The Committee asked for a redacted version of the Investigation Report. That request was denied. The Committee asked for a summary of the Investigation Report.  That request was also denied.

71.     Thus, the allegedly consensual Releases, if approved by the Court, will have been approved with no disclosure, no informed consent, and no facts upon which this Court can make the requisite findings under Bankruptcy Rule 9019 for the approval of settlement.[46]

---

[43] *See* Disclosure Statement, Art. V.B.3.

[44] *See* Meltzer Declaration, ¶¶ 15, 20.

[45] While this Court has previously ruled that the Investigation Report is privileged, the ruling of the Court was based on a request for the report from a non-fiduciary adversary – the Cross-Holder Ad Hoc Group.  That ruling should not apply to the Committee.  The Committee is not only a fiduciary, it is also mandated by statute to investigate the Debtors and their insiders.  Section 1103(c)(2) states that "[a] committee appointed under section 1102 of this title may … *investigate the acts, conduct, assets, liabilities, and financial condition of the debtor*, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan."  11 U.S.C. § 1103(c)(2) (emphasis added).  One circuit court has held that the "may" in section 1103 is not merely permissive.  It creates a *duty* to undertake such investigative tasks.  *Advisory Comm. of Major Funding Corp. v. Sommers (In re Advisory Comm. of Major Funding Corp.)*, 109 F.3d 219, 224-25 (5th Cir. 1997).

[46] In the Third Circuit, bankruptcy settlement approval is governed by the *In re Martin*, 91 F.3d 389 (3d Cir. 1996) standard, which requires the court to determine if a settlement is "fair and equitable." Courts use the four-factor *Martin* test to assess the probability of success on the merits, collection difficulties, litigation complexity/expense, and the creditors' interests.  None of the information necessary for this Court to make these findings is contained in the Disclosure Statement.

72. Additionally, the Disclosure Statement contains materially misleading information in various respects. The Disclosure Statement misrepresents (overstates) the scope of the First Lien Lenders' liens and secured claims, erroneously allocating the value of Unencumbered Assets that rightfully belongs to all unsecured creditors to the First Lien Lenders. The true beneficiaries of the Unencumbered Assets should be Class 5 Junior Funded Debt Claims,[47] which if the Motion to Designate is successful, would only consist of the Unsecured Noteholders. Additionally, the Disclosure Statement understates the value of the Reorganized Debtors, which valuation flaw taints the Plan's structure and renders the Plan unconfirmable. Thus, the Disclosure Statement fails to take into account and address the numerous Plan objections discussed herein that render the Plan unconfirmable.

73. It must be noted that the Committee had not yet been appointed at the time the Disclosure Statement was preliminarily approved using an expedited procedure based on the alleged "prepackaged" nature of the Plan. However, use of the combined disclosure statement/plan approval procedures of section 105(d)(2)(B)(vi) of the Bankruptcy Code does not abrogate the requirement that a disclosure statement contain adequate information,[48] and the Debtors should not be permitted to proceed to confirmation based upon an inadequate disclosure statement.

74. Problematically, creditors' votes (including those of unsecured creditors in Class 5) were cast based on inaccurate and/or incomplete information, such as undisclosed findings contained in the secret Investigation Report upon which all the Releases are based. That this is

---

[47] The Class 6 General Unsecured Creditors are already unimpaired and the Committee has no issue with their Plan treatment.

[48] "Section 105(d)(2) lets this Court 'mix and match' the opportunities and timing for a debtor, creditors, and parties-in-interest, to file plans and disclosure statements, and solicit acceptances of such plans. It is an omnibus provision with which the Court can customize Chapter 11 preconfirmation procedures, *as long as those procedures are not inconsistent with other provisions of the Code*. Thus, the Court is authorized to use Section 105(d)(2) options as long as they don't conflict with Sections 1121 and 1125." *In re Aspen Limousine Serv.*, 187 B.R. 989, 995 (Bankr. D. Col. 1995) (emphasis added).

alleged to be a prepackaged bankruptcy case does not give the Debtors license to sidestep the requirement that creditors are entitled to correct and adequate information when they vote on a chapter 11 plan. *See In re Congoleum Corp.*, 426 F.3d 675, 691 (3d Cir. 2005) ("We do not approve of a bankruptcy court applying less than careful scrutiny to pre-petition procedures in pre-packaged plans."). The defective Disclosure Statement, with materially inaccurate or missing information and flawed solicitation process, mandates rejection of the Plan.[49]  All of the foregoing reasons and circumstances justify the Court denying final approval of the Disclosure Statement and confirmation of the Plan.

## V.  RESERVATION OF RIGHTS

75.  The Committee reserves its right in all respects to supplement this Objection at or prior to the hearing to consider confirmation of the Plan.

## VI.  CONCLUSION

**WHEREFORE**, the Committee requests that the Court deny final approval of the Disclosure Statement, deny confirmation of the Plan, and grant such other and further relief as is appropriate and just.

---

[49] The disclosure statement requirement of section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system" and, consequently, "the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d at 362 (citing *In re Oneida Motor Freight, Inc.)*, 848 F.2d at 417-18). In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).

Dated:  April 9, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Bradford J. Sandler*

Bradford J. Sandler (NJ Bar No. 009521996)
Robert J. Feinstein (admitted *pro hac vice*)
Judith Elkin (admitted *pro hac vice*)
Shirley S. Cho (*pro hac vice* pending)
PACHULSKI STANG ZIEHL & JONES LLP
1700 Broadway, 36th Floor
New York, NY 10019
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
bsandler@pszjlaw.com
rfeinstein@pszjlaw.com
jelkin@pszjlaw.com
scho@pszjlaw.com

*Proposed Counsel for the Official Committee of
Unsecured Creditors*